# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Dreamland Baby Co.,

Plaintiff,

v.

U.S. Consumer Product Safety Commission,
*et al.*,

Defendants.

Case No. 1:24-cv-03277-RC

### Defendants' Corrected Memorandum in Support of their Motion to Dismiss

BRETT A. SHUMATE
Acting Assistant Attorney General

MICHAEL D. GRANSTON
Deputy Assistant Attorney General

AMANDA N. LISKAMM
Director

LISA K. HSIAO
Senior Deputy Director

HILARY K. PERKINS
Assistant Director

ISAAC C. BELFER (D.C. BAR NO. 1014909)
DAVID H. HIXSON (ILL. BAR NO. 6289751)
Trial Attorneys
Consumer Protection Branch
Civil Division
U.S. Department of Justice
P.O. Box 386
Washington, DC 20044-0386
(202) 305-7134 (Belfer)
(202) 449-8070 (Hixson)
(202) 514-8742 (fax)
Isaac.C.Belfer@usdoj.gov
David.H.Hixson@usdoj.gov

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND .................................................................................................................. 2

I.     Statutory and Regulatory Background ........................................................... 2

    A.   CPSC's Mission to Protect the Public ..................................................... 2

    B.   CPSC's Process for Publicly Disclosing Information About Consumer
        Products and Retracting Such Information ................................................ 4

II.    Factual and Procedural Background ................................................................. 6

    A.   Statements on the CPSC Website and by Commissioner Trumka ............ 6

    B.   Dreamland's Retraction Requests ............................................................. 9

LEGAL STANDARD ......................................................................................................... 11

ARGUMENT .................................................................................................................... 12

I.     Count I Fails to State a Claim Because the CPSC Statement and Deadlocked
       Vote on Retracting Commissioner Trumka's Statements Were Not Final Agency
       Action, and the Complaint Does Not Plausibly Allege that CPSC Acted in
       Excess of Statutory Authority ....................................................................... 12

    A.   Neither the Challenged CPSC Statement Nor the Deadlocked Vote on Retracting
        Commissioner Trumka's Statements Was Final Agency Action ................ 13

       1. The CPSC Statement Was Neither Agency Action Nor Final Agency Action ........... 13

       2. The Deadlocked Vote on Commissioner Trumka's Statements Was Neither
          Agency Action Nor Final Agency Action ......................................... 20

    B.   Count I Fails in its Entirety Because Dreamland Does Not Plausibly Allege that
        CPSC Exceeded its Statutory Authority ................................................... 21

II.    Count II Fails to State a Claim Because the Complaint Does Not Plausibly
       Allege that the Challenged Statements by NIH or CDC Were *Ultra Vires* ................ 24

III.   Count III Fails to State a Claim Because the Complaint Does Not Plausibly
       Allege that Commissioner Trumka's Challenged Statements Were *Ultra Vires* ......... 28

IV.   Count IV Fails to State a Claim Because the CPSC Statement and the Deadlocked
       Vote on Retracting Commissioner Trumka's Statements Were Not Final Agency
       Action, and the Complaint Does Not Plausibly Allege that CPSC Acted
       Arbitrarily or Capriciously .......................................................................... 31

V.    Count V Fails to State a Claim Because the CPSC Statement and Deadlocked
       Vote on Retracting Commissioner Trumka's Statements Were Not Final Agency
       Action, and the Complaint Does Not Plausibly Allege that CPSC Failed to
       Observe Procedures Required by Law ......................................................... 35

VI.   The Court Lacks Subject-Matter Jurisdiction over Count VI, and Count VI also
       Fails to State a Claim, Because Dreamland's Due Process Allegations Are
       Speculative ................................................................................................... 37

i

VII.    Count VII Fails to State a Claim Because the Removal Protection for CPSC
Commissioners Does Not Violate the Separation of Powers, and the Complaint
Fails to Show Harm to Dreamland from the Removal Protection ............................... 40

CONCLUSION...................................................................................................................... 42

# TABLE OF AUTHORITIES

**Cases**

*Adams v. U.S. Capitol Police Bd.*,
   564 F. Supp. 2d 37 (D.D.C. 2008) ........................................................................ 11

*Aerosource, Inc. v. Slater*,
   142 F.3d 572 (3d Cir. 1998) ................................................................................. 17

*Apter v. Dep't of Health & Hum. Servs.*,
   80 F.4th 579 (5th Cir. 2023) ................................................................... 14, 15, 17

*Arch Coal, Inc. v. Acosta*,
   888 F.3d 493 (D.C. Cir. 2018) ............................................................................. 17

*Arpaio v. Obama*,
   797 F.3d 11 (D.C. Cir. 2015) ............................................................................... 11

*Arrow Reliance, Inc. v Califf*,
   No. 2:22-cv-1057, 2022 WL 18027595 (W.D. Wash. Dec. 30, 2022) .................. 18

*\*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ..................................................................................... 12, 23

*Barr v. Matteo*,
   360 U.S. 564 (1959) ............................................................................................ 22

*\*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ..................................................................................... 39, 40

*Bennett v. Spear*,
   520 U.S. 154 (1997) ..................................................................................... 16, 18

*Blue v. District of Columbia*,
   811 F.3d 14 (D.C. Cir. 2015) ............................................................................... 12

*Cannon v. District of Columbia*,
   717 F.3d 200 (D.C. Cir. 2013) ............................................................................... 7

*\*Changji Esquel Textile Co. v. Raimondo*,
   40 F.4th 716 (D.C. Cir. 2022) ....................................................................... 24, 25

*\*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) ............................................................................................ 38

*Cleantech Innovations, Inc. v. NASDAQ Stock Mkt., LLC*,
   No. 11 CIV. 9358 KBF, 2012 WL 345902 (S.D.N.Y. Jan. 31, 2012) .................... 39

*\*Collins v. Yellen*,
   594 U.S. 220 (2021) ..................................................................................... 41, 42

*Consumers' Rsch. v. CPSC*,
   91 F.4th 342 (5th Cir. 2024) ............................................................................... 41

*CPSC v. GTE Sylvania, Inc.*,
  447 U.S. 102 (1980) .................................................................................................... 21

*DaimlerChrysler Corp. v. Cuno*,
  547 U.S. 332 (2006) ............................................................................................... 11, 37

*Danara Int'l, Ltd. v. CPSC*,
  549 F. Supp. 367 (D.N.J. 1982) ........................................................................... 23, 32

*Davis v. Fed. Election Comm'n*,
  554 U.S. 724 (2008) .................................................................................................... 11

*Del. Valley Reg'l Ctr., LLC v. U.S. Dep't of Homeland Sec.*,
  106 F.4th 1195 (D.C. Cir. 2024) ............................................................................... 31

*Doe v. Pub. Citizen*,
  749 F.3d 246 (4th Cir. 2014) ..................................................................................... 19

*Doe v. Tenenbaum*,
  127 F. Supp. 3d 426 (D. Md. 2012) ..................................................................... 19, 20

*El-Shifa Pharm. Indus. Co. v. United States*,
  No. 01-cv-731 (RWR), 2007 WL 950082 (D.D.C. Mar. 28, 2007) ........................ 14

*Farah v. Esquire Mag.*,
  736 F.3d 528 (D.C. Cir. 2013) ..................................................................................... 6

*\*Fed. Express Corp. v. U.S. Dep't of Com.*,
  39 F.4th 756 (D.C. Cir. 2022) .............................................................. 24, 25, 27, 28, 31

*Flue-Cured Tobacco Coop. v. EPA*,
  313 F.3d 852 (4th Cir. 2002) ............................................................................... 16, 19

*Free Enter. Fund v. PCAOB*,
  561 U.S. 477 (2010) .................................................................................................... 40

*FTC v. Standard Oil Co. of Cal.*,
  449 U.S. 232 (1980) .................................................................................................... 17

*Hearst Radio, Inc. v. FCC*,
  167 F.2d 225 (D.C. Cir. 1948) ................................................................................... 14

*Hishon v. King & Spalding*,
  467 U.S. 69 (1984) ...................................................................................................... 12

*Holistic Candlers & Consumers Ass'n v. FDA*,
  664 F.3d 940 (D.C. Cir. 2012) ....................................................................... 13, 16, 18

*\*Humphrey's Executor v. United States*,
  295 U.S. 602 (1935) .................................................................................................... 40

*Indep. Equip. Dealers Ass'n v. EPA*,
  372 F.3d 420 (D.C. Cir. 2004) ................................................................................... 19

*\*Indus. Safety Equip. Ass'n, Inc. v. EPA*,
  837 F.2d 1115 (D.C. Cir. 1988) ..................................................................... 14, 15, 16

*Invention Submission Corp. v. Rogan,*
    357 F.3d 452 (4th Cir. 2004) ............................................................................... 16, 19

*Jake's Fireworks Inc. v. CPSC,*
    105 F.4th 627 (4th Cir. 2024) ............................................................................... 17, 18

*Jarkesy v. SEC,*
    803 F.3d 9 (D.C. Cir. 2015) .................................................................................. 39

*Joshi v. Nat'l Transp. Safety Bd.,*
    791 F.3d 8 (D.C. Cir. 2015) .................................................................................. 16, 18, 20

*Leachco, Inc. v. CPSC,*
    103 F.4th 748 (10th Cir. 2024) ............................................................................. 40, 41

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) .............................................................................................. 11, 37, 38

*Lujan v. Nat'l Wildlife Fed'n,*
    497 U.S. 871 (1990) .............................................................................................. 16

*Metro. Council of N.A.A.C.P. Branches v. FCC,*
    46 F.3d 1154 (D.C. Cir. 1995) .............................................................................. 39, 40

*Morrison v. Olson,*
    487 U.S. 654 (1988) .............................................................................................. 40

*Neitzke v. Williams,*
    490 U.S. 319 (1989) .............................................................................................. 12, 39

*Prohibition Juice Co. v. FDA,*
    45 F.4th 8 (D.C. Cir. 2022) ................................................................................... 36, 37

*Pub. Citizen, Inc. v. FERC,*
    839 F.3d 1165 (D.C. Cir. 2016) ............................................................................ 20

*Reliable Automatic Sprinkler Co. v. CPSC,*
    324 F.3d 726 (D.C. Cir. 2003) .............................................................................. 17, 18

*Seila Law LLC v. CFPB,*
    591 U.S. 197 (2020) .............................................................................................. 40, 41

*Shurtleff v. City of Boston,*
    596 U.S. 243 (2022) .............................................................................................. 22

*Sobin v. District of Columbia,*
    No. 19-CV-02580 (ABJ), 2020 WL 4732098 (D.D.C. Aug. 14, 2020) ................ 6

*Soundboard Ass'n v. FTC,*
    888 F.3d 1261 (D.C. Cir. 2018) ............................................................................ 16

*Sprint Nextel Corp. v. FCC,*
    508 F.3d 1129 (D.C. Cir. 2007) ............................................................................ 20

*Tex. Low Income Hous. Info. Serv. v. Carson,*
    427 F. Supp. 3d 43 (D.D.C. 2019) ........................................................................ 11, 38

*Thunder Basin Coal Co. v. Reich*,
   510 U.S. 200 (1994) ........................................................................ 38, 39

*Trudeau v. FTC*,
   456 F.3d 178 (D.C. Cir. 2006) ................................................................ 14

*U.S. Postal Serv. v. Gregory*,
   534 U.S. 1 (2001) ......................................................................... 33, 40

*United States v. Morgan*,
   313 U.S. 409 (1941) ......................................................................... 40

*United States v. SunSetter Prods. LP*,
   No. 23-CV-10744-ADB, 2024 WL 1116062 (D. Mass. Mar. 14, 2024) ................................. 41

**Statutes**

5 U.S.C. §
   551 .............................................................................................. 13
   551(4) ......................................................................................... 15
   551(13) .................................................................................... 13, 16
   704 ............................................................................................. 13
   706 ............................................................................................. 36
   706(2)(A) ................................................................................ 28, 31
   706(2)(B) ..................................................................................... 12
   706(2)(C) ................................................................................. 24, 28
   706(2)(D) ................................................................................. 28, 35

15 U.S.C. §
   1261 ............................................................................................. 3
   1261(q)(1)(A) .................................................................................. 3
   1261(q)(1)(B) .................................................................................. 3
   2051 ............................................................................................. 3
   2051(b) ......................................................................................... 2
   2051(b)(1) ..................................................................................... 21
   2051(b)(2) ..................................................................................... 21
   2052(a)(5) ..................................................................................... 22
   2053 ......................................................................................... 2, 21
   2053(a) ..................................................................................... 2, 41
   2053(b)(1) ..................................................................................... 41
   2053(c) ......................................................................................... 41
   2054(a)(1) ..................................................................................... 21
   2055(a) ......................................................................................... 19
   2055(b) ..................................................................................... 19, 28
   2055(b)(1) ..................................................................... 5, 29, 30, 31
   *2055(b)(6) .............................................................................. passim
   2055(b)(7) .............................................................................. 5, 6, 9, 23
   2055(d)(2) ...................................................................................... 4
   2055a(a)(1) ..................................................................................... 4
   2055a(b)(1) ..................................................................................... 4

2055a(b)(1)(A) ....................................................................................................... 19
2055a(c) ................................................................................................................. 19
2055a(f)(1) ............................................................................................................. 19
2056 ....................................................................................................................... 18
2056(a) ..................................................................................................................... 3
2057 ..................................................................................................... 18, 22, 32
2058 ........................................................................................................... 18, 32
2058(e) ................................................................................................................... 22
2058(f) ........................................................................................................... 22, 34
2060 ............................................................................................................... 38, 39
2064 ......................................................................................................................... 3
2079(a) ..................................................................................................................... 3

42 U.S.C. §
241(a) .................................................................................................................... 26
241(a)(1) ........................................................................................................ 26, 27
300c-11(a) ...................................................................................................... 25, 26
300c-13(a)(2) ................................................................................................. 25, 26
300u-3(1) ........................................................................................................ 25, 26

**Rules**

Fed. R. Civ. P. 12(b)(1) ......................................................................................... 11

Fed. R. Civ. P. 12(b)(6) ................................................................................... 11, 12

**Regulations**

16 C.F.R. §

1000.2 ....................................................................................................................... 3

1101.1 .................................................................................................................... 5, 6

1101.1(c) ...................................................................................................... 4, 32, 36

1101.2(c) ................................................................................................................. 10

1101.11(a)(1) ......................................................................................................... 29

1101.11(a)(3) ......................................................................................................... 30

1101.11(a)(4) ......................................................................................................... 29

1101.13 ................................................................................................................ 5, 30

1101.51 ..................................................................................................................... 6

1101.52 ................................................................................................................ 6, 23

1101.52(a) ................................................................................................................. 6

1101.52(b) ................................................................................................................. 6

1101.52(c) ................................................................................................................. 6

1101.52(d) ................................................................................................................. 6

1101.52(e) .................................................................................................... 6

**Other Authorities**

*U.S. Const., amend. V ............................................................................... 37, 39

Information Disclosure Under Section 6(b) of the Consumer Product Safety Act,
    48 Fed. Reg. 57406 (Dec. 29, 1983) ................................................... 5, 30

## INTRODUCTION

The U.S. Consumer Product Safety Commission ("CPSC" or "Commission") provides a variety of safety education resources to help protect the public against unreasonable risks of injury from consumer products. Among these resources is a CPSC webpage concerning infant sleep products, which offers best practices that caregivers can follow to ensure that infants sleep safely and avoid unnecessary risks. One best practice warns not to use weighted blankets or weighted swaddles. In making this statement, CPSC cited to similar recommendations made by the Centers for Disease Control and Prevention ("CDC") and the National Institutes of Health ("NIH"). After CPSC added the safety advice to its website, one of its Commissioners, Richard Trumka, made additional public statements and sent letters to certain retailers expressing his view that weighted infant sleep products are unsafe.

Plaintiff Dreamland Baby Co. sells weighted infant sleep products and alleges that CPSC's and Commissioner Trumka's statements have damaged its business. Dreamland asserts several claims against CPSC and Commissioner Trumka and a single Count against the Department of Health and Human Services ("HHS"), CDC, and NIH. Each of these claims is legally deficient and should be dismissed.

Counts I, IV, and V assert Administrative Procedure Act ("APA") claims against CPSC, challenging CPSC's statement about weighted infant sleep products, the Commission's denial of Dreamland's request to retract that statement, and the Commission's deadlocked vote on whether to retract Commissioner Trumka's statements. However, CPSC's statement and the Commission's deadlocked vote on whether to retract Commissioner Trumka's statements were not final agency action—they did not mark the consummation of the agency's decision-making process or have any legal consequences—and thus Dreamland fails to state an APA claim. Additionally, all of Dreamland's APA claims fail because CPSC plainly has the authority to issue

non-binding safety recommendations to the public, and Dreamland's conclusory and unsupported allegations are insufficient to establish that CPSC acted in excess of statutory authority, acted arbitrarily or capriciously, or failed to observe required procedures.

Count II is asserted against HHS and its subagencies CDC and NIH, and it alleges that safety recommendations by CDC and NIH are *ultra vires*. Dreamland fails to state a claim, however, because CDC and NIH have clear statutory authority to make safety recommendations to the public. Count III claims that Commissioner Trumka's statements are *ultra vires*, but Commissioner Trumka had authority to make his statements because they repeated CPSC's lawful statement and did not run afoul of statutory requirements that apply when agency statements identify individual companies.

Count VI alleges that Commissioner Trumka's statements violate the Fifth Amendment's Due Process Clause. But Dreamland lacks standing to assert this claim, and also fails to state a plausible claim for relief, because it offers only speculation about Commissioner Trumka's alleged bias or any future injury that Dreamland might suffer. Finally, Count VII alleges that the for-cause removal protection for CPSC Commissioners violates the separation of powers. This Count fails to state a claim for relief because it is foreclosed by Supreme Court precedent, and Dreamland also fails to show any harm to itself from the removal protection.

Because each of Dreamland's claims is legally deficient, the Complaint should be dismissed in its entirety.

**BACKGROUND**

## I.    Statutory and Regulatory Background

### A.    CPSC's Mission to Protect the Public

CPSC is an independent agency created by Congress in 1972 to protect the public against unreasonable risks of injury from consumer products. *See* 15 U.S.C. §§ 2051(b), 2053. The

Commission is composed of up to five Commissioners who are appointed by the President with the advice and consent of the Senate. *Id.* § 2053(a).

CPSC administers several statutes, including the Consumer Product Safety Act ("CPSA"), 15 U.S.C. § 2051 *et seq.*, and the Federal Hazardous Substances Act ("FHSA"), 15 U.S.C. § 1261 *et seq.*; *see* 15 U.S.C. § 2079(a); 16 C.F.R. § 1000.2. These statutes authorize CPSC to take a variety of actions to protect the public against unsafe consumer products. For example, under the CPSA, CPSC "may promulgate consumer product safety standards" imposing "performance requirements" or requirements for "warnings or instructions" on consumer products. 15 U.S.C. § 2056(a). If the agency determines that a product presents a substantial product hazard, it may order a manufacturer, distributor, or retailer to provide notice of the hazard and take remedial actions, such as recalling the product. *See id.* § 2064. Under the FHSA, a toy or other article intended for use by children which is a hazardous substance, or bears or contains a hazardous substance, is banned by operation of law; the agency may also ban certain dangerous hazardous substances. *Id.* § 1261(q)(1)(A)–(B). None of these actions is challenged here.

At issue here is another important way that CPSC protects the public: providing information about consumer products. Providing such information is authorized by statute and CPSC's authority to communicate with the public. *See infra* pp. 21–23. CPSC's website provides information about a wide variety of consumer products, such as through its "Safety Education," "Recalls & Product Safety Warnings," and "Safety Alerts" pages and its "Community Outreach Resource Center."[1] Moreover, Congress directed CPSC to maintain a publicly searchable online

---

[1] CPSC, *Safety Education,* https://www.cpsc.gov/Safety-Education (last visited Jan. 28, 2025); CPSC, *Recalls & Product Safety Warnings*, https://www.cpsc.gov/Recalls (last visited Jan. 28,

product safety database containing "[r]eports of harm relating to the use of consumer products."

15 U.S.C. § 2055a(a)(1), (b)(1); *see* https://www.saferproducts.gov/.

### B. CPSC's Process for Publicly Disclosing Information About Consumer Products and Retracting Such Information

The CPSA and CPSC's regulations and policies prescribe procedures and requirements

before CPSC may publicly disclose certain information about consumer products. They also

provide for retraction when CPSC determines that it has publicly disclosed inaccurate or

misleading information that reflects adversely on the safety of a consumer product or the

practices of a manufacturer. These procedures generally apply "whenever information is to be

disclosed by the Commission, any member of the Commission, or any employee, agent, or

representative of the Commission in an official capacity." 15 U.S.C. § 2055(d)(2).

When CPSC "initiates the public disclosure of information that reflects on the safety of a

consumer product or class of consumer products, … the Commission shall establish procedures

designed to ensure that such information is accurate and not misleading." *Id.* § 2055(b)(6). CPSC

has established such procedures in its Directive 1450.2, which is titled "Clearance Procedures for

Providing Information to the Public" and is attached to the Complaint as Exhibit 4. *See* 16 C.F.R.

§ 1101.1(c); ECF No. 1 ("Compl.") ¶ 147. Appendix B to Directive 1450.2 provides the

Commission's policy on linking to other websites, and states that "CPSC can crosslink to content

on federal and state government websites and Social Media Sites, provided that the content

complements safety information issued by the agency and is related to the agency's mission." Ex.

---

2025); CPSC, *Safety Alerts*, https://www.cpsc.gov/Safety-Education/Safety-Alerts (last visited Jan. 28, 2025); CPSC, *Community Outreach Resource Center*, https://www.cpsc.gov/Safety-Education/Community-Outreach-Resource-Center (last visited Jan. 28, 2025).

5 at 2[2] (Commission Policy on Linking to Nongovernment Websites, Appendix B to Directive 1450.2).

Under the CPSA, the agency must follow certain requirements before disclosing manufacturer-specific information. If "the manner in which [a] consumer product is to be designated or described in [the disclosed] information will permit the public to ascertain readily the identity of [the] manufacturer," then the agency must give the manufacturer advance notice and the opportunity to comment on the disclosure. 15 U.S.C. § 2055(b)(1); *see* 16 C.F.R. § 1101.1. CPSC has interpreted this requirement to "apply only when a reasonable person receiving the information in the form in which it is to be disclosed and lacking specialized expertise can readily ascertain from the information itself the identity of the manufacturer." 16 C.F.R. § 1101.13 (further explaining that CPSC will follow the requirements "if there is a question whether the public could readily ascertain the identity of a manufacturer or private labeler"). The preamble to the final rule explained that, in applying this regulation, CPSC "staff will not … customarily perform research or look beyond the face of the document to determine whether the identity of a manufacturer can be ascertained." Information Disclosure Under Section 6(b) of the Consumer Product Safety Act, 48 Fed. Reg. 57406, 57409 (Dec. 29, 1983).

The CPSA and CPSC regulations also prescribe procedures for retracting inaccurate or misleading information. Under the statute, CPSC's obligation to retract information is triggered when the agency "finds that, in the administration of this Act, it has made public disclosure of inaccurate or misleading information which reflects adversely upon the safety of any consumer product or class of consumer products, or the practices of any manufacturer … of consumer products." 15 U.S.C. § 2055(b)(7). When it makes such a finding, the agency "shall, in a manner

---

[2] Citations to "Ex." refer to exhibits to the Complaint.

equivalent to that in which such disclosure was made, take reasonable steps to publish a retraction of such inaccurate or misleading information." *Id.*; *see* 16 C.F.R. §§ 1101.1, 1101.51–1101.52.

Under CPSC regulations, retractions can be initiated by the agency or upon the request of a manufacturer or any other person. 16 C.F.R. § 1101.52(a). Retraction requests "must be in writing" and must include the information specified in the regulation "to the extent it is reasonably available." *Id.* § 1101.52(b)–(c). The Commission "will act expeditiously on any request for retraction within 30 working days unless the Commission determines, for good cause, that a longer time period is appropriate." *Id.* § 1101.52(d). If the Commission finds retraction is warranted under the statute and regulations, it "will publish a retraction of information in a manner equivalent to that in which the disclosure was made." *Id.* If it "finds that fuller disclosure is necessary, it will publish a retraction in the manner it determines appropriate under the circumstances." *Id.* The Commission will also "promptly notify the requester in writing of its decision on [a] request for retraction" and provide "the reasons for the Commission's decision." *Id.* § 1101.52(e).

## II.   Factual and Procedural Background

### A.  Statements on the CPSC Website and by Commissioner Trumka

CPSC provides many "Safety Education Resources" on its website. *See* CPSC, *Safety Education*, https://www.cpsc.gov/Safety-Education (last visited Jan. 28, 2025).[3] One of these

---

[3] The Court may consider this website in deciding Defendants' motion to dismiss. "[I]n determining whether a complaint states a claim, the court may consider the facts alleged in the complaint, documents attached thereto or incorporated therein, and matters of which it may take judicial notice." *Farah v. Esquire Mag.*, 736 F.3d 528, 534 (D.C. Cir. 2013) (quotations omitted). The Court may "take judicial notice of information posted on official public websites of government agencies." *Sobin v. District of Columbia*, No. 19-CV-02580 (ABJ), 2020 WL

resources is a webpage discussing "Infant Sleep," which includes several best practices "to make every sleep a safe sleep." CPSC, *Safe Sleep – Cribs and Infant Products*, https://www.cpsc.gov/ SafeSleep (last visited Jan. 28, 2025) (cited at Compl. ¶ 77). These best practices include, "Don't use weighted blankets or weighted swaddles." *Id.* This statement is supported by citations to the NIH and CDC websites. *Id.*[4]

At a Commission meeting on November 8, 2023, to consider the agency's Fiscal Year 2024 Operating Plan, Commissioner Trumka introduced an amendment that would, among other things, have required agency staff to "pursue a mandatory standard to address foreseeable risks" posed by weighted infant sleep products. CPSC, *Minutes of Commission Meeting*, at 13 (Nov. 8, 2023).[5] The amendment would also have required CPSC to "update all safe sleep messaging and guidance to incorporate recent advice on weighted infant products from the [CDC] and from the [NIH]." *Id.* The Commission voted 3-1 not to adopt the amendment. *Id.* at 2; *see* Compl. ¶¶ 67– 69.[6]

---

4732098, at *221 n.8 (D.D.C. Aug. 14, 2020) (citing *Cannon v. District of Columbia*, 717 F.3d 200, 205 n.2 (D.C. Cir. 2013)).

[4] This statement was originally followed by an asterisk footnote with the following text: "NIH.gov and CDC.gov." Compl. ¶ 77. As discussed below, the text in the asterisk footnote was later changed to the following: "This guidance is based on information from the Centers for Disease Control and the National Institutes for Health. Please go to CDC.gov and NIH.gov for more information." *Id.*; *see infra* p. 10.

[5] https://www.cpsc.gov/s3fs-public/Comm-Mtg-Min-FY-2024-Operating-Plan-Decisional. pdf?VersionId=GDwWSUy29P7SN9MpqVVWdX5Nn9xe36Vm (cited at Compl. ¶ 67).

[6] Then-Chair Hoehn-Saric stated that Commissioner Trumka's amendment was unnecessary to the extent it called for updating CPSC's safe sleep guidance, since CPSC already planned to update its safe sleep guidance to incorporate advice from CDC and NIH. *See* CPSC, *Commission Meeting FY24 Operating Plan Decisional*, at 19:59–20:26 (Nov. 9, 2023), https://www. youtube.com/watch?v=LHemQpZZBN0&list=PLPbI8bR243fHmCYA1a7pZ4l4wzhYjla_V&ind ex=7 (cited at Compl. ¶¶ 70–71, 74, 76).

Commissioner Trumka then issued a statement expressing his concern with weighted infant sleep products and criticizing the Commission's rejection of his amendment. Statement of Commissioner Richard Trumka, *CPSC Operating Plan Fails to Address Glaring Safety Concerns: Commissioner Trumka Forced to Vote "No*" (Nov. 8, 2023).[7] He later made several other public statements expressing his view that weighted infant sleep products are unsafe and advising consumers not to use them and retailers not to sell them. Compl. ¶¶ 87–91. Certain of these statements referenced a Washington Post article that mentioned Dreamland and its products. *Id.* ¶ 88.

Commissioner Trumka also sent letters to several retailers advising them that weighted infant sleep products are unsafe and asking them to stop selling those products. *Id.* ¶¶ 92–96. The letters did not purport to require retailers to take any action and did not indicate that there was any mandatory product standard regarding such products. Instead, they asked, "Considering these serious safety concerns, I would like to speak with a representative of your company to discuss a simple question: does [the company] really want to continue selling these products to its consumers?" Statement of Commissioner Richard Trumka, *Target, Walmart, Nordstrom, and Babylist Commit to Stop Selling Weighted Infant Products* (Apr. 26, 2024), attaching letters from Commissioner Trumka to Retailers.[8]

---

[7] https://www.cpsc.gov/About-CPSC/Commissioner/Richard-Trumka/Statement/CPSC-Operating-Plan-Fails-to-Address-Glaring-Safety-Concerns-Commissioner-Trumka-Forced-to-Vote-%E2%80%9CNo%E2%80%9D (cited at Compl. ¶ 72).

[8] https://www.cpsc.gov/s3fs-public/Trumka_Statement_Weighted_Infant_Products_4_26_24_with_attachments.pdf?VersionId=iK5EDmatuGu9_z2jKt8t8BaWndFKwWCh (cited at Compl. ¶ 93).

### B.  Dreamland's Retraction Requests

On July 23, 2024, Dreamland requested that CPSC retract the statement on the agency's website and Commissioner Trumka's statements about weighted infant sleep products. Ex. 1. Dreamland argued that those statements are "inaccurate or misleading" and "reflect[] adversely upon the safety of Dreamland's weighted sleep swaddles and blankets and the class of infant weighted sleep swaddles and blankets in general." *Id.* at 1 (quotations omitted).

On August 30, 2024, the agency notified Dreamland of the results of the Commission's consideration of the retraction request. Ex. 2. The agency explained that it acted separately regarding the statement on the agency's website and Commissioner Trumka's statements because Commissioner Trumka voluntarily recused himself from the Commission's consideration of his own statements. *Id.*

The Commission "voted 3-0-2" (i.e., 3 votes in favor and 2 abstentions) to "take other action" on the CPSC statement—to deny retraction and issue a letter explaining why "a retraction is not warranted." *Id.*; Ex. 3 at 2.[9] That letter stated that "the Commission has determined that the CPSC Statement is not barred by" 15 U.S.C. § 2055(b)(7), which "allows the CPSC to reference complementary information on other federal websites as long as such information is accurate and not misleading." Ex. 3 at 3. The letter further explained that, "[i]n adding the CPSC Statement to the CPSC website, Commission staff cleared it for public disclosure pursuant to its internal agency clearance process, found in Directive 1450.2," and that "Commission regulations make clear that … this process is designed to comply with the mandate

---

[9] Exhibit 3 does not have numbered pages, so the citations to this document will cite the page numbers generated by PACER.

in [15 U.S.C. § 2055(b)(6)] to establish 'procedures designed to ensure that … information is accurate and not misleading.'" *Id.* (omission in original) (citing 16 C.F.R. § 1101.2(c)).

The letter also rejected Dreamland's objection to the citations on the CPSC website to the NIH and CDC websites. It explained that "consideration of and crosslinking to other agencies' guidance is consistent with the CPSC's Linking Out Policy, which explains that CPSC can 'crosslink to content on federal and state government websites and Social Media Sites, provided that the content complements safety information issued by the agency and is related to the agency's mission.'" *Id.* at 3–4 (citing Directive 1450.2, Appendix B). The letter stated that "[t]o provide further context for the crosslinks to content from NIH and CDC in the CPSC Statement, the Commission has made a slight modification to the references in the asterisk." *Id.* at 4. Specifically, the Commission changed the asterisk footnote from "NIH.gov and CDC.gov" to the following: "This guidance is based on information from the Centers for Disease Control and the National Institutes for Health. Please go to CDC.gov and NIH.gov for more information." Compl. ¶ 77. The CDC and NIH websites advise the public that weighted infant sleep products are unsafe. *Id.* ¶¶ 78–79.

The letter explained that NIH and CDC provided their guidance on weighted infant sleep products "as part of the Safe to Sleep® campaign, a collaboration between federal health agencies [including CPSC, NIH, and CDC], the American Academy of Pediatrics [("AAP")], and other outside organizations, that has been in place for more than 30 years." Ex. 3 at 4. "According to an NIH timeline of the campaign," the letter observed, "the campaign's safe sleep guidance has reflected the recommendations of the AAP Task Force on SIDS since 2000," and "[t]his reliance on AAP is made clear on the NIH website describing the Safe to Sleep® collaborators and partners." *Id.* (citing Safe to Sleep, *Campaign History*, https://safetosleep.nichd.nih.gov/

campaign/history; Safe to Sleep, *Collaborators and Partners*, https://safetosleep.nichd.nih.gov/ campaign/partners).

Finally, regarding Dreamland's request to retract Commissioner Trumka's statements, "the Commission voted 2-0-2," i.e., two votes to "take other action"—to deny retraction for the reasons set out in an accompanying statement—and two abstentions. Ex. 2. Because "[a] majority was not reached," the Commission took "no action" on this retraction request. *Id.*

## LEGAL STANDARD

When considering a motion to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1), the Court "presume[s]" to "lack jurisdiction" unless the plaintiff meets its "burden of establishing it." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 n.3 (2006) (quotation omitted). The Court lacks subject-matter jurisdiction if the plaintiff cannot establish its standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Because "[s]tanding is not dispensed in gross," *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (quotation omitted), the plaintiff "must demonstrate standing for each claim [it] seeks to press" and for "each form of relief sought," *DaimlerChrysler*, 547 U.S. at 352. The Court accepts the complaint's "well-pleaded factual allegations" and any reasonable inferences drawn therefrom but does "not assume the truth of legal conclusions" or "accept inferences that are unsupported by the facts set out in the complaint." *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015) (citation omitted). "Additionally, '[t]he court must give the plaintiff's factual allegations closer scrutiny when resolving a Rule 12(b)(1) motion than would be required for a Rule 12(b)(6) motion because subject-matter jurisdiction focuses on the court's power to hear the claim.'" *Tex. Low Income Hous. Info. Serv. v. Carson*, 427 F. Supp. 3d 43, 52 (D.D.C. 2019) (quoting *Adams v. U.S. Capitol Police Bd.*, 564 F. Supp. 2d 37, 40 (D.D.C. 2008)).

"[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss" under Rule 12(b)(6). *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). The plausibility standard applies to each element for each claim for relief. *See Blue v. District of Columbia*, 811 F.3d 14, 20 (D.C. Cir. 2015). Allegations "that are merely consistent with a defendant's liability" are insufficient to survive a motion to dismiss. *Iqbal*, 556 U.S. at 678 (quotation omitted). Moreover, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Finally, a claim that fails as a matter of law "must be dismissed, without regard to whether it is based on an outlandish legal theory or on a close but ultimately unavailing one." *Neitzke v. Williams*, 490 U.S. 319, 326–27 (1989) (quoting *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984)).

**ARGUMENT**

**I.  Count I Fails to State a Claim Because the CPSC Statement and Deadlocked Vote on Retracting Commissioner Trumka's Statements Were Not Final Agency Action, and the Complaint Does Not Plausibly Allege that CPSC Acted in Excess of Statutory Authority**

Dreamland brings Count I under 5 U.S.C. § 706(2)(B), alleging that CPSC's statement regarding weighted infant sleep products was made "in excess of" the agency's statutory authority. Compl. ¶¶ 156–57 (quoting 5 U.S.C. § 706(2)(B)). In particular, Dreamland contends that the CPSC statement constituted a "product safety determination" that exceeded the agency's authority because (i) it "opine[s] on the safety of weighted infant sleep products and direct[s] parents and caregivers not to use weighted infant sleep products," *id.* ¶¶ 153, 156, (ii) "[t]he Commission took none of the required steps before it adopted" the determination, *id.* ¶ 154, and (iii) "[t]he CPSA does not authorize CPSC to determine the safety of consumer products absent evidence and data," *id.* ¶ 155. Dreamland further asserts, without explanation, that the Commission's denial of Dreamland's request to retract the CPSC statement and its deadlocked

12

vote on whether to retract Commissioner Trumka's statements were "also made 'in excess of' CPSC's statutory authority." *Id.* ¶ 157.

Count I fails to state a claim for two reasons. First, Dreamland cannot state any APA claim regarding the CPSC statement or the deadlocked vote on whether to retract Commissioner Trumka's statements because they were not "final agency action." Second, even if there were final agency action here, Count I fails to state a claim that CPSC acted in excess of statutory authority because CPSC's broad authority to disseminate product safety information plainly encompasses the challenged CPSC statement, and the Commission likewise has explicit authority to consider and vote on requests to retract public statements made by the agency or a Commissioner.

### A. Neither the Challenged CPSC Statement Nor the Deadlocked Vote on Retracting Commissioner Trumka's Statements Was Final Agency Action

"The APA … only provides a right to judicial review of '*final* agency action for which there is no other adequate remedy in a court.'" *Holistic Candlers & Consumers Ass'n v. FDA*, 664 F.3d 940, 943 (D.C. Cir. 2012) (quoting 5 U.S.C. § 704). Because non-binding public statements like the one challenged here are not "agency action," much less "final agency action," Dreamland cannot state an APA claim regarding the CPSC statement. Similarly, because a multi-member commission's deadlocked vote that results in no action is neither "agency action" nor "final agency action," Dreamland also cannot state an APA claim regarding the Commission's deadlocked vote on whether to retract Commissioner Trumka's statements.

### 1. The CPSC Statement Was Neither Agency Action Nor Final Agency Action

*No "agency action."* The APA defines "agency action" to mean a "rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act," 5 U.S.C. § 551(13), and the statute further defines each of those terms, *see id.* § 551. Relying on one out-of-circuit decision,

Dreamland claims that "[a]n agency's published statements," like the CPSC statement regarding weighted infant sleep products, "may constitute agency actions." Compl. ¶ 159 (citing *Apter v. Dep't of Health & Hum. Servs.*, 80 F.4th 579, 590 (5th Cir. 2023)). D.C. Circuit precedent forecloses Dreamland's argument.

Less than two years after the APA was enacted, the D.C. Circuit squarely held that an agency's publication of information—even information causing reputational harm to a business—is not an "agency action" under the APA. *Hearst Radio, Inc. v. FCC*, 167 F.2d 225, 227 (D.C. Cir. 1948). In *Hearst Radio*, the D.C. Circuit agreed with the plaintiff that an agency report was potentially defamatory because it relied on an "unjustifiable" factual basis, but the court dismissed his APA claims because the definition of agency action "obviously does not cover an act such as the publication of [a non-binding agency report]." *Id.* Although some later decisions have questioned *Hearst Radio*'s "absolute immunity rule for agency publications" and suggested that judicial review "might" be available in certain cases, *Indus. Safety Equip. Ass'n, Inc. v. EPA*, 837 F.2d 1115, 1118–19 (D.C. Cir. 1988), the D.C. Circuit has never overruled *Hearst Radio*, *see Trudeau v. FTC*, 456 F.3d 178, 189 (D.C. Cir. 2006). Accordingly, circuit precedent requires dismissal of Dreamland's challenge to the CPSC statement. *See also El-Shifa Pharm. Indus. Co. v. United States*, No. 01-cv-731 (RWR), 2007 WL 950082, at *1 (D.D.C. Mar. 28, 2007) ("numerous courts have rejected classifying" non-binding agency statements about regulated entities as agency action "based on the APA's definition") (citing *Trudeau*, 456 F.3d at 189).

Even under the cases that questioned *Hearst Radio*, the CPSC statement still would not be agency action. For example, in *Industrial Safety Equipment*, the D.C. Circuit held that EPA's issuance of a report warning against the use of certain asbestos-protection respirators, but not

prohibiting them, was not a "rule" or other type of agency action. 837 F.2d at 1120–21. The court explained that the report "establish[d] no rule that the regulated industry must obey"; rather, it set forth only "recommendations" that might affect the "choices of industry customers and workers," and such an "indirect" effect was insufficient to "transform" the report into agency action. *Id*. at 1121. The same analysis applies here. The CPSC statement was merely a safety recommendation, and any indirect effect it may have had on sales of Dreamland's products does not transform the statement into agency action.

In its Complaint, Dreamland cites the Fifth Circuit's *Apter* decision to argue that the CPSC statement is agency action, but *Apter* is inconsistent with *Industrial Safety Equipment*. In *Apter*, the Fifth Circuit held that FDA tweets discouraging individuals from using ivermectin to treat COVID-19 were "non-binding agency policy statements" that qualified as "rules" under 5 U.S.C. § 551(4), because the tweets "announce [a] principle[ ] of general applicability and future effect"—namely, that consumers "Should Not Use Ivermectin to Treat or Prevent COVID-19." 80 F.4th at 590. But *Industrial Safety Equipment* squarely held that such agency "recommendations" are not rules under 5 U.S.C. § 551(4). *See* 837 F.2d at 1121.

Moreover, under 5 U.S.C. § 551(4), a rule must be "designed to implement, interpret, or prescribe law or policy" or must "describ[e] the organization, procedure, or practice requirements of an agency." In *Industrial Safety Equipment*, the D.C. Circuit explained that the EPA's report did not meet this definition because it "does not change any law or official policy presently in effect. It does not narrow or alter the grounds on which the [National Institute for Occupational Safety and Health] will act to certify any of the thirteen lawful respirator types." 837 F.2d at 1120. The D.C. Circuit further explained that "there is no evidence at all that the Guide will alter the EPA or NIOSH's regulatory behavior towards asbestos users or

15

manufacturers, so the Guide would not even qualify as an agency statement of policy." *Id.* at 1119 n.8. Again, the same analysis applies here. CPSC did not change "any law or official policy" previously "in effect" because it did not "alter the grounds on which" CPSC would act regarding potential CPSA violations or "alter" CPSC's "regulatory behavior towards" manufacturers of infant sleep products. Accordingly, under *Industrial Safety Equipment*, CPSC's statement does not relate to "law" or "policy" and is therefore not a rule or any other type of agency action.

**No "final agency action."** Even if CPSC's statement were "agency action" within the meaning of 5 U.S.C. § 551(13), Dreamland also must show it is "final agency action." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882 (1990). An "agency action" is "final" only when it (1) "mark[s] the consummation of the agency's decisionmaking process" and (2) is an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citations and quotation marks omitted). The first prong is evaluated "from the agency's perspective," and the second prong is evaluated "from the regulated parties' perspective." *Soundboard Ass'n v. FTC*, 888 F.3d 1261, 1271 (D.C. Cir. 2018).

The D.C. Circuit has consistently held that agency statements with no binding effect are not final agency action under the APA. *See, e.g.*, *Holistic Candlers*, 664 F.3d at 945 & n.6 (collecting cases and holding that FDA warning letter was not final agency action); *Joshi v. Nat'l Transp. Safety Bd.*, 791 F.3d 8, 11 (D.C. Cir. 2015) (holding that investigative report identifying pilot as the likely cause of accident was not final agency action).[10] The court's decision in

---

[10] *See also, e.g., Invention Submission Corp. v. Rogan*, 357 F.3d 452 (4th Cir. 2004) (Patent and Trademark Office advertising campaign alerting consumers to invention promotion scams was not final agency action); *Flue-Cured Tobacco Coop. v. EPA*, 313 F.3d 852, 854 (4th Cir. 2002) (EPA report classifying environmental tobacco smoke as a carcinogen was not final agency

*Reliable Automatic Sprinkler Co. v. CPSC*, 324 F.3d 726 (D.C. Cir. 2003), is instructive. There, the D.C. Circuit held that CPSC did not take final agency action when it issued a warning letter to a sprinkler manufacturer advising that it intended to make a "preliminary determination that the[] sprinklers present a substantial product hazard" and requesting the company take "voluntary corrective action." *Id.* at 730. First, the letter did not mark the "consummation" of CPSC's decision-making process because it did not commit the agency to "pursue enforcement action" and did not go through "the steps required under the statutory and regulatory scheme" for the letter "to have any legal consequences." *Id.* at 732. Second, though the letter may have had "practical consequences" for the manufacturer, *id.*, it simply communicated the agency's current "position" on the matter and did not represent a decision "imposing any obligation on" the manufacturer, "denying any right of" the manufacturer, or "fixing any legal relationship," *id.* at 732, 734.

The CPSC statement challenged here also does not reflect the consummation of the agency's decision-making process. Nothing in the statement committed CPSC to a "definitive" position or to take any enforcement or regulatory action. *Arch Coal, Inc. v. Acosta*, 888 F.3d 493, 503 (D.C. Cir. 2018) (quoting *FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 241 (1980)). Indeed, unlike the warning letter at issue in *Reliable*, the CPSC statement did not even mention Dreamland or announce any "preliminary determination" about a product's lawfulness. *Reliable*, 324 F.3d at 730, 732; *see also Jake's Fireworks Inc. v. CPSC*, 105 F.4th 627, 632 (4th Cir. 2024) (CPSC warning notice did not consummate agency process because it "d[id] not trigger any of

---

action); *Aerosource, Inc. v. Slater*, 142 F.3d 572, 581 (3d Cir. 1998) (FAA reports warning aviation community that the plaintiff may have improperly maintained aircraft parts were not final agency action); *Apter*, 80 F.4th at 594–95 (FDA tweets recommending against the use of ivermectin to treat COVID-19 were not final agency action).

the administrative, civil, or criminal proceedings that the [agency] could pursue"); *Holistic Candlers*, 664 F.3d at 942 (FDA letter warning that recipient may be subject to "regulatory action" did not consummate decision-making process). CPSC also has not commenced the notice-and-comment process that would be required to set a mandatory safety standard or ban a hazardous product. *See* 15 U.S.C. §§ 2056–58. Nor did the CPSC statement bear the hallmarks of a final agency order: "[W]hen the Commission itself does issue orders, it says so, stating that they are 'final decisions and orders' to perform clearly binding commands." *Jake's Fireworks*, 105 F.4th at 633 (citation omitted). As such, the CPSC statement did not go through any of "the steps required" for it "to have any legal consequences," and therefore it does not represent the consummation of an agency decision-making process. *Reliable,* 324 F.3d at 732.

      The CPSC statement also did not determine any "rights or obligations" or create "legal consequences." *Bennett*, 520 U.S. at 178. Dreamland does not (and could not plausibly) allege that the statement "imposes an obligation, denies a right, or fixes some legal relationship." *Reliable*, 324 F.3d at 731. To the contrary, Dreamland concedes that the statement merely "opine[d]" on the safety of certain infant sleep products. Compl. ¶ 156. CPSC's statement also "d[id] not command any action," *Jake's Fireworks*, 105 F.4th at 633, and it "contain[ed] no findings and conclusions of law that determine [Dreamland] violated any law," *Arrow Reliance, Inc. v Califf*, No. 2:22-cv-1057, 2022 WL 18027595, at *5 (W.D. Wash. Dec. 30, 2022) (holding that FDA press release was not final agency action). Any "practical consequences" the statement may have had on Dreamland's business are insufficient to satisfy the second *Bennett* prong. *Reliable*, 324 F.3d at 731; *Joshi*, 791 F.3d at 12.[11] In short, the CPSC statement "had no binding

---

[11] As the Fourth Circuit has observed, if agency statements could be challenged whenever they were persuasive to the public, "almost any agency policy or publication issued by the

effect whatsoever—not on the agency and not on the regulated community." *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004) (Roberts, J.) (holding that an EPA advice letter was not final agency action).

Dreamland's argument for why CPSC's statement was final agency action rests on a single out-of-circuit district court decision, *Doe v. Tenenbaum*, 127 F. Supp. 3d 426 (D. Md. 2012), *rev'd on other grounds sub nom. Doe v. Pub. Citizen*, 749 F.3d 246 (4th Cir. 2014). *See* Compl. ¶ 148. But that case is limited to a specific statutory scheme, not at issue here, requiring CPSC to publish certain reports of harm after providing the identified manufacturer with notice and an opportunity to object. *See* 127 F. Supp. 3d at 460 (discussing 15 U.S.C. § 2055a(c)). What's more, the statutory provisions that *are* at issue here—those in section 2055(b)—did not apply to publication of the reports that *Doe v. Tenenbaum* considered. *See* 15 U.S.C. § 2055a(f)(1) ("The provisions of section 2055(a) and (b) of this title shall not apply to the disclosure … of a report described in [15 U.S.C. § 2055a(b)(1)(A)].").

In *Doe v. Tenenbaum*, the court held that CPSC's decision to publish, over the plaintiff's objection, a report about the death of an infant in plaintiff's product was final agency action. 127 F. Supp. 3d at 459–66. The court explained that "the Commission's decision perfected an adversarial process" in which the plaintiff was required to file an objection supported by "evidence," and the Commission made a "legal determination that Plaintiff failed to carry the burden of proof and that the report otherwise satisfied the statutory and regulatory preconditions for publication." *Id.* at 463. The court emphasized that "[t]hese conditions"— "consummation of

---

government would be subject to judicial review." *Flue-Cured Tobacco*, 313 F.3d at 861. Congress did not intend "to create private rights of action[] to challenge the inevitable objectionable impressions created whenever controversial research by a federal agency is published." *Invention Submission*, 357 F.3d at 459 (quoting *Flue-Cured Tobacco*, 313 F.3d at 861).

an adversarial process" and determination of the plaintiff's "right … to prevent a materially inaccurate report from" being published—"are not present whenever the government plans to publish controversial research or completes a multistep administrative process." *Id.* at 462, 464.

In stark contrast to *Doe v. Tenenbaum*, here no adversarial process took place before CPSC made its statement, nor does the CPSA require such a process in this context. Because the CPSC statement did not consummate an agency decision-making process or "result in a *legal* consequence," this Court "lack[s] the power to review [it]." *Joshi*, 791 F.3d at 12 (emphasis in original). Accordingly, Count I should be dismissed for failure to state a claim as to the CPSC statement.

### 2.  The Deadlocked Vote on Commissioner Trumka's Statements Was Neither Agency Action Nor Final Agency Action

CPSC's deadlocked vote on Dreamland's request to retract Commissioner Trumka's statements also is not "agency action" or "final agency action." As Dreamland notes, "[n]o action was taken" on this retraction request "because 'the Commission voted 2-0-2'"—that is, of the Commissioners participating in the vote, two voted against the retraction and two abstained, resulting in a deadlocked vote. Compl. ¶ 128 (quoting Ex. 2 at 1).

The D.C. Circuit has squarely held that the "deadlocked vote" of a multi-member commission "cannot be considered an order of the Commission nor can it constitute agency action." *Sprint Nextel Corp. v. FCC*, 508 F.3d 1129, 1131 (D.C. Cir. 2007); *see Pub. Citizen, Inc. v. FERC*, 839 F.3d 1165, 1170 (D.C. Cir. 2016) ("FERC did not engage in collective, institutional action when it deadlocked on FCA 8's rates."). That is because "[t]he votes were actions of the individual Commissioners, not the Commission." *Sprint Nextel*, 508 F.3d at 1131. Therefore, Dreamland has not alleged an agency action, let alone a final agency action, and so has failed to

state a claim under the APA. The Court should dismiss Count I as to the Commission's

deadlocked vote on whether to retract Commissioner Trumka's statements.

**B.    Count I Fails in its Entirety Because Dreamland Does Not Plausibly Allege that CPSC Exceeded its Statutory Authority**

Even if there is final agency action here, Count I still fails in its entirety because

Dreamland does not plausibly allege that CPSC exceeded its statutory authority by making the

CPSC statement, denying Dreamland's request to retract the CPSC statement, or deadlocking on

whether to retract Commissioner Trumka's statements. Under the CPSA, CPSC has clear

authority to make safety recommendations like the CPSC statement and to determine whether a

public disclosure by CPSC or its Commissioners is inaccurate or misleading such that it would

warrant publication of a retraction.

**1.** Congress charged CPSC with, among other things, "protect[ing] the public against

unreasonable risks of injury associated with consumer products" and "assist[ing] consumers in

evaluating the comparative safety of consumer products." 15 U.S.C. § 2051(b)(1)–(2); *see id.*

§ 2053. To enable the agency to fulfill these duties, Congress "gave the Commission broad

powers to gather, analyze, and disseminate vast amounts of private information." *CPSC v. GTE*

*Sylvania, Inc.*, 447 U.S. 102, 111 (1980). Those "powers include the authority to collect and

disseminate product safety information." *Id.* at 104 (citing 15 U.S.C. § 2054(a)(1)). For example,

section 2054(a)(1) requires CPSC to "collect, investigate, analyze, and disseminate injury data,

and information, relating to the causes and prevention of death, injury, and illness associated

with consumer products." 15 U.S.C. § 2054(a)(1). In addition, section 2055 imposes various

requirements on CPSC's public disclosure of information, including "information that reflects on

the safety of a consumer product or class of consumer products," thus implicitly recognizing the

agency's authority to disseminate such information. *See id.* § 2055(b)(6). And like all federal

agencies, CPSC has inherent authority to communicate information to the public. *See Shurtleff v. City of Boston*, 596 U.S. 243, 251 (2022) ("When the government wishes to state an opinion, to speak for the community, to formulate policies, or to implement programs, it naturally chooses what to say and what not to say. That must be true for government to work.") (internal citation omitted); *cf. Barr v. Matteo*, 360 U.S. 564, 574–75 (1959) (plurality opinion) (finding implicit authority for public officials to make a "public statement of agency policy in respect to matters of wide public interest and concern").

The CPSC statement plainly falls within the agency's broad authority to disseminate product safety information. The statement addressed "consumer products" because weighted baby blankets and weighted swaddles are articles "produced or distributed (i) for sale to a consumer … or (ii) for the personal use, consumption or enjoyment of a consumer.…" 15 U.S.C. § 2052(a)(5). And the statement concerned the safety of consumer products because it conveyed information about, among other things, (i) the suffocation risk certain consumer products pose for young babies; (ii) certain types of consumer products that can prevent or reduce the risk of suffocation; and (iii) certain types of consumer products that can cause a risk of suffocation. *See* CPSC, *Safe Sleep – Cribs and Infant Products*, https://www.cpsc.gov/SafeSleep (last visited Jan. 28, 2025).

Dreamland ignores CPSC's authority to disseminate information, instead suggesting that the agency failed to comply with statutory requirements relating to the agency's internal procedures, Compl. ¶ 147 (citing 15 U.S.C. § 2055(b)(6)), promulgating a mandatory safety standard, *id.* ¶ 151 (citing 15 U.S.C. § 2058(e)–(f)), and banning hazardous products, *id.* ¶ 152 (citing 15 U.S.C. § 2057). None of these provisions limits CPSC's authority to disseminate product safety information.

First, section 2055(b)(6) requires CPSC to "establish procedures designed to ensure that" information it discloses reflecting on the safety of a consumer product "is accurate and not misleading." 15 U.S.C. § 2055(b)(6). Whether CPSC followed its internal clearance procedures may be relevant to Dreamland's arbitrary and capricious claim in Count IV, *see infra* pp. 32–33, but it has no bearing on Count I because section 2055(b)(6) does not limit the agency's authority to disseminate information. Rather, the "requirement is solely a direction to the Commission to establish internal clearance procedures." *Danara Int'l, Ltd. v. CPSC*, 549 F. Supp. 367, 375 (D.N.J. 1982) (quoting H.R. Rep. No. 97-208, *as reprinted in* 1981 U.S.C.C.A.N. 1010, 1242). Second, the CPSC statement did not purport to be a mandatory safety standard or hazardous product ban, so sections 2057 and 2058 are irrelevant to the Commission's authority to make the statement.

**2.** Dreamland also erroneously alleges that the Commission's decision not to retract the challenged CPSC statement and its deadlocked vote on whether to retract Commissioner Trumka's statements were made in excess of the agency's authority. *See* Compl. ¶ 157. But the CPSA expressly provides that the Commission will make determinations on whether "to publish a retraction of" information alleged to be "inaccurate or misleading." 15 U.S.C. § 2055(b)(7); *see also* 16 C.F.R. § 1101.52. The authority to make such determinations plainly encompasses the Commission's decision not to retract the CPSC statement. That authority also authorized the Commission to vote on whether to retract Commissioner Trumka's statements. The result of that vote—a deadlock—was not an action by the agency and thus could not have exceeded the agency's authority. Moreover, Dreamland's allegation offers no explanation why these votes purportedly exceeded the Commission's powers, and such a "conclusory statement[]" is insufficient to state a plausible claim for relief. *Iqbal*, 556 U.S. at 678. And to the extent

Dreamland is arguing that the retraction denial and deadlocked vote were unlawful because the challenged CPSC statement exceeded CPSC's authority, that theory fails for the reasons discussed above. *See supra* pp. 21–23. For these reasons, the Court should dismiss Count I for failure to state a claim.

## II. Count II Fails to State a Claim Because the Complaint Does Not Plausibly Allege that the Challenged Statements by NIH or CDC Were *Ultra Vires*

Count II alleges that NIH's and CDC's statements regarding weighted infant sleep products were *ultra vires*. Compl. ¶¶ 158–63. As an initial matter, it is questionable whether the Court should entertain Dreamland's nonstatutory *ultra vires* claim. Dreamland's argument is essentially a garden-variety APA claim for action in excess of statutory authority. 5 U.S.C. § 706(2)(C). Such a claim would require Dreamland to show final agency action. *See supra* pp. 13–20. But Dreamland cannot show that NIH's and CDC's statements, which provide nonbinding advice to the public, are final agency action, *see id.*, and its nonstatutory *ultra vires* claim appears to be an attempt to circumvent that requirement. This gambit should be rejected.

Count II also fails to allege a plausible *ultra vires* claim. Such a claim requires that "(i) there is no express statutory preclusion of all judicial review; (ii) there is no alternative procedure for review of the statutory claim; and (iii) the agency plainly acts in excess of its delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory." *Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 763 (D.C. Cir. 2022). *Ultra vires* review has an "extremely limited scope." *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 721–22 (D.C. Cir. 2022) (quotations omitted). "*[U]ltra vires* claims are confined to extreme agency error where the agency has stepped so plainly beyond the bounds of [its statutory authority], or acted so clearly in defiance of it, as to warrant the immediate intervention of an equity court." *Fed. Express*, 39 F.4th at 764 (quotations omitted). "Only error that is patently a

misconstruction of [statute], that disregard[s] a specific and unambiguous statutory directive, or that violate[s] some specific command of a statute will support relief." *Id.* (quotations omitted). The D.C. Circuit has characterized an *ultra vires* claim as "essentially a Hail Mary pass" that "rarely succeeds." *Id.* at 765 (quotations omitted); *Changji Esquel Textile*, 40 F.4th at 721–22.

NIH and CDC have clear statutory authority to make the challenged statements, and Dreamland has not come close to meeting the demanding *ultra vires* standard. For example, under the Public Health Service Act, HHS and its subagencies are expressly authorized to "disseminat[e] information to educate the public, health care providers, and other stakeholders on … sudden unexpected infant death." 42 U.S.C. § 300c-13(a)(2). HHS and its subagencies also may "develop, support, or maintain programs or activities to address sudden unexpected infant death." *Id.* § 300c-11(a); *see* Compl. ¶¶ 36, 162. In addition, they have broad authority to "conduct … such activities as may be required to make information respecting health information and health promotion … available to the consumers of medical care … and others who are or should be informed respecting such matters," with such activities including "[t]he publication of information" about topics such as "child care," "disease prevention," and "safety and accident prevention." 42 U.S.C. § 300u-3(1).

These statutes, among others, plainly authorize NIH's and CDC's challenged statements. NIH explained that weighted infant sleep products "can pose dangers for baby," and that avoiding such products in an infant's sleep area "can help reduce baby's risk for Sudden Infant Death Syndrome (SIDS) and other sleep-related deaths, such as from accidental suffocation."[12] Similarly, CDC provided advice on steps to "help baby sleep safely and reduce the risk of sleep-

---

[12] Safe to Sleep, *Safe Sleep Environment for Baby,* https://safetosleep.nichd.nih.gov/reduce-risk/safe-sleep-environment (last visited Jan. 28, 2025).

related infant deaths, including sudden infant death syndrome (SIDS) and accidental

suffocation."[13] CDC explained that "[p]roducts labeled as weighted—including weighted

sleepers, swaddles, sleep sacks, and blankets—are not safe for infants."[14] These statements

"educate the public" about "sudden unexpected infant death," 42 U.S.C. § 300c-13(a)(2), and are

"activities to address" it, *id.* § 300c-11(a). They also provide health information to the public

relating to "child care," "disease prevention," and "safety and accident prevention." *Id.* § 300u-

3(1).

   HHS and its subagencies also have authority to "encourage, cooperate with, and render

assistance to … , and promote the coordination of, research, investigations, experiments,

demonstrations, and studies relating to the causes … and prevention of physical and mental

diseases." 42 U.S.C. § 241(a). They are further authorized to "collect and make available through

publications and other appropriate means, information as to, and the practical application of,

such research and other activities." *Id.* § 241(a)(1).

   This statute authorizes NIH's and CDC's challenged statements because the statements

are "information as to, and the practical application of," AAP's study of the evidence relating to

sleep-related infant deaths and its recommendations based on such study, which HHS has

"encourage[d], cooperate[d] with, …and[/or] promote[d] the coordination of" in order to prevent

diseases. *Id.* The NIH website explains that "the safe sleep messages outlined in Safe to

Sleep® materials are based on recommendations from the AAP Task Force on SIDS," and the

website links to AAP's "Sleep-Related Infant Deaths: Updated 2022 Recommendations for

---

[13] CDC, *Helping Babies Sleep Safely* (Sept. 25, 2024), https://www.cdc.gov/reproductive-health/features/babies-sleep.html?CDC_AAref_Val=https://www.cdc.gov/reproductivehealth/features/baby-safe-sleep/index.html.

[14] *Id.*

Reducing Infant Deaths in the Sleep Environment."[15] Similarly, the CDC website explains that "CDC supports the recommendations issued by [AAP] to reduce the risk of all sleep-related infant deaths," and it links to AAP's Updated 2022 Recommendations and a related AAP webpage.[16] Moreover, AAP's Updated 2022 Recommendations, and the related report providing the evidentiary basis for those recommendations, reflect "cooperat[ion] with" NIH and CDC employees as consultants to the Task Force on Sudden Infant Death Syndrome and the Committee on Fetus and Newborn.[17] 42 U.S.C. § 241(a)(1). Furthermore, NIH and CDC "cooperate with" AAP regarding infant sleep safety in a variety of ways through the Safe to Sleep campaign.[18]

Finally, like CPSC and all other federal agencies, NIH and CDC have inherent authority to communicate information to the public. *See supra* pp. 21–22. Because NIH and CDC have both express and inherent authority to make the challenged statements, Dreamland has failed to show "extreme agency error where the agency has stepped so plainly beyond the bounds of [its statutory authority], or acted so clearly in defiance of it, as to warrant the immediate intervention of an equity court." *Fed. Express*, 39 F.4th at 764 (quotations omitted).

---

[15] Safe to Sleep, *Collaborators & Partners*, https://safetosleep.nichd.nih.gov/campaign/partners (last visited Jan. 28, 2025).

[16] CDC, *Helping Babies Sleep Safely* (Sept. 25, 2024), https://www.cdc.gov/reproductive-health/features/babies-sleep.html?CDC_AAref_Val=https://www.cdc.gov/reproductivehealth/features/baby-safe-sleep/index.html.

[17] *See* AAP, *Sleep-Related Infant Deaths: Updated 2022 Recommendations for Reducing Infant Deaths in the Sleep Environment* (June 21, 2022), https://publications.aap.org/pediatrics/article/150/1/e2022057990/188304/Sleep-Related-Infant-Deaths-Updated-2022?autlogincheck=redirected; AAP, *Evidence Base for 2022 Updated Recommendations for a Safe Infant Sleeping Environment to Reduce the Risk of Sleep-Related Infant Deaths* (June 21, 2022), https://publications.aap.org/pediatrics/article/150/1/e2022057991/188305/Evidence-Base-for-2022-Updated-Recommendations-for.

[18] *See* Safe to Sleep, *Collaborators & Partners*, https://safetosleep.nichd.nih.gov/campaign/partners (last visited Jan. 28, 2025).

### III. Count III Fails to State a Claim Because the Complaint Does Not Plausibly Allege that Commissioner Trumka's Challenged Statements Were *Ultra Vires*

Dreamland alleges that Commissioner Trumka's statements exceeded his authority in two respects, but neither states an *ultra vires* claim. First, Dreamland alleges that Commissioner Trumka's statements repeated CPSC's statement, which allegedly did not "follow[] the statutorily delineated process" and so was "statutorily insufficient." Compl. ¶¶ 168–69. But Dreamland has failed to state a claim that CPSC's statement was made "without observance of procedure required by law" and has also failed to state a claim that the agency's statement was "in excess of statutory … authority" or "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A), (C)–(D); *see supra* pp. 12–24; *infra* pp. 31–37. Thus, Dreamland has not plausibly alleged that, by repeating CPSC's statement, Commissioner Trumka's statements were *ultra vires*. Moreover, even if Dreamland had plausibly alleged that CPSC's statement was unlawful, it still would fail to state an *ultra vires* claim against Commissioner Trumka because it has not plausibly alleged that Commissioner Trumka "stepped so plainly beyond the bounds of [his statutory authority], or acted so clearly in defiance of it, as to warrant the immediate intervention of an equity court." *Fed. Express*, 39 F.4th at 764 (quotations omitted).

Second, Dreamland argues that Commissioner Trumka's statements violated 15 U.S.C. § 2055(b). Compl. ¶ 170.[19] That statute generally requires CPSC to provide a manufacturer with notice and an opportunity to respond prior to the "public disclosure" of certain information "if the manner in which [a] consumer product is to be designated or described in such information

---

[19] Dreamland also alleges that Commissioner Trumka's statements violated the regulations implementing 15 U.S.C. § 2055(b). Compl. ¶ 170. But an *ultra vires* claim requires that an agency or agency official unambiguously violated a *statute*, not the agency's own regulations. *See Fed. Express*, 39 F.4th at 763–64.

will permit the public to ascertain readily the identity of such manufacturer." 15 U.S.C.

§ 2055(b)(1). Dreamland alleges that Commissioner Trumka violated that statute by "publishing adverse statements about Dreamland's weighted infant sleep products, from which the public was readily able to ascertain Dreamland's identity[,] without providing advance notice and the opportunity for the company to respond." Compl. ¶ 170.

Dreamland fails to state a claim because the requirements in 15 U.S.C. § 2055(b)(1) apply only when the public can readily ascertain the identity of a manufacturer from "the manner in which [a] consumer product is to be designated or described" in information "public[ly] disclos[ed]" by a Commissioner. 15 U.S.C. § 2055(b)(1).[20] But Commissioner Trumka's statements did not reference Dreamland, and Dreamland does not argue that its identity could be readily ascertained from "the manner in which [any] consumer product [was] designated or described" in Commissioner Trumka's statements. *Id.*

Instead, Dreamland argues that Commissioner Trumka's statements referenced a Washington Post article and online product searches, that the Washington Post article and online product searches themselves identified Dreamland, and thus that Commissioner Trumka's statements allegedly identified Dreamland. Compl. ¶¶ 106–09. But the contents of third-party documents that are *referenced* in a Commissioner's statements are not relevant in determining whether 15 U.S.C. § 2055(b)(1) applies. Rather, the statute applies when the manufacturer's identity can be readily ascertained based on "the manner in which [a] consumer product is to be designated or described" in information "public[ly] disclos[ed]" by a Commissioner. 15 U.S.C.

---

[20] *See also* 16 C.F.R. § 1101.11(a)(1), (4) ("[t]he information must pertain to a specific product which is either designated or described in a manner which permits its identity to be ascertained readily by the public," and "[t]he manner in which the product is designated or described in the information must permit the public to ascertain readily the identity of the manufacturer").

§ 2055(b)(1). Referencing a document that is already in the public domain, such as a previously published newspaper article, is not "public[ly] disclos[ing]" the contents of that document. *Id.* Thus, Commissioner Trumka did not "public[ly] disclos[e]" the contents of the Washington Post article or the online product searches. *Id.* Even if Dreamland's identity could be readily ascertained from the Washington Post article or the online product searches, that would not show that its identity could be readily ascertained from any information publicly disclosed by Commissioner Trumka. At most, Commissioner Trumka publicly disclosed his statements themselves, but Dreamland does not allege that its identity could be readily ascertained from those statements.

CPSC's implementing regulations confirm that 15 U.S.C. § 2055(b)(1) is triggered only when a manufacturer's identity can be readily ascertained from agency statements themselves, not from documents referenced in those statements. Under the regulations, the statute "appl[ies] only when a reasonable person receiving the information in the form in which it is to be disclosed and lacking specialized expertise can readily ascertain *from the information itself* the identity of the manufacturer." 16 C.F.R. § 1101.13 (emphasis added); *see id.* § 1101.11(a)(3) (the statute's requirements apply only to information that "[t]he Commission or its members, employees, agents or representatives" will "disclose" to "the public"). The preamble to the final rule explained that, in applying this regulation, CPSC "staff will not … customarily perform research or look beyond the face of the document to determine whether the identity of a manufacturer can be ascertained." 48 Fed. Reg. at 57409. Because there is no allegation that Dreamland's identity can be readily ascertained from Commissioner Trumka's statements themselves, 15 U.S.C. § 2055(b)(1) does not apply.

In short, Commissioner Trumka did not violate 15 U.S.C. § 2055(b)(1), let alone commit

an "extreme agency error" involving an "unambiguous" violation of statute. *Fed. Express*, 39

F.4th at 764 (quotations omitted). Thus, Count III fails to state an *ultra vires* claim.

### IV. Count IV Fails to State a Claim Because the CPSC Statement and the Deadlocked Vote on Retracting Commissioner Trumka's Statements Were Not Final Agency Action, and the Complaint Does Not Plausibly Allege that CPSC Acted Arbitrarily or Capriciously

Dreamland brings Count IV under 5 U.S.C. § 706(2)(A), alleging that the CPSC

statement, the Commission's denial of Dreamland's request to retract the CPSC statement, and

the Commission's deadlocked vote on whether to retract Commissioner Trumka's statements

were "arbitrary and capricious." Compl. ¶¶ 171–87. Dreamland asserts that the agency "did not

follow any of the required procedures or conduct any analysis," *id.* ¶ 176, "[f]ail[ed] to engage in

reasoned decisionmaking," *id.* ¶ 175 (citation omitted), and proffered an "explanation [that] runs

counter to the evidence it has in its possession," *id.* ¶ 183. In particular, Dreamland faults CPSC

for "relying on the recommendations put forth by CDC and NIH," whom Dreamland alleges

were not "authorize[d] … to make determinations about the safety of a consumer product." *Id.*

¶¶ 180, 184, 186.

Count IV fails to state a claim as to the CPSC statement and the deadlocked vote on

whether to retract Commissioner Trumka's statements because, as discussed above, they were

neither "agency action" nor "final agency action." *See supra* pp. 13–21; *Del. Valley Reg'l Ctr.,*

*LLC v. U.S. Dep't of Homeland Sec.*, 106 F.4th 1195, 1203 (D.C. Cir. 2024) (dismissing APA

claim for lack of final agency action). Beyond that, Count IV fails to state a claim in its entirety

because Dreamland does not plausibly allege that CPSC failed to comply with applicable

procedural requirements, failed to engage in reasoned decision-making, or proffered an

explanation counter to the evidence in the agency's possession.

Count IV asserts without specificity that "CPSC did not follow any of the required procedures." Compl. ¶ 176. Elsewhere in the Complaint, Dreamland mentions various purported procedural requirements,[21] only one of which—15 U.S.C. § 2055(b)(6)—applied to issuance of the CPSC statement. As noted above, section 2055(b)(6) requires CPSC to "establish procedures designed to ensure that" information it discloses reflecting on the safety of a class of products "is accurate and not misleading." 15 U.S.C. § 2055(b)(6). Congress explained that this "requirement is solely a direction to the Commission to establish internal clearance procedures." *Danara*, 549 F. Supp. at 375 (quoting H.R. Rep. No. 97-208, *as reprinted in* 1981 U.S.C.C.A.N. 1010, 1242). Dreamland acknowledges that CPSC has established such internal procedures in Directive 1450.2, and it does not contend that they are deficient in any way. *See* Compl. ¶ 147 and Ex. 4; *see also* 16 C.F.R.§ 1101.1(c) (stating that the "internal clearance procedures" that 15 U.S.C. § 2055(b)(6) requires are set forth in Commission Directive 1450.2). It is thus undisputed "that the procedures that were set forth to assure the accuracy of the information … meet the requirements of the statute." *Danara*, 549 F. Supp. at 375.

Dreamland also does not plausibly allege that CPSC failed to adhere to its internal clearance procedures in this case. Dreamland alleges only that, according to its own self-serving speculation, CPSC "apparently" did not follow its procedures because the CPSC statement "appear[s]" not to be based on sufficient data. Compl. ¶¶ 115–16. This unsupported allegation cannot overcome the "presumption of regularity [that] attaches to the actions of Government

---

[21] For example, the Complaint several times mentions the requirements of 15 U.S.C. §§ 2057 and 2058. Compl. ¶¶ 23, 27–28, 51, 75, 152. Those provisions are inapplicable to the challenged CPSC statement or the Commission's votes on Dreamland's retraction requests because Dreamland does not allege that CPSC issued a mandatory safety standard or banned a hazardous product. The Complaint also refers to the joint-project provisions of Directive 1450.2. *See id.* ¶¶ 117–19, 191. Those provisions are addressed in the discussion of Count V, below.

agencies." *U.S. Postal Serv. v. Gregory*, 534 U.S. 1, 10 (2001). That is particularly so in light of the Commission's express confirmation that, "[i]n adding the CPSC Statement to the CPSC website, Commission staff cleared it for public disclosure pursuant to its internal agency clearance process, found in Directive 1450.2." Ex. 3 at 3. And there is no dispute that, in the context of considering Dreamland's request to retract the CPSC statement, the agency reviewed that statement and determined that it was not inaccurate or misleading. *See id.*

Count IV also fails in its attacks on the reasoning and evidentiary basis for the CPSC statement, the Commission's denial of Dreamland's request to retract that statement, and the deadlocked vote on whether to retract Commissioner Trumka's statements. First, Dreamland errs in claiming that CPSC could not reasonably refer to and rely upon the statements made by CDC and NIH. As already discussed, CDC and NIH are, like CPSC, charged with protecting the public health, and they have clear statutory authority to make their statements. *See supra* pp. 25–28. They are also CPSC's longstanding partners in the Safe to Sleep campaign, a collaborative effort between federal agencies and other organizations to make safety recommendations to reduce the risk of SIDS, and they made their statements as part of that campaign.[22] Furthermore, as CPSC explained in the retraction denial, agency procedures adopted pursuant to 15 U.S.C. § 2055(b)(6) expressly provide that CPSC may refer and "crosslink to content on federal and state government websites … , provided that the content complements safety information issued by the agency and is related to the agency's mission." Ex. 3 at 3–4 (retraction denial); *see also* Ex. 5 at 2 (Commission Policy on Linking to Nongovernment Websites, Appendix B to Directive 1450.2). There is no question that the content of the CDC and NIH statements—safety information about

---

[22] *See, e.g.,* Safe to Sleep, *Safe Sleep Environment for Baby,* https://safetosleep.nichd.nih.gov/ reduce-risk/safe-sleep-environment (last visited Jan. 28, 2025).

consumer products—complements safety information that CPSC has issued and is related to the agency's mission. Accordingly, it was reasonable for CPSC to cite and rely on those statements.

Dreamland's allegation that CPSC "outsource[d] it[s] power to the AAP," Compl. ¶ 126, is also wrong. CPSC did not give AAP any power. Instead, it made recommendations to the public based on the statements on the NIH and CDC websites, which in turn reasonably relied on AAP's findings. *See* Ex. 3 at 4. And as described above, CPSC cleared its own statement before publishing it, in accordance with agency procedure. As such, Dreamland fails to state a claim that CPSC acted arbitrarily or capriciously by publishing, or declining to retract, its statement regarding weighted infant sleep products.

Second, Dreamland's claim that CPSC acted contrary to the evidence in its possession is conclusory and not supported by any well-pleaded allegations. Dreamland argues that the agency lacked sufficient evidence to make the CPSC statement because "CPSC admitted that it lacked the data to pursue a mandatory standard in FY 2024 for weighted infant sleep products." Compl. ¶ 115; *see id.* ¶¶ 74–76, 87. But the evidence necessary to support a federal regulation establishing across-the-board standards is far different than that needed to make a non-binding public statement. *See, e.g.*, 15 U.S.C. § 2058(f) (requiring the agency to make certain findings prior to promulgating a consumer product safety rule). While Dreamland alleges that the CPSC statement was "based on no data whatsoever" and that there is not "an iota of evidence" that the agency commissioned research from its staff, Compl. ¶ 116, its own Complaint disproves those allegations. For example, the Complaint states that, "[s]ince the November 2023 hearing, the Commission has worked to identify potential product hazards associated with" weighted and unweighted infant sleep products, including an effort by CPSC's staff to review and categorize reported incidents involving such products. *Id.* ¶¶ 83–84. As the Complaint notes, the resulting

data set identified 167 incidents, including multiple fatalities. *Id.* ¶¶ 85–86. Dreamland's

conclusory allegations that such evidence does not exist are plainly not supported by any well-

pleaded allegations and are therefore insufficient to state a plausible claim under the APA. The

Court should dismiss Count IV.

V.    **Count V Fails to State a Claim Because the CPSC Statement and Deadlocked Vote on Retracting Commissioner Trumka's Statements Were Not Final Agency Action, and the Complaint Does Not Plausibly Allege that CPSC Failed to Observe Procedures Required by Law**

Dreamland brings Count V under 5 U.S.C. § 706(2)(D), alleging that the CPSC

statement, the Commission's denial of Dreamland's request to retract the CPSC statement, and

the Commission's deadlocked vote on whether to retract Commissioner Trumka's statements

were all made "without observance of procedure required by law." Compl. ¶¶ 188–93 (quoting

5 U.S.C. § 706(2)(D)). Count V primarily repeats a subset of Count IV's allegations, asserting

that CPSC "did not follow the CPSA or its own regulations and internal procedures" when

engaging in the challenged conduct. *Id.* ¶¶ 190, 192–93. Count V adds an allegation that CPSC

failed to clear NIH's statements before NIH posted them to its website. *Id.* ¶ 191; *see id.* ¶¶ 117–

19.

As to the allegations that repeat Count IV, Count V likewise fails to state a claim because

(1) neither the CPSC statement nor the deadlocked vote on retracting Commissioner Trumka's

statements was "agency action" or "final agency action," *see supra* pp. 13–21, and

(2) Dreamland does not plausibly allege that CPSC failed to comply with applicable procedural

requirements, namely those set forth in 15 U.S.C. § 2055(b)(6), *see supra* pp. 32–33.

Count V's additional allegation that CPSC violated its internal procedures by failing to

clear NIH's statement misses the mark for three reasons. First, neither the CPSA nor CPSC's

regulations required CPSC to clear NIH's statement before NIH posted it to the NIH website.

CPSC adopted its internal clearance procedures, including the provisions regarding joint projects, in accordance with 15 U.S.C. § 2055(b)(6), which requires procedures applicable "[w]here *the Commission initiates* the public disclosure of information .…" 15 U.S.C. § 2055(b)(6) (emphasis added); *see* 16 C.F.R. § 1101.1(c) ("Section 6(b)(6) requires the Commission to establish internal clearance procedures for *Commission initiated* disclosures of information that reflect on the safety of a consumer product or class of products .…") (emphasis added). Consistent with the statute, Directive 1450.2 sets forth CPSC's internal clearance procedures and states that they "apply to any release of information *initiated by the Commission*, including information disseminated on the agency's web site .…" Ex. 4 ¶ 1(a). The procedures are thus plainly inapplicable to NIH-initiated statements published to the NIH website.

Second, even assuming CPSC's internal procedures required it to clear NIH's statements and that CPSC failed to do so, Dreamland has no plausible entitlement to any relief against either NIH or CPSC. NIH had independent statutory authority to issue its statements, *see supra* pp. 25–28, so CPSC's alleged failure to clear those statements would not be a basis on which to set the statements aside (nor does Dreamland challenge NIH's statements on that ground). And because NIH's statements are independently lawful, there is no CPSC action that this Court could compel or set aside that would afford Dreamland any meaningful relief. In short, regardless of whether CPSC should have cleared NIH's statements, Dreamland is not entitled to relief.

Third, Dreamland does not plausibly allege that any alleged error by CPSC in allegedly failing to clear NIH's statements was anything more than harmless error. *See* 5 U.S.C. § 706 (instructing that "due account shall be taken of the rule of prejudicial error" in conducting arbitrary-and-capricious review); *Prohibition Juice Co. v. FDA*, 45 F.4th 8, 24 (D.C. Cir. 2022). The CPSC statement links to the NIH statement and, before making its statement, CPSC cleared

its contents in accordance with its internal agency clearance process. *See* Ex. 3 at 2. CPSC again reviewed both the CPSC statement and the NIH statement in the context of considering Dreamland's retraction request. As such, CPSC ultimately subjected the NIH statement to the very review process that Dreamland insists was required. *See id*. Accordingly, there is "not the slightest uncertainty" about whether CPSC would have cleared NIH's statement had it reviewed the statement earlier, and therefore any error "had no bearing" on the statements issued by either NIH or CPSC. *Prohibition Juice,* 45 F.4th at 24 (citations omitted). For all these reasons, Count V fails to state an APA claim against CPSC and should be dismissed.

## VI. The Court Lacks Subject-Matter Jurisdiction over Count VI, and Count VI also Fails to State a Claim, Because Dreamland's Due Process Allegations Are Speculative

Count VI asserts a due process claim based on bias, asserting that Commissioner Trumka has prejudged the safety of weighted infant sleep products. Compl. ¶¶ 194–206. It alleges that Commissioner Trumka has "formed a strong negative impression of [weighted infant sleep] products and is incapable of an unbiased consideration of actions affecting these products in the future." *Id.* ¶ 206. This claim fails, however, for both lack of standing and failure to state a claim for relief.

As a threshold matter, Dreamland has not met its burden to show standing to assert a due process claim because it has not shown an injury in fact. *See DaimlerChrysler*, 547 U.S. at 342 n.3; *Lujan*, 504 U.S. at 561. The Fifth Amendment provides that no person shall "be deprived of life, liberty, or property, without due process of law." U.S. Const., amend. V. But although Count VI alleges that Commissioner Trumka is biased, it does not allege that Dreamland is currently being deprived, or will imminently be deprived, of "life, liberty, or property" without due process. *Id.*; *see* Compl. ¶¶ 194–206. Thus, even if Dreamland had sufficiently alleged that Commissioner Trumka is biased (it has not), it would still fail to allege the requisite injury in fact

and thus would fail to show standing to assert a due process claim. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013); *Lujan*, 504 U.S. at 560–61.

Dreamland speculates about "actions affecting [weighted infant sleep] products in the future," Compl. ¶ 206, and requests "[a] permanent injunction enjoining Commissioner Trumka from participating in any future CPSC actions, including votes, regarding Dreamland's weighted infant sleep products and the class of weighted infant sleep products generally," *id.* at 43; *see id.* ¶ 73 (speculating that "Commissioner Trumka may propose the same or a substantially similar amendment again before his term as Commissioner expires in October of 2028"). But the Supreme Court has squarely rejected standing based on such speculation about possible future injury: it "ha[s] repeatedly reiterated that threatened injury must be *certainly impending* to constitute injury in fact, and that [a]llegations of *possible* future injury are not sufficient." *Clapper*, 568 U.S. at 409 (quotations omitted). Because Dreamland alleges no actual or imminent injury from Commissioner Trumka's alleged bias and offers only speculation about possible future proceedings at some indefinite point in the future, it has failed to show standing. *See id.*

To the extent Count VI asserts a due process claim based on future agency rulemaking, *see* Compl. ¶ 206 & p. 43, the Court lacks jurisdiction for an additional reason: the CPSA vests the courts of appeals with jurisdiction to review challenges to CPSC rules. 15 U.S.C. § 2060. Moreover, the *Thunder Basin* factors, which identify circumstances when district courts may exercise jurisdiction even though a statutory scheme vests review of final agency decisions in the court of appeals, are not met here. *See Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994). Precluding district court jurisdiction would not "foreclose all meaningful judicial review," since challenges to the final rule could be reviewed in the court of appeals. *Id.* at 212–13; 15 U.S.C.

§ 2060. And Dreamland's bias claim would be neither "wholly collateral" to the CPSA's review provisions nor "outside the agency's expertise," since it would relate to whether Commissioner Trumka has prejudged the substantive issues in a hypothetical future rulemaking. 510 U.S. at 212 (quotations omitted). As the D.C. Circuit has explained, a prejudgment claim is "inextricably intertwined with the conduct of the very enforcement proceeding the statute grants the [agency] the power to institute and resolve as an initial matter." *Jarkesy v. SEC*, 803 F.3d 9, 22–23 (D.C. Cir. 2015) (finding that the other *Thunder Basin* factors also favored precluding district court review of a prejudgment claim); *see Cleantech Innovations, Inc. v. NASDAQ Stock Mkt., LLC*, No. 11 CIV. 9358 KBF, 2012 WL 345902 (S.D.N.Y. Jan. 31, 2012).

Even if the Court had jurisdiction, Dreamland would still fail to state a due process claim. As discussed above, it fails to allege that it is currently being deprived, or will imminently be deprived, of "life, liberty, or property" without due process. U.S. Const., amend. V; *see* Compl. ¶¶ 194–206. Its due process claim is therefore legally deficient because it fails to allege an element of the claim. *See Neitzke*, 490 U.S. at 326–27. Although Dreamland speculates about possible future CPSC proceedings in which Commissioner Trumka will allegedly be biased against it, Compl. ¶ 206 & p. 43, a complaint must "raise a right to relief above the speculative level," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Not only does Dreamland speculate about the existence of future proceedings, but it also speculates about Commissioner Trumka's alleged bias. A prejudgment claim requires showing that "a disinterested observer may conclude that [the decisionmaker] has in some measure adjudged the facts as well as the law of a particular case in advance of hearing it." *Metro. Council of N.A.A.C.P. Branches v. FCC*, 46 F.3d 1154, 1164–65 (D.C. Cir. 1995) (quotations omitted). But it is speculative whether Commissioner Trumka has prejudged the facts and the

law of a potential future case, where that case does not yet exist, and it is unknown which facts

or law might be at issue. Such speculation cannot survive a motion to dismiss. *See Twombly*, 550

U.S. at 555; *Metro. Council of N.A.A.C.P. Branches*, 46 F.3d at 1164 (rejecting prejudgment

claim that was based on speculation). Finally, the fact that Commissioner Trumka "expressed

strong views" regarding weighted infant sleep products does not change the fact that he and the

other Commissioners are "assumed to be men of conscience and intellectual discipline, capable

of judging a particular controversy fairly on the basis of its own circumstances." *United States v.

Morgan*, 313 U.S. 409, 421 (1941); *see Gregory*, 534 U.S. at 10 ("a presumption of regularity

attaches to the actions of Government agencies"). The Complaint does not plausibly overcome

this well-established presumption.

### VII. Count VII Fails to State a Claim Because the Removal Protection for CPSC Commissioners Does Not Violate the Separation of Powers, and the Complaint Fails to Show Harm to Dreamland from the Removal Protection

Count VII alleges that the for-cause removal protection for CPSC Commissioners in

15 U.S.C. § 2053(a) violates the separation of powers. Compl. ¶¶ 207–11. This argument is

foreclosed by Supreme Court precedent, and also fails to state a claim for relief because

Dreamland has not shown any harm from the removal protection.

In *Humphrey's Executor v. United States*, 295 U.S. 602, 631–32 (1935), the Supreme

Court upheld the for-cause removal protection for FTC Commissioners.[23] Applying *Humphrey's

Executor*, several courts have recently upheld the removal protection for CPSC Commissioners

because CPSC is a "mirror image" of the FTC. *Leachco, Inc. v. CPSC*, 103 F.4th 748, 762 (10th

---

[23] Over the past ninety years, the Supreme Court has repeatedly applied and declined to overrule *Humphrey's Executor*. *See, e.g.*, *Seila Law LLC v. CFPB*, 591 U.S. 197, 204 (2020); *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 483 (2010); *Morrison v. Olson*, 487 U.S. 654, 688 & n.25 (1988).

Cir. 2024) (quoting *Consumers' Rsch. v. CPSC*, 91 F.4th 342, 346 (5th Cir. 2024), *cert. denied*,

No. 23-1323, 2024 WL 4529808 (U.S. Oct. 21, 2024)); *see United States v. SunSetter Prods. LP*,

No. 23-CV-10744-ADB, 2024 WL 1116062, at *2–4 (D. Mass. Mar. 14, 2024). As with the FTC,

"there are five CPSC commissioners, no more than three can be from the same political party,

and they serve staggered, seven-year terms." *Leachco*, 103 F.4th at 761 (citing 15 U.S.C. §

2053(a), (b)(1), (c)). Moreover, *Humphrey's Executor* extends beyond agencies that mirror the

FTC and protects any "traditional independent agency headed by a multimember board,"

including CPSC. *Consumers' Rsch.*, 91 F.4th at 352 (quoting *Seila Law*, 591 U.S. at 207).

Finally, even if Dreamland had shown that the CPSC Commissioners' removal protection

was unconstitutional, it would not be entitled to relief because the Complaint does not show

harm to Dreamland from the removal protection. In *Collins v. Yellen*, 594 U.S. 220 (2021), the

Supreme Court held that, to obtain relief on a removal protection claim, a plaintiff must show

that the removal protection caused it compensable harm. *Id.* at 259–60. For example, a plaintiff

might show harm if "the President had attempted to remove a [Commissioner] but was prevented

from doing so by a lower court decision holding that he did not have 'cause' for removal," or if

"the President had made a public statement expressing displeasure with actions taken by a

[Commissioner] and had asserted that he would remove the [Commissioner] if the statute did not

stand in the way." *Id.* In *Leachco*, the Tenth Circuit reaffirmed that "[t]o establish harm under

*Collins*, [the plaintiff] would need to make a showing that the challenged removal provisions

actually impacted, or will impact, the actions taken by the CPSC against it." 103 F.4th at 757.

*Leachco* "agree[d] with the Second, Fifth, and Sixth Circuits that *Collins*' relief analysis applies

to both retrospective and prospective relief." *Id.*

Here, the Complaint does not even attempt to show that the CPSC Commissioners' removal protection had any effect on the challenged actions. For example, the Complaint does not allege that the President wanted to remove a CPSC Commissioner but could not do so because of the removal protection. *See Collins*, 594 U.S. at 259–60. Thus, not only has Dreamland failed to show that the CPSC Commissioners' removal protection is unconstitutional, but it also is not entitled to relief because it fails to allege compensable harm from the removal protection.

**CONCLUSION**

For the foregoing reasons, the Court should dismiss the Complaint for lack of subject-matter jurisdiction and failure to state a claim for relief.

January 28, 2025                        Respectfully submitted,

                                       */s/ Isaac C. Belfer*
                                       ISAAC C. BELFER (D.C. Bar No. 1014909)
                                       DAVID H. HIXSON (Ill. Bar No. 6289751)
                                       Trial Attorneys
                                       Consumer Protection Branch
                                       Civil Division
                                       U.S. Department of Justice
                                       P.O. Box 386
                                       Washington, DC 20044-0386
                                       (202) 305-7134 (Belfer)
                                       (202) 449-8070 (Hixson)
                                       (202) 514-8742 (fax)
                                       Isaac.C.Belfer@usdoj.gov
                                       David.H.Hixson@usdoj.gov

                                       *Counsel for Defendants*

42
