# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Dreamland Baby Co.,<br><br>              Plaintiff,<br><br>    v.<br><br>U.S. Consumer Product Safety Commission,<br>*et al.*,<br><br>              Defendants. | Case No. 1:24-cv-03277-RC |

## Reply in Support of Defendants' Motion to Dismiss

BRETT A. SHUMATE
Assistant Attorney General

YAAKOV M. ROTH
Principal Deputy Assistant Attorney General
Civil Division

LISA K. HSIAO
Acting Director

JAMES W. HARLOW
Acting Assistant Director

ISAAC C. BELFER (D.C. BAR NO. 1014909)
DAVID H. HIXSON (ILL. BAR NO. 6289751)
Trial Attorneys
Consumer Protection Branch
Civil Division
U.S. Department of Justice
P.O. Box 386
Washington, DC 20044-0386
(202) 305-7134 (Belfer)
(202) 449-8070 (Hixson)
(202) 514-8742 (fax)
Isaac.C.Belfer@usdoj.gov
David.H.Hixson@usdoj.gov

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

ARGUMENT ................................................................................................................... 2

I.   Count I Does Not Plausibly Allege that CPSC's Safe Sleep Statement or Deadlocked Vote Were Final Agency Action or that CPSC Acted in Excess of Statutory Authority ......................................................................................... 2

    A.   CPSC's Safe Sleep Statement Was Neither Agency Action Nor Final Agency Action ................................................................................................. 2

    B.   CPSC Did Not Plausibly Exceed its Statutory Authority ........................... 7

II.  Count II Does Not Plausibly Allege that CDC or NIH Acted *Ultra Vires* ........................ 9

III. Count III Does Not Plausibly Allege that Commissioner Trumka Acted *Ultra Vires* ..... 12

IV.  Count IV Does Not Plausibly Allege that CPSC's Safe Sleep Statement or Deadlocked Vote Were Final Agency Action or that CPSC Acted Arbitrarily or Capriciously ....................................................................................................... 16

V.   Count V Does Not Plausibly Allege that CPSC's Safe Sleep Statement or Deadlocked Vote Were Final Agency Action or that CPSC Failed to Observe Procedures Required by Law ............................................................................. 17

VI.  Dreamland Fails to Establish Subject-Matter Jurisdiction for Count VI or Plausibly Allege a Due Process Violation ...................................................................... 18

VII. Count VII Does Not Allege that the Removal Protection Harmed Dreamland ............... 21

CONCLUSION ................................................................................................................ 22

# TABLE OF AUTHORITIES

**Cases**

*Arrow Reliance, Inc. v Califf*,
No. 2:22-cv-1057, 2022 WL 18027595 (W.D. Wash. Dec. 30, 2022) ...................................... 5

*Asbury Auto. Grp., Inc. v. FTC*,
No. 4:24-cv-950-O, 2025 WL 2317455 (N.D. Tex. Aug. 11, 2025) ...................................... 22

*Axon Enters., Inc. v. FTC*,
598 U.S. 175 (2023) ...................................................................................................... 20

*Bennett v. Spear*,
520 U.S. 154 (1997) .............................................................................................. 5, 6, 7

*Bierly v. Dep't of Def.*,
No. 23-cv-2386-RCL, 2024 WL 4227154 (D.D.C. Sept. 18, 2024) ...................................... 18

*Bowen v. Georgetown Univ. Hosp.*,
488 U.S. 204 (1988) ...................................................................................................... 3

*Boyle v. Trump*,
No. 25-cv-1628-MJM, 2025 WL 1677099 (D. Md. June 13, 2025) ...................................... 22

*Cal. By & Through Brown v. EPA*,
940 F.3d 1342 (D.C. Cir. 2019) ...................................................................................... 6

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ...................................................................................................... 19

*CPSC v. GTE Sylvania, Inc.*,
447 U.S. 102 (1980) ...................................................................................................... 8

*Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.*,
77 F.4th 679 (D.C. Cir. 2023) ........................................................................................ 18

*Doe v. Tenenbaum*,
127 F. Supp. 3d 426 (D. Md. 2012) ............................................................................. 6, 7

*Eagle Pharms., Inc. v. Azar*,
952 F.3d 323 (D.C. Cir. 2020) ...................................................................................... 7

*Eagle Trust Fund v. USPS*,
811 F. App'x 669 (D.C. Cir. 2020) ............................................................................... 12

*Elec. Energy, Inc. v. EPA*,
106 F.4th 31 (D.C. Cir. 2024) ...................................................................................... 3

*El-Shifa Pharm. Indus. Co. v. United States*,
No. 01-cv-731-RWR, 2007 WL 950082 (D.D.C. Mar. 28, 2007) ...................................... 5

*\*Epic Sys. Corp. v. Lewis*,
584 U.S. 497 (2018) ............................................................................................... 8, 11

*\*Fed. Express Corp. v. U.S. Dep't of Com.*,
39 F.4th 756 (D.C. Cir. 2022) ............................................................................. 9, 10, 15

*Flue-Cured Tobacco Coop. Stabilization Corp. v. EPA,*
    313 F.3d 852 (4th Cir. 2002) ..................................................................... 6

*Georator Corp. v. Equal Emp. Opportunity Comm'n,*
    592 F.2d 765 (4th Cir. 1979) ..................................................................... 4

*Gerlich v. U.S. Dep't of Just.,*
    659 F. Supp. 2d 1 (D.D.C. 2009) ............................................................ 18

*Hearst Radio, Inc. v. FCC,*
    167 F.2d 225 (D.C. Cir. 1948) ................................................................... 5

*\*Indus. Safety Equip. Ass'n v. EPA,*
    837 F.2d 1115 (D.C. Cir. 1988) ............................................................ 5, 6

*\*Int'l Tel. & Tel. Corp. v. Loc. 134, Int'l Bhd. of Elec. Workers,*
    419 U.S. 428 (1975) ................................................................................ 3, 4

*Invention Submission Corp. v. Rogan,*
    357 F.3d 452 (4th Cir. 2004) ..................................................................... 6

*ITServe All., Inc. v. U.S. Dep't of Homeland Sec.,*
    71 F.4th 1028 (D.C. Cir. 2023) .................................................................. 3

*Kokesh v. SEC,*
    581 U.S. 455 (2017) .................................................................................... 4

*Lamie v. U.S. Tr.,*
    540 U.S. 526 (2004) .................................................................................... 7

*Leachco, Inc. v. CPSC,*
    103 F.4th 748 (10th Cir. 2024) ......................................................... 21, 22

*Loper Bright Enters. v. Raimondo,*
    603 U.S. 369 (2024) .................................................................................. 15

*\*Me. Cmty. Health Options v. United States,*
    590 U.S. 296 (2020) ............................................................................ 10, 11

*Metro. Council of N.A.A.C.P. Branches v. FCC,*
    46 F.3d 1154 (D.C. Cir. 1995) ........................................................... 20, 21

*Morton v. Mancari,*
    417 U.S. 535 (1974) .................................................................................. 10

*Nat'l Treasury Emps. Union v. Vought,*
    No. 25-5091, 2025 WL 2371608 (D.C. Cir. Aug. 15, 2025) ..................... 9

*NRC v. Texas,*
    605 U.S. 665 (2025) .................................................................................... 9

*Osicka v. Off. of Law. Regul.,*
    25 F.4th 501 (7th Cir. 2022) ...................................................................... 4

*Postal Police Officers Ass'n v. USPS,*
    502 F. Supp. 3d 411 (D.D.C. 2020) ........................................................ 12

*Republic of Sudan v. Harrison*,
  587 U.S. 1 (2019) ........................................................................................ 8

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016) .................................................................................... 18

*Thunder Basin Coal Co. v. Reich*,
  510 U.S. 200 (1994) .................................................................................... 20

*Trump v. Boyle*,
  145 S. Ct. 2653 (2025) .......................................................................... 19, 22

*U.S. Postal Serv. v. Gregory*,
  534 U.S. 1 (2001) ...................................................................................... 16

*Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer*,
  515 U.S. 528, 533 (1995) .......................................................................... 11

*Watts v. SEC*,
  482 F.3d 501 (D.C. Cir. 2007) .................................................................... 3

*Zen Magnets, LLC v. CPSC*,
  968 F.3d 1156 (10th Cir. 2020) .................................................................. 20

**Statutes**

5 U.S.C. §
  551 ............................................................................................................ 2
  551(6) ........................................................................................................ 3
  551(7) ........................................................................................................ 3
  551(10) ...................................................................................................... 4
  706 .......................................................................................................... 16

15 U.S.C. §
  2051 .......................................................................................................... 7
  2052 .......................................................................................................... 7
  2053 .......................................................................................................... 7
  2054 .......................................................................................................... 7
  2054(a) ...................................................................................................... 8
  2055 ...................................................................................................... 6, 7
  2055(b) .................................................................................................. 8, 9
  2055(b)(1) ......................................................................................... 14, 15
  2055(b)(6) ................................................................................... 4, 6, 8, 14
  2055(b)(7) .......................................................................................... 4, 8
  2055a ........................................................................................................ 6
  2055a(c) .................................................................................................... 6

42 U.S.C. §
  241(a) ...................................................................................................... 10
  242c ........................................................................................................ 11
  281 .......................................................................................................... 11
  300c-11 .................................................................................................... 10
  300c-13(a)(2) .......................................................................................... 10

300u-3(1) ................................................................................................ 10

**Regulations**

16 C.F.R. § 1101.13 .............................................................................. 15

**Other Authorities**

48 Fed. Reg. 57,406 (Dec. 19, 1983) ..................................................... 15

Attorney General's Manual on the APA (1947) ......................................... 3

*Fine*, Black's Law Dictionary (11th ed. 2019) ......................................... 4

Letter from Sandy L. Chung, MD and President of AAP to CPSC and ASTM
    International F15 Committee Chair Donald Mays (June 15, 2023),
    https://www.documentcloud.org/documents/23849624-aap-letter-61523) ............................. 14

## INTRODUCTION

Dreamland filed suit to erase public statements made by CPSC, a now-former CPSC Commissioner, CDC, and NIH about weighted infant sleep products.[1] But as Defendants explained, each of the Complaint's seven counts is legally deficient. *See* Mem., ECF No. 8-1. Dreamland's opposition brief (ECF No. 15) does not save this lawsuit.

Dreamland's APA claims against CPSC (Counts I, IV, and V) are not well-pleaded. For starters, Dreamland concedes the Commission's deadlocked vote on whether to retract Commissioner Trumka's statements is not "final agency action." Although Dreamland now argues CPSC's statement providing safe sleep recommendations was an "order" or "sanction," that argument runs counter to decades of on-point case law. Dreamland's response also does nothing to rehabilitate the Complaint's conclusory allegations that CPSC acted in excess of statutory authority, acted arbitrarily or capriciously, or failed to observe required procedures.

Dreamland's *ultra vires* claims against HHS, CDC, and NIH (Count II), and against former Commissioner Trumka (Count III) are no more availing. Dreamland's imagined limitations on the agencies' authority to communicate information to the public do not reflect the actual, statutory text. Indeed, the statutory authorities expressly and independently permit all three agencies to disseminate information. In addition, Dreamland's contentions that Commissioner Trumka improperly disclosed information already in the public domain and failed to follow inapplicable procedural requirements find no support in the facts or the statute.

Finally, Dreamland's constitutional due process claim against Commissioner Trumka (Count VI) and challenge to the CPSA's for-cause removal protections (Count VII) remain meritless. Dreamland continues to merely speculate about harms it might suffer from

---

[1] We carry forward the abbreviations and definitions used in the motion to dismiss.

Commissioner Trumka's alleged bias or the statutory removal protections. Such speculation will not suffice for jurisdiction or a plausible claim. For these reasons, the Complaint should be dismissed in its entirety.

ARGUMENT

### I. Count I Does Not Plausibly Allege that CPSC's Safe Sleep Statement or Deadlocked Vote Were Final Agency Action or that CPSC Acted in Excess of Statutory Authority

Count I fails to state an APA claim as to the statement on CPSC's website about safe sleep and the deadlocked vote on whether to retract Commissioner Trumka's statements because neither was "agency action," much less the requisite "final agency action." *See* Mem. 13–21. Dreamland does not dispute that the deadlocked vote was not final agency action, *see, e.g.*, Opp'n 14, 27, so Count I should be dismissed as it relates to that vote. (The same holds true for Counts IV and V, *see infra* Parts IV and V.) Dreamland's argument that the website statement rises to the level of final agency action flies in the face of decades of precedent. In any event, Dreamland also does not plausibly allege that CPSC exceeded its authority by issuing the statement or by denying Dreamland's retraction request. *See* Mem. 21–24.

### A. CPSC's Safe Sleep Statement Was Neither Agency Action Nor Final Agency Action

***No "agency action."*** Defendants' motion explained that, under D.C. Circuit precedent, a non-binding agency publication such as the statement on CPSC's website about safe sleep is not "agency action" because it does not satisfy any of the definitions set forth 5 U.S.C. § 551. *See* Mem. 13–16. Dreamland responds that the agency's statement was an "order" or "sanction" because it "represents the 'final disposition' of the Commission's review under its clearance process," or because it was "false or unauthorized publicity" that "caused destruction . . . of Dreamland's property." Opp'n 14–17 (internal quotations and alterations omitted). Neither contention has merit.

2

An "order" is formulated through an agency's process of "adjudication," 5 U.S.C. § 551(7), and it is defined as "the whole or a part of a final disposition . . . of an agency in a matter other than rule making but including licensing," *id.* § 551(6). Under the APA, "adjudication involves 'case-specific determinations' that 'immediately bind parties by retroactively applying law to their past actions.'" *Elec. Energy, Inc. v. EPA*, 106 F.4th 31, 45 (D.C. Cir. 2024) (quoting *ITServe All., Inc. v. U.S. Dep't of Homeland Sec.*, 71 F.4th 1028, 1035 (D.C. Cir. 2023)); *see Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 218–19 (1988) (Scalia, J., concurring) ("[A]djudication is concerned with the determination of past and present rights and liabilities.") (quoting Attorney General's Manual on the APA 14 (1947)). Here, CPSC's decision to post its safe sleep statement to the agency's website did not involve any specific parties, nor did it purport to address how the law applies to anyone's actions or to any consumer product. So while "agency lawyers . . . review[ed]" a draft of the statement, and there were "internal agency meetings and consultations," this "internal agency process for reaching a decision on whether to [publish the safe sleep statement] is not typically or comfortably described as an 'adjudication.'" *Watts v. SEC*, 482 F.3d 501, 506 (D.C. Cir. 2007).

Critically, a "final disposition" also must "have some determinate consequences for the party to the proceeding." *Int'l Tel. & Tel. Corp. v. Loc. 134, Int'l Bhd. of Elec. Workers*, 419 U.S. 428, 443 (1975). The Supreme Court expressly declined to "sweep under the definition" of "order" "numerous ancillary agency proceedings that are distinct from . . . adjudications" and lack legal effects. *Id.* at 447. In this case, CPSC's safe sleep statement cannot be an "order" because it has no "determinate consequences" for Dreamland. *See id.* at 443. The statement does "not order anybody to do anything," and "standing alone," it "binds no one." *Id.* (quotation omitted). For APA purposes, the CPSC's safe sleep statement "is lifeless, [as it] can fix no

obligation nor impose any liability on [Dreamland]." *Georator Corp. v. Equal Emp. Opportunity Comm'n*, 592 F.2d 765, 768 (4th Cir. 1979) (holding that EEOC's "determination of reasonable cause to believe that the charge of discrimination filed against the plaintiff was true" was not an "order"). Any legal consequences would have to derive from a new proceeding that "has a life of its own." *Int'l Tel. & Tel.*, 419 U.S. at 443. The CPSC's safe sleep statement thus falls well short of being an "order."

CPSC's statement is also not a "sanction" because it does not plausibly limit Dreamland's "freedom," withhold relief, impose a penalty or fine, take or withhold property, assess damages, revoke any license, or take any "other compulsory or restrictive action." 5 U.S.C. § 551(10). Dreamland ignores the APA's definition of "sanction," and it cites no authority holding that a non-binding statement is a sanction or other agency action. Opp'n 14–17. Instead, Dreamland argues this case is unique because the CPSA "limits . . . public disclosures based on [the Commission's] determination that the disclosure is not 'inaccurate or misleading' and 'reflects adversely' on the safety of a product or class of products." *Id.* 15 (citing 15 U.S.C. § 2055(b)(6), (7)). But nothing in the CPSA's procedural requirements transforms the agency's non-binding safety advice for consumers into a "fine," "penalty," or other type of sanction. *See, e.g.*, *Osicka v. Off. of Law. Regul.*, 25 F.4th 501, 506 (7th Cir. 2022) ("A fine is 'a pecuniary criminal punishment or civil penalty payable to the public treasury.'") (quoting *Fine (5)*, Black's Law Dictionary (11th ed. 2019)); *Kokesh v. SEC*, 581 U.S. 455, 461–62 (2017) ("A penalty is a punishment, whether corporal or pecuniary, imposed and enforced by the State, for a crime or offense against its laws.") (cleaned up).

Dreamland next posits that CPSC's safe sleep statement was a "sanction" because it was allegedly "inaccurate or misleading" and "caused destruction of Dreamland's property, *i.e.*, its

business." Opp'n 16 (cleaned up). However, numerous courts have squarely held that merely alleging a government statement is "false" or has caused an "adverse impact" is insufficient to establish a sanction. *Arrow Reliance, Inc. v Califf*, No. 2:22-cv-1057, 2022 WL 18027595, at *3–4 (W.D. Wash. Dec. 30, 2022) (FDA press release recommending that consumers not use the plaintiff's pet food was not a sanction); *see Hearst Radio, Inc. v. FCC*, 167 F.2d 225, 227 (D.C. Cir. 1948) (holding that the APA's definition of "sanction" "obviously does not cover" an allegedly defamatory agency statement); *Indus. Safety Equip. Ass'n v. EPA*, 837 F.2d 1115, 1118–19 (D.C. Cir. 1988) (EPA's issuance of a report warning against—but not prohibiting the use of certain asbestos-protection respirators—was not a sanction or other agency action); *El-Shifa Pharm. Indus. Co. v. United States*, No. 01-cv-731-RWR, 2007 WL 950082, at *1 (D.D.C. Mar. 28, 2007) ("[N]umerous courts have rejected classifying [allegedly] defamatory statements as sanctions based on the APA's definition."). CPSC's statement about safe sleep is not "agency action."

**No *"final agency action."*** Even if there were "agency action" here, the statement on CPSC's website about safe sleep is not "final agency action" because it has no "legal consequences." Mem. 18–20 (quoting *Bennett v. Spear*, 520 U.S. 154, 178 (1997)). Dreamland's response falls wide of the mark.

Dreamland argues that CPSC's safe sleep statement has "legal consequences" because its issuance (a) "triggered Dreamland's right to seek retraction under the CPSA and its implementing regulations," and (b) led to "Dreamland [being] subject to litigation that was predicated on the [CPSC's statement]." Opp'n 19. However, these sorts of indirect effects are not the "*direct* and appreciable legal consequences" necessary to satisfy *Bennett*'s second prong. *Bennett*, 520 U.S. at 178 (emphasis added). Nothing in CPSC's statement "determined"

Dreamland's "rights or obligations" under the CPSA to seek a retraction. *Id.* Likewise, the separate class action litigation about which Dreamland complains is "not [a] direct consequence[] of [CPSC's safe sleep statement]," but rather is "attributable to independent responses and choices of third parties." *Flue-Cured Tobacco Coop. Stabilization Corp. v. EPA*, 313 F.3d 852, 861 (4th Cir. 2002); *see Indus. Safety Equip.*, 837 F.2d at 1121 (holding that the "reactions and choices of industry customers and workers" were insufficient to establish legal consequences). In other words, the class action suit by private plaintiffs against Dreamland is "not a regulatory effect reviewable in court, but at most an indirect effect from third parties." *Invention Submission Corp. v. Rogan*, 357 F.3d 452, 469 (4th Cir. 2004); *see Cal. By & Through Brown v. EPA*, 940 F.3d 1342, 1352 (D.C. Cir. 2019) (recognizing that "voluntary actions" by third parties "do not generate final agency action").

Lastly, Dreamland tries to analogize this case to *Doe v. Tenenbaum*, 127 F. Supp. 3d 426 (D. Md. 2012), *rev'd on other grounds sub nom. Doe v. Pub. Citizen*, 749 F.3d 246 (4th Cir. 2014)). *See* Opp'n 18–19. But *Doe* arose under 15 U.S.C. § 2055a—a distinct statutory scheme not at issue here—and Dreamland glosses over crucial statutory differences and the court's reasoning to argue that "15 U.S.C. §§ 2055 and 2055a [are] the same." Opp'n 18, 19.

As Defendants explained, *see* Mem. 19–20, whereas section 2055(b)(6) requires CPSC to have internal procedures designed to ensure the accuracy of agency-initiated statements, section 2055a requires CPSC to publish certain third-party reports of harm to a public database after providing the identified manufacturer with notice and an opportunity to object, *see Doe*, 127 F. Supp. 3d at 460 (discussing 15 U.S.C. § 2055a(c)). In *Doe*, the court found that CPSC's decision to publish a third-party report over the manufacturer's objection "perfected an adversarial process" that required the manufacturer to offer "evidence" and carry the "burden of

proof." *Id.* at 463. Critically, CPSC's action in *Doe* also "*determine[d]* Plaintiff's statutorily and regulatorily spawned *right* to prevent publication of the materially inaccurate information." *Id.* at 461 (emphases added). Here, by contrast, CPSC's publication of its safe sleep statement did not result from or require any "adversarial process," nor did it "determine[]" Dreamland's "right" to obtain a retraction of that statement. *See id.* In short, the safe sleep statement had no "direct and appreciable *legal* consequences." *Bennett*, 520 U.S. at 178 (emphasis added).

**B.   CPSC Did Not Plausibly Exceed its Statutory Authority**

Apart from final agency action, Count I fails in its entirety because CPSC has authority to issue its statement regarding safe sleep and to vote on Dreamland's retraction request. *See* Mem. 21–24. Dreamland does not directly dispute Defendants' textual analysis of the CPSA or the propositions that CPSC has "broad authority to disseminate product safety information" and can vote on retractions requests. *Id.* (discussing 15 U.S.C. §§ 2051–55). Instead, Dreamland offers extra-textual interpretations of the CPSA, and factual arguments irrelevant to Count I.

**1.**   Dreamland starts by rewriting the CPSA to impose non-textual limits on the Commission's ability to disseminate information. Dreamland calls CPSC's statement about safe sleep a "product safety determination," Opp'n 20–21, a term foreign to the CPSA and its implementing regulations, *see Lamie v. U.S. Tr.*, 540 U.S. 526, 538 (2004) (stating that a court may not "read an absent word into the statute" because doing so "would result not in a construction of the statute, but, in effect, an enlargement of it by the court") (quotation and citation omitted); *Eagle Pharms., Inc. v. Azar*, 952 F.3d 323, 339–40 (D.C. Cir. 2020) ("Our role is to interpret the language of the statute enacted by Congress, not to improve upon it.") (quotations and citations omitted).

Next, Dreamland theorizes that, because the CPSA has "specific procedures and requirements" that apply when CPSC acts through "regulation, recalls, and enforcement action,"

these are the *only* mechanisms through which CPSC can make a "product safety determination." Opp'n 20. The upshot, Dreamland tells us, is that "CPSC's general authority to disseminate product safety determinations" is subject to unstated "limitations" on "when CPSC may make product safety determinations." Opp'n 21.

Dreamland's unsupported reading of the CPSA defies the statute's plain text and creates numerous unnecessary conflicts between provisions. *See Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 521 (2018) ("[T]he canon against reading conflicts into statutes is a traditional tool of statutory construction. . . ."). Dreamland's view would disable the CPSA's requirement that CPSC "disseminate injury data[] and information[] relating to the causes and prevention of death, injury, and illness associated with consumer products," 15 U.S.C. § 2054(a), because such information "reflects on the safety of [a] consumer product" and would be a "product safety determination" that could occur only in the context of a regulation, formal recall, or enforcement action, *see* Opp'n 25 (describing what constitutes a "product safety determination"). Similarly, many of 15 U.S.C. § 2055(b)'s information disclosure requirements apply to the Commission's public disclosure of "information that reflects on the safety of a consumer product or class of consumer products," *id.* § 2055(b)(6), (7), but, under Dreamland's interpretation, such disclosures would be either prohibited or be permitted only in the context of a regulation, recall, or enforcement action.

By contrast, CPSC's understanding of its authority stems from the CPSA, that is, from "the language of the statute itself." *Republic of Sudan v. Harrison*, 587 U.S. 1, 8 (2019); *see* Mem. 21–23. Congress "gave the Commission broad powers to gather, analyze, and disseminate vast amounts of private information," *CPSC v. GTE Sylvania, Inc.*, 447 U.S. 102, 111 (1980),

and the Commission may exercise these powers consistent with the requirements of 15 U.S.C. § 2055(b). It is that simple.

2.    Dreamland also raises "question[s] of fact," contending that CPSC exceeded its authority because there was "no evidence supporting" the agency's statement regarding safe sleep and the agency was "without any data or evidence supporting its decision" to deny Dreamland's request to retract the CPSC's statement. *Id.* 22. Whether CPSC properly weighed the evidence is relevant to Dreamland's arbitrary and capricious claim in Count IV, *see infra* Part IV, but it has no bearing on Count I because it does not affect the agency's statutory authority to issue the statement or deny the retraction request, *see* Compl. ¶¶ 148–57 (alleging statutory, not evidentiary, grounds for asserting Count I). For all these reasons, Count I fails to state a claim under the APA and should be dismissed.

## II.    Count II Does Not Plausibly Allege that CDC or NIH Acted *Ultra Vires*

Count II exemplifies why "the Supreme Court recently described *ultra vires* challenges as 'essentially a Hail Mary pass—and in court as in football, the attempt rarely succeeds.'" *Nat'l Treasury Emps. Union v. Vought*, No. 25-5091, 2025 WL 2371608, at *18 (D.C. Cir. Aug. 15, 2025) (quoting *NRC v. Texas*, 605 U.S. 665, 681–82 (2025)). CDC and NIH have express statutory authority to make their challenged statements, and Dreamland's response does nothing to show that Count II meets the high bar for *ultra vires* claims. *See* Mem. 24–27. For starters, Dreamland merely suggests that "it is *questionable* that CDC's and NIH's determinations even meet the requirements of the [Public Health Service Act (PHSA)]." Opp'n 26 (emphasis added). This ambivalent claim comes nowhere near plausibly alleging that the agencies "plainly act[ed] in excess of [their] delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory." *Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 763 (D.C. Cir. 2022). So Count II fails from the get-go.

What's more, Dreamland presents *no* textual argument why CDC's and NIH's statements exceeded their statutory authority. Dreamland argues that there is "no evidence or data" establishing a safety risk, that "CDC and NIH did not independently study these products," and that they should not have relied on AAP's recommendations. Opp'n 26. But *ultra vires* claims do not ask whether an agency properly weighed the evidence; they "are confined to extreme agency error where the agency has stepped . . . plainly beyond the bounds of" its statutory authority, "or acted . . . clearly in defiance of it." *Fed. Express*, 39 F.4th at 764 (quotation omitted). As Defendants explained, the PHSA expressly authorizes HHS and its subagencies to "disseminat[e] information" about, and to "develop . . . programs and activities to address," "sudden unexpected infant death." Mem. 25 (quoting 42 U.S.C. § 300c-11, 13(a)(2)). These provisions, among others, plainly encompass the agencies' statements regarding health and safety risks related to weighted infant sleep products. *See id.* 25–27 (discussing also 42 U.S.C. §§ 241(a), 300u-3(1)).

Unable to attack CDC's and NIH's statutory authority directly, Dreamland claims that "the PHSA's general provisions are not the controlling provisions, the CPSA is." Opp'n 24. In Dreamland's view, the CPSA's supposed unstated limitations on *CPSC's* ability to make public statements related to consumer product safety also apply to *all other agencies*. *Id.* 22–27.

Dreamland's theory is wrong as to CPSC for the reasons already discussed, *see* Part I.B, and it is doubly flawed as to CDC and NIH. When "[p]resented with two statutes, the Court will 'regard each as effective'—unless Congress's intention to repeal is 'clear and manifest' or the two laws are 'irreconcilable.'" *Me. Cmty. Health Options v. United States*, 590 U.S. 296, 315 (2020) (quoting *Morton v. Mancari*, 417 U.S. 535, 550–51(1974)). Consequently, "[a] party seeking to suggest that two statutes cannot be harmonized, and that one displaces the other, bears the heavy burden of showing 'a clearly expressed congressional intention' that such a result

should follow." *Epic Sys. Corp.*, 584 U.S. at 510 (quoting *Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer*, 515 U.S. 528, 533 (1995)). Dreamland does not meet this burden. It points to *nothing* in the PHSA or CPSA remotely suggesting that CDC's and NIH's express authority to disseminate non-binding health and safety information, including information specifically about sudden unexpected infant death, is "displace[d]" by the CPSA. *See id.*

More broadly, Dreamland offers no persuasive reason why the PHSA and CPSA are "irreconcilable" rather than complementary. *See Me. Cmty. Health Options*, 590 U.S. at 315. CDC and NIH, as subagencies of HHS, are wholly separate from CPSC, created under a different statute, vested with distinct authorities, and charged with their own mission to disseminate public health information. *See, e.g.*, 42 U.S.C. §§ 242c, 281–283r. Where a consumer product affects the public health, it is unsurprising that Congress enabled CDC and NIH, as well as CPSC, to inform the public about the risks.

Dreamland tries to save its theory with two untenable statutory arguments. First, it claims that the "PHSA's general statutory provisions" must be read to "accommodate the more specific requirements of the CPSA." Opp'n 25. But there is no need for an "accomodat[ion]"—the only conflict between provisions arises from Dreamland's misreading of the statutes.[2] *See Me. Cmty. Health Options*, 590 U.S. at 315. Second, Dreamland tries to avoid treating the PHSA's provisions as surplusage by conceding that CDC and NIH can disseminate information regarding consumer products *after* CPSC issues a product safety determination. Opp'n 26. Yet again, however, Dreamland points to nothing in the PHSA's text evidencing this supposed exception to

---

[2] Even if there were a conflict, when assessing NIH's and CDC's authority to disseminate information, the *PHSA* is the more specific statute.

the notional limits on the agencies' authority. Dreamland's theory, completely unmoored from the statutory text, is wrong and should be rejected.

For all these reasons, Dreamland fails to state an *ultra vires* claim against HHS, CDC, or NIH, and Count II should be dismissed.

### III.  Count III Does Not Plausibly Allege that Commissioner Trumka Acted *Ultra Vires*

Defendants refuted Count III's legal conclusion that former Commissioner Trumka exceeded his authority by demonstrating that (i) Commissioner Trumka merely repeated the lawfully issued statement on CPSC's website regarding safe sleep, and (ii) his statements did not mention Dreamland and the information to which his statements linked was already public. *See* Mem. 28–31. Dreamland offers four responses, none of which salvages its *ultra vires* claim against Commissioner Trumka.

*First*, Dreamland contends that, like the statements by NIH, CDC, and CPSC, Commissioner Trumka's statements were an unlawful "product safety determination" because they "reflect on the safety of [a] consumer product" without sufficient "data and evidence." Opp'n 25, 28. This theory fails for the reasons already discussed. *See supra* Part I.B.

*Second*, Dreamland misstates the law in arguing that *ultra vires* claims can be based on violations of agency regulations. *See* Opp'n 29–30. As the D.C. Circuit has explained, "none of [its] decisions have placed an agency's failure to follow its own regulations in the '*ultra v*ires' category." *Eagle Trust Fund v. USPS*, 811 F. App'x 669, 670 (D.C. Cir. 2020); *see also Postal Police Officers Ass'n v. USPS*, 502 F. Supp. 3d 411, 422 (D.D.C. 2020) ("[A] conflict between the Bowers Memo and postal regulations would not, by itself, mean that USPS 'acted in excess of its statutory authority,' which is the sole basis for relief on an *ultra vires* claim.") (citation omitted).

*Third*, whereas Count III alleges only that Commissioner Trumka "repeated [CPSC's] statutorily insufficient statement[]," Compl. ¶ 169, Dreamland now argues that Commissioner Trumka's statements were *ultra vires* because he (i) "convey[ed] new information beyond what CPSC had previously disclosed" and (ii) failed to comply with "the Commission's clearance process."[3] Opp'n 29, 31. Dreamland is wrong on both accounts.

Commissioner Trumka's statements were substantively consistent with CPSC's safe sleep guidance. Consider one of Commissioner Trumka's social media posts that Dreamland highlights: "Companies will try to fool you into thinking [weighted swaddles or blankets are] safe, but there's a reason @USCPSC, @CDC, & @NIH have warned you NOT to use them. It's a risk of death to your baby." Opp'n 29 (quoting Ex. 1 at 39). Yet CPSC's safe sleep guidance contains the same recommendations and likewise cites to NIH and CDC: "Don't use weighted blankets or weighted swaddles* . . . *NIH.gov and CDC.gov"; "Don't add pillows or blankets to your baby's sleep space"; and "Do remember Bare is Best – nothing but a fitted sheet in a crib, bassinet or play yard." Ex. 1 at 19. And just as Commissioner Trumka noted the potentially fatal safety risks, the safe sleep guidance advised parents in bold type: "Many young babies cannot lift their heads to pull away from soft objects that can pose a suffocation risk, such as bumpers, blankets, pillows, and sleep positioners." *Id.* at 18. Commissioner Trumka may have used more vivid language, but the substance is the same.

CPSC's warning that sleep products pose a risk to infants' ability to breathe properly and potentially suffocate, *see id.*, is also echoed by another statement of Commissioner Trumka:

---

[3] Dreamland falsely states that former Commissioner Trumka "does not dispute" that he failed to comply with "required" procedures. Opp'n 31. Defendants' motion addressed the allegations set forth in Count III, *see* Mem. 28–29 (discussing Compl. ¶¶ 168–70), and Dreamland now relies on a single allegation made dozens of paragraphs earlier in the Complaint. Opp'n 31 (citing Compl. ¶ 139).

"AAP also cites risks to babies' brain development, stating that 'there is evidence that the use of weighted sleep products can lead to lower oxygen levels, which . . . may be harmful to the developing infant's brain.'" Ex. 1 at 36 (quoted in part at Opp'n 28). In addition, given that this statement quotes from a public letter that AAP had sent to CPSC,[4] Commissioner Trumka did not "convey new information" at all, *contra* Opp'n 29, much less beyond what the agency had previously disclosed. Accordingly, Dreamland does not plausibly show that Commissioner Trumka disclosed new information.

Even if Commissioner Trumka had done so, Dreamland also has not plausibly shown he violated the clearance procedures required under 15 U.S.C. § 2055(b)(6) and set forth in CPSC Directive 1450.2. Directive 1450.2 establishes an alternative procedure for Commissioner statements: "Commissioners are urged to refer statements they and their staffs make to appropriate Offices/Directorates for technical, program and legal review." Ex. 4 ¶ 7(g)(1). Thus, while CPSC's procedures "urge[]" Commissioners to submit their statements to "appropriate" agency offices for review, it does not "require" them to do so. *Contra* Opp'n 31. As such, Commissioner Trumka would not have violated CPSC procedures even if, as Dreamland alleges, his statements did not undergo a clearance review.

*Fourth*, Dreamland wrongly contends that Commissioner Trumka violated 15 U.S.C. § 2055(b)(1) because his statements allegedly allowed "the public to ascertain readily" Dreamland's identity without giving the company advance notice and an opportunity to

---

[4] As Dreamland notes, Commissioner Trumka's statement attributes the AAP quote to a Washington Post article. Opp'n 28 n.6. That appears to have been a typographical error; the quote comes from an AAP letter that Commissioner Trumka cites in his same statement. *See* Ex. 1 at 37 n.5 (citing Letter from Sandy L. Chung, MD and President of AAP to CPSC and ASTM International F15 Committee Chair Donald Mays (June 15, 2023), https://www.documentcloud.org/documents/23849624-aap-letter-61523).

comment. Opp'n 29–33. But section 2055(b)(1) is not triggered by the contents of third-party documents merely referenced by Commissioner Trumka. Opp'n 31–32. Rather, the statute applies when a "reasonable person receiving the information" can readily ascertain a manufacturer's identity "from the information itself." 16 C.F.R. § 1101.13. In other words, 15 U.S.C. § 2055(b)(1) does not require "look[ing] beyond the face of the document." 48 Fed. Reg. 57,406, 57,409 (Dec. 29, 1983); *see Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024) (stating that an agency's consistent, longstanding construction may be "especially useful in determining the statute's meaning").

Moreover, Dreamland fails to grapple with Defendants' point that providing a non-product specific link to "a document that is already in the public domain, such as a previously published newspaper article, is not 'public[ly] disclos[ing]' the contents of that document." Mem. 30 (quoting 15 U.S.C. § 2055(b)(1)). Thus, Commissioner Trumka did not publicly disclose the contents of the Washington Post article or the online product searches. Notwithstanding Dreamland's claim that the product searches "do not just exist" and "must be created," Opp'n 32, the results of those searches consist of pre-existing retailer websites displaying pre-existing product listings. Linking to a product search is no different than linking to department store's website that contains listings for a variety of products; neither discloses new information to the public.

In the end, Dreamland does not plausibly allege that Commissioner Trumka failed to comply with the CPSA, alone that that he "plainly act[ed] in excess of [his] delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory." *Fed. Express*, 39 F.4th at 763. Accordingly, Count III fails to state an *ultra vires* claim.

**IV. Count IV Does Not Plausibly Allege that CPSC's Safe Sleep Statement or Deadlocked Vote Were Final Agency Action or that CPSC Acted Arbitrarily or Capriciously**

As discussed above, Count IV's challenges to the statement on CPSC's website about safe sleep and the deadlocked vote on retracting Commissioner Trumka's statements fail because they are not "final agency action." *See supra* Part I.A. The rest of Dreamland's defense of Count IV largely reiterates its meritless arguments from Counts I and II regarding non-existent limits on CPSC's authority to issue public statements and alleged failures to comply with internal procedures.

Dreamland rehashes without elaboration its conclusory allegation that "CPSC did not adhere to its internal clearance process" when the agency first added the safe sleep statement to its website. Opp'n 33. Defendants already showed that "[t]his unsupported allegation cannot overcome the presumption of regularity [that] attaches to the actions of Government agencies.'" Mem. 32–33 (quoting *U.S. Postal Serv. v. Gregory*, 534 U.S. 1, 10 (2001)). What's more, Dreamland does not contest that CPSC reviewed its safe sleep statement for accuracy when assessing Dreamland's retraction request. Thus, it is undisputed that CPSC has now reviewed the statement for accuracy and determined it does not need to be retracted. Any error was harmless. *See* 5 U.S.C. § 706 (instructing that "due account shall be taken of the rule of prejudicial error" in conducting arbitrary-and-capricious review).

Next, Dreamland contends that CPSC's reliance on, and citation to, NIH's and CDC's statements was arbitrary and capricious because those agencies "are not authorized to make product safety determinations in the first instance." Opp'n 34. This argument fails for the reasons already discussed, *see supra* Parts I.B and II, as does Dreamland's alternate contention that CPSC legally could not rely on NIH's and CDC's statements at all, *see* Mem. 33–34.

16

Lastly, Dreamland asserts that Defendants misconstrue the allegations of the Complaint. Opp'n 35–36. To the contrary, Defendants correctly noted that the data referred to in paragraphs 83 through 86 of the Complaint disprove Dreamland's allegations that "the CPSC statement was 'based on no data whatsoever' and that there is not 'an iota of evidence' that the agency commissioned research from its staff." Mem. 34 (quoting Compl. ¶ 116). Dreamland's response only underscores that point. The company acknowledges that the data set revealed double-figure incidents—defined as "deaths + injuries"—involving weighted sleep products. Opp'n 36 (quoting Compl. ¶ 86). Dreamland's conclusory allegations, contradicted by its own Complaint, fail to plausibly allege that the CPSC safe sleep statement or retraction denial were arbitrary and capricious or otherwise not in accordance with law. For all these reasons, Count IV should be dismissed.

## V. Count V Does Not Plausibly Allege that CPSC's Safe Sleep Statement or Deadlocked Vote Were Final Agency Action or that CPSC Failed to Observe Procedures Required by Law

Count V differs from Count IV only through the additional assertion that CPSC violated its internal clearance procedures by allegedly failing to review a draft of NIH's statement before NIH issued it. *See* Compl. ¶¶ 188–93; Mem. 35. However, Dreamland sidesteps Directive 1450.2's key language, which provides that the procedures "apply to any release of information *initiated by the Commission*, including information disseminated on the agency's web site . . . ." Mem. 36 (quoting Ex. 4 ¶ 1(a) (emphasis added)). Consistent with that scope, the Directive's "Joint Projects" provisions apply where information is disclosed "with some degree of CPSC involvement," and they anticipate that "the CPSC name and/or logo will be used." Ex. 4 ¶ 7(h)(1), (4). The challenged NIH statement, by contrast, was NIH-initiated and published to the NIH website.

Furthermore, Dreamland lacks standing to challenge CPSC's supposed failure to pre-clear the NIH statement. Dreamland's desire for a declaratory judgment does not mean its alleged injury "is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016); *see Bierly v. Dep't of Def.*, No. 23-cv-2386-RCL, 2024 WL 4227154, at *7 (D.D.C. Sept. 18, 2024) (stating that a plaintiff cannot "satisfy redressability on the basis of declaratory relief for past injuries alone"). Ordering CPSC to review and clear NIH's statement at this point could not redress any injury because CPSC already has twice reviewed the CPSC safe sleep statement—which links to and relies upon the NIH statement—under its internal procedures and determined that is accurate and not misleading. *See* Mem. 36–37. NIH has not changed its statement and so a third review of the NIH statement would change nothing. *See Gerlich v. U.S. Dep't of Just.*, 659 F. Supp. 2d 1, 19 (D.D.C. 2009) ("[T]o the extent that plaintiffs are seeking declaratory relief with respect to defendants' past conduct, they cannot demonstrate that a declaratory judgment will redress their injuries.").

For the same reasons, any alleged error by CPSC in failing to clear NIH's statement is harmless error. *See* Mem. 36–37. Contrary to Dreamland's assertions, Opp'n 38, the harmless-error doctrine is a proper ground for dismissal under Rule 12(b)(6), *see, e.g., Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.*, 77 F.4th 679, 682–83 (D.C. Cir. 2023) (affirming dismissal under Rule 12(b)(6) where defendant allegedly failed to engage in notice-and-comment rulemaking and explaining that "any error was harmless"). Therefore, the Court should dismiss Count V for lack of standing or failure to state a claim.

## VI. Dreamland Fails to Establish Subject-Matter Jurisdiction for Count VI or Plausibly Allege a Due Process Violation

For Count VI, Dreamland still does not identify any ongoing or impending agency action that involves former Commissioner Trumka and threatens Dreamland with injury, as required to

establish standing or state a due process claim. *See* Opp'n 38–43; Mem. 37–40. Dreamland generally fears injury from "the many ways CPSC Commissioners impact agency decision-making [or] act on their own accord." Opp'n 39. It points to Commissioner Trumka's past support for developing proposed mandatory standards and his past statements regarding weighted infant sleep products, and it posits that "there is nothing stopping him from doing the same in the future." Opp'n 39–40. But such "[a]llegations of *possible* future injury" at some undefined point "are not sufficient" to establish injury in fact. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013); *see* Mem. 38–39. And Dreamland does not even attempt to explain how a single former Commissioner's support for *proposed* mandatory standards—containing unknown proposed requirements and which the Commission already declined to pursue, *see* Compl. ¶¶ 66–69—poses a "certainly impending" threat of injury, *Clapper*, 568 U.S. at 409.

Dreamland's claim is even more speculative given that Commissioner Trumka was removed from office in May 2025, and, following a temporary reinstatement, has not served in that position since approximately July 23, 2025. *See Trump v. Boyle*, 145 S. Ct. 2653 (2025). As Dreamland acknowledges, "Commissioner's Trumka's removal from the Commission would obviate the ongoing harm he poses to Dreamland." Opp'n 45. Thus, Dreamland concedes it is not being deprived, nor will it imminently be deprived, of any protected right or interest without due process.

Apart from the absence of standing, this Court lacks jurisdiction over Count VI to the extent it asserts a due process claim based on future agency rulemaking. *See* Mem. 38–39; Opp'n 39–40 (alleging bias in hypothetical mandatory standard rulemaking). In *Thunder Basin*, the Supreme Court identified three factors for determining when district courts may exercise jurisdiction even though a statutory scheme provides for review in the courts of appeals. *See*

*Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212–13 (1994). Dreamland does not dispute that the first *Thunder Basin* factor is not satisfied because the court of appeals can review challenges to a CPSC final rule. Rather, Dreamland contends its bias claims are "wholly collateral" and "outside the agency's expertise," Opp'n 40–41, relying on *Axon Enterprises, Inc. v. FTC*, 598 U.S. 175 (2023). But *Axon* involved a far different scenario—a broad constitutional challenge to administrative law judges' authority to "exercise[e] any power," which went "to the core of the FTC's existence." 598 U.S. at 189. By contrast, Dreamland's bias allegations concern whether former Commissioner Trumka has prejudged the specific facts and law at issue in a future rulemaking—precisely the type of "specific substantive decision" that is within the agency's expertise. *Id.* Accordingly, the *Thunder Basin* factors do not support this collateral attack.

Count VI also does not state a due process claim because (i) as discussed, Dreamland does not allege a deprivation of a protected right or interest without due process, and (ii) its speculation about former Commissioner Trumka's alleged bias cannot "overcome [the] presumption that" he will be "neutral." *Zen Magnets, LLC v. CPSC*, 968 F.3d 1156, 1175 (10th Cir. 2020); *see* Mem. 39–40. Dreamland has no response to Defendants' argument that, without knowing which law or facts might be at issue in a hypothetical future case, it is speculative to say Commissioner Trumka has "demonstrably made up his mind about important and specific factual questions and is impervious to contrary evidence." *Metro. Council of N.A.A.C.P. Branches v. FCC*, 46 F.3d 1154, 1165 (D.C. Cir. 1995) (quotation omitted).

Dreamland sidesteps the problem, offering general assertions that Commissioner Trumka "made unsubstantiated and harmful claims about weighted infant sleep products" and that "he has never . . . correct[ed] the record." Opp'n 41. But as explained above, *see supra* Part III, Commissioner Trumka's statements merely publicized the same safety risks the Commission

identified in its safe sleep guidance—guidance which the Commission declined to retract and which was consistent with NIH's and CDC's prior published statements. So while Dreamland may *disagree* with these statements, the former Commissioner was no lone wolf in drawing public attention to the risks associated with weighted infant sleep products. Consequently, "a disinterested observer" would have no reason to conclude that Commissioner Trumka has "adjudged the facts as well as the law of" a hypothetical future case "in advance of hearing it." *Metro. Council of N.A.A.C.P. Branches*, 46 F.3d at 1164–65. Count VI should be dismissed.

### VII.    Count VII Does Not Allege that the Removal Protection Harmed Dreamland

As Defendants explained, Count VII fails because "the Complaint does not show harm to Dreamland from the [for-cause] removal" provision in the CPSA. Mem. 41–42. Dreamland misses the mark by claiming that past events "would have come out different" if there were no statutory removal protections. Opp'n 44. All the relevant events—CPSC's statement, Commissioner Trumka's statements, and the Commission's vote on Dreamland's retraction request—occurred before Dreamland filed this lawsuit in November 2024, *i.e.*, during former President Biden's term in office. Dreamland does not contend that President Biden wanted to but could not remove any CPSC Commissioner. As such, the CPSA's removal protection had no "impact[]" on Dreamland. *Leachco, Inc. v. CPSC*, 103 F.4th 748, 762 (10th Cir. 2024), *cert. denied*, 145 S. Ct. 1047 (2025).

Contrary to Dreamland's contention, "intervening events" have not "establish[ed]" that it will suffer compensable harm. Opp'n 43.[5] Dreamland points to President Trump's removal of three Commissioners on May 8 and 9, 2025, and their temporary reinstatement by a District

---

[5] Dreamland also speculates that "it seems unlikely" that "the remaining Commissioners" would challenge the Complaint's allegations "on the same grounds" that Defendants' motion advanced. Opp'n 45. As the instant brief demonstrates, Dreamland's speculation is wrong.

Court, as evidence that the "removal provision impacted or will impact Dreamland." *Id.* (citing *Boyle v. Trump*, No. 25-cv-1628-MJM, 2025 WL 1677099, at *1, 2 (D. Md. June 13, 2025)). But these events prove just the opposite. The Supreme Court has since stayed the District Court's order, *Trump v. Boyle*, 145 S. Ct. 2653, and the three Commissioners are no longer serving in their former positions. "[T]he very fact that President Trump removed [the Commissioners] disproves that the President had a perceived inability to remove the actor due to the infirm provision." *Asbury Auto. Grp., Inc. v. FTC*, No. 4:24-cv-950-O, 2025 WL 2317455, at *6 (N.D. Tex. Aug. 11, 2025) (internal citation and quotation omitted). Therefore, Dreamland has not shown the CPSA's removal protections "will impact" it, *Leachco*, 103 F.4th at 762, and Count VII should be dismissed.

**CONCLUSION**

For the foregoing reasons, the Court should dismiss the Complaint for lack of subject-matter jurisdiction and failure to state a claim for relief.

August 20, 2025                              Respectfully submitted,

                                             */s/ David H. Hixson*
                                             ISAAC C. BELFER (D.C. Bar No. 1014909)
                                             DAVID H. HIXSON (Ill. Bar No. 6289751)
                                             Trial Attorneys
                                             Consumer Protection Branch
                                             Civil Division
                                             U.S. Department of Justice
                                             P.O. Box 386
                                             Washington, DC 20044-0386
                                             (202) 305-7134 (Belfer)
                                             (202) 449-8070 (Hixson)
                                             (202) 514-8742 (fax)
                                             Isaac.C.Belfer@usdoj.gov
                                             David.H.Hixson@usdoj.gov

                                             *Counsel for Defendants*