## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DREAMLAND BABY CO.,

    *Plaintiff*,

v.

CONSUMER PRODUCT SAFETY
COMMISSION, *et al.*,

    *Defendants*.

Case No. 1:24-cv-03277-RC

**ORAL HEARING REQUESTED**

**PLAINTIFF'S COMBINED MEMORANDUM
IN OPPOSITION TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT
AND REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

TABLE OF CONTENTS..................................................................................................................i

TABLE OF AUTHORITIES ........................................................................................................ii

INTRODUCTION ......................................................................................................................... 1

ARGUMENT ................................................................................................................................. 2

I.     CPSC'S WEIGHTED PRODUCT WARNING IS REVIEWABLE FINAL AGENCY ACTION .............2

     A.     CPSC's Decision to Make a Public Disclosure Constitutes Agency Action .......... 2

     B.     The Weighted Product Warning Is Final Agency Action ....................................... 6

     C.     CPSC's Initial Clearance Is Reviewable as a "Preliminary Action" Under the APA .............................................................................................................................. 8

II.    CPSC'S CLEARANCE OF THE WEIGHTED PRODUCT WARNING AND ITS DENIAL OF DREAMLAND'S RETRACTION REQUEST WERE ARBITRARY AND CAPRICIOUS.......................9

     A.     CPSC's Decision Was Neither Reasonable nor Reasonably Explained ................. 9

        1.     CPSC's Conclusory Explanations Are Arbitrary and Capricious................. 10

        2.     CPSC's Post Hoc Rationalizations Are Arbitrary and Capricious .............. 15

        3.     The Weighted Product Warning Is Inaccurate and Misleading .................... 21

     B.     CPSC's Remaining Arguments Lack Merit............................................................ 22

CONCLUSION............................................................................................................................ 25

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abbott Labs. v. Gardner*,
    387 U.S. 136 (1967) .................................................................................................... 8

*Am. Acad. of Pediatrics v. Kennedy*,
    No. 25-11916-BEM, 2026 WL 733828 (D. Mass. Mar. 16, 2026) ........................... 8

*\*Am. Radio Relay League, Inc. v. FCC*,
    524 F.3d 227 (D.C. Cir. 2008) ................................................................. 9, 10, 11, 14

*Bennett v. Spear*,
    520 U.S. 154 (1977) .................................................................................................... 6

*Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*,
    419 U.S. 281 (1974) .................................................................................................. 14

*Burlington Truck Lines, Inc. v. United States*,
    371 U.S. 156 (1962) .................................................................................................... 9

*Cboe Futures Exch., LLC v. SEC*,
    77 F.4th 971 (D.C. Cir. 2023) .................................................................................. 17

*City of Dania Beach v. FAA*,
    628 F.3d 581 (D.C. Cir. 2010) .................................................................................. 24

*D&F Afonso Realty Tr. v. Garvey*,
    216 F.3d 1191 (D.C. Cir. 2000) ..................................................................... 10, 11, 12

*DHS v. Regents of the Univ. of Cal.*,
    591 U.S. 1 (2020) ....................................................................................................... 8

*\*Dickson v. Sec'y of Def.*,
    68 F.3d 1396 (D.C. Cir. 1995) ............................................... 9, 10, 11, 12, 13, 14, 21

*Drs. for Am. v. Off. of Pers. Mgmt.*,
    793 F. Supp. 3d 112 (D.D.C. 2025) .......................................................................... 25

*Esch v. Yeutter*,
    876 F.2d 976 (D.C. Cir. 1989) .................................................................................. 25

*FTC v. Standard Oil Co. of Cal.*,
    449 U.S. 232 (1980) .................................................................................................... 3

*Garcia Ramirez v. U.S. Immigr. & Customs Enf't*,
    No. CV 18-508 (RC), 2025 WL 3563183 (D.D.C. Dec. 12, 2025) ........................... 23

*Gen. Elec. Co. v. EPA*,
    290 F.3d 377 (D.C. Cir. 2002) .................................................................................... 7

*Genuine Parts Co. v. EPA*,
    890 F.3d 304 (D.C. Cir. 2018) .................................................................................. 17

*Getty v. Fed. Sav. & Loan Ins. Corp.*,
  805 F.2d 1050, 1055 (D.C. Cir. 1986) ................................................................ 11

*Gold Rsrv. Inc. v. Bolivarian Republic of Venezuela*,
  146 F. Supp. 3d 112 (D.D.C. 2015) ..................................................................... 25

*Grace v. Barr*,
  965 F.3d 883 (D.C. Cir. 2020) ...................................................... 12, 13, 15, 21

*Gulf Restoration Network v. Haaland*,
  47 F.4th 795 (D.C. Cir. 2022) ........................................................................ 9, 15

*Hearst Radio v. FCC*,
  167 F.2d 225 (D.C. Cir. 1948) ............................................................................. 4

*Impro Prods., Inc. v. Block*,
  722 F.2d 845 (D.C. Cir. 1983) ............................................................................. 5

*In re Murray Energy Corp.*,
  788 F.3d 330 (D.C. Cir. 2015) ............................................................................. 7

*Indus. Safety Equip. Ass'n v. EPA*,
  837 F.2d 1115 (D.C. Cir. 1988) ....................................................................... 4, 5

*Izaak Walton League of America v. Marsh*,
  655 F.2d 346 (D.C. Cir. 1981) ............................................................................. 4

*Jefferson v. Harris*,
  170 F. Supp. 3d 194 (D.D.C. 2016) ..................................................................... 6

*LaShawn v. Barry*,
  87 F.3d 1389 (D.C. Cir. 1996) ............................................................................. 9

*Latif v. Obama*,
  677 F.3d 1175 (D.C. Cir. 2011) ......................................................................... 24

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ............................................................................................. 14

*N. Am.'s Bldg. Trades Unions v. Dep't of Def.*,
  783 F. Supp. 3d 290 (D.D.C. 2025) .................................................................. 6, 7

*N.Y. Stock Exch. LLC v. SEC*,
  2 F.4th 989 (D.C. Cir. 2021) ................................................................................ 3

*Nat'l Parks Conservation Ass'n v. Semonite*,
  422 F. Supp. 3d 92 (D.D.C. 2019) ..................................................................... 25

*Pac. Shores Subdivision, California Water Dist. v. U.S. Army Corps of Eng'rs*,
  448 F. Supp. 2d 1 (D.D.C. 2006) ....................................................................... 16

*Point Park Univ. v. NLRB*,
  457 F.3d 42 (D.C. Cir. 2006) ........................................................................ 10, 15

*Powder River Basin Res. Council v. U.S. Dep't of the Interior*,
  No. 22-CV-2696 (TSC), 2026 WL 555013  (D.D.C. Feb. 27, 2026) .......... 10, 15, 19

*Reliance Electric. Co. v. CPSC,
   924 F.2d 274 (D.C. Cir. 1991) ............................................................................ 12

Safe Extensions, Inc. v. FAA,
   509 F.3d 593 (D.C. Cir. 2007) ............................................................................... 4

SEC v. Chenery Corp.,
   318 U.S. 80 (1943) .............................................................................. 9, 12, 13

Sherrod v. McHugh,
   334 F. Supp. 3d 219 (D.D.C. 2018) .................................................................... 25

Stewart v. Stackley,
   251 F. Supp. 3d 138 (D.D.C. 2017) ................................................................ 9, 15

Trudeau v. FTC,
   456 F.3d 178 (D.C. Cir. 2006) ............................................................................... 5

U.S. Army Corps of Eng'rs v. Hawkes Co.,
   578 U.S. 590 (2016) ............................................................................................... 6

Watts v. SEC,
   482 F.3d 501 (D.C. Cir. 2007) ............................................................................... 4

Whitman v. Am. Trucking Ass'ns,
   531 U.S. 457 (2001) ............................................................................................... 4

Wilderness Soc'y v. U.S. Dep't of Interior,
   No. 22-CV-1871 (CRC), 2024 WL 1241906 (D.D.C. Mar. 22, 2024) .................... 17

*Wilkins v. Jackson,
   750 F. Supp. 2d 160 (D.D.C. 2010) ........................................................... 2, 11, 12

**Statutes**

   5 U.S.C. § 551(10) ................................................................................................. 4

   5 U.S.C. § 551(13) ................................................................................................. 3

   5 U.S.C. § 551(6) ................................................................................................... 3

   5 U.S.C. § 704 ....................................................................................................... 8

   15 U.S.C. § 2051(b) ............................................................................................. 22

   15 U.S.C. § 2051(b)(2) ......................................................................................... 19

   15 U.S.C. § 2055(b) ............................................................................................... 3

   15 U.S.C. § 2055(b)(1) ......................................................................................... 13

   15 U.S.C. § 2055(b)(2) ......................................................................................... 13

   *15 U.S.C. § 2055(b)(6) .................................................................................... 5, 13

   *15 U.S.C. § 2055(b)(7) .............................................................................. 5, 7, 13, 23

iv

**Regulations**

16 C.F.R. § 1101.51 ....................................................................................................... 5, 7

*16 C.F.R. § 1101.52 ................................................................................................ 5, 7, 23

**Other Authorities**

88 Fed. Reg. 10,432 (Feb. 17, 2023) ................................................................................. 4

*Evidence-based*, CAMBRIDGE DICTIONARY................................................................. 17

*In the Matter of Leachco*,
    CPSC Docket No. 22-1 (July 3, 2024)........................................................................ 19

Lauren Kirchner, *Weighted blankets are dangerous for babies, doctors warn*,
    WASH. POST (Jan. 22, 2024 at 2:00 p.m. EST)......................................................... 23

**INTRODUCTION**

At its most basic level, the Administrative Procedure Act ("APA") provides review of agency decisions and requires them to provide an explanation for their decisions. Here, the Consumer Product Safety Commission ("CPSC" or the "Commission") attempts to avoid the APA's minimal requirements and escape judicial review, all while harming Dreamland Baby Co.'s ("Dreamland") lawful business.

CPSC has not provided a reasonable explanation for its decision to tell the public not to use weighted infant sleep products. AR532 ("Weighted Product Warning"). CPSC provided no reasons for clearing and publishing the Weighted Product Warning, and it has admitted as much to this Court. It did not adequately explain why the statement does not violate the Consumer Product Safety Act's ("CPSA") prohibition on inaccurate and misleading public disclosures under 15 U.S.C. § 2055(b)(6), (7) nor how it complied with its internal procedures. When Dreamland requested that CPSC retract its warning because it was inaccurate and misleading, the Commission denied its request. *See* AR416–503 ("Retraction Request"); *see also* AR512–14 ("Denial Letter"). In the Denial Letter, the Commission states that the Weighted Product Warning complied with the CPSA and that its staff had cleared the statement under CPSC's statutorily-required procedures. But as with its initial clearance decision, CPSC did not connect any facts to its conclusions.

CPSC's decisions are based on little more than its own conclusory statements and parroting of procedural requirements. Under the APA, neither provides an adequate explanation for CPSC's decision to clear, publish, and not retract the Weighted Product Warning. Before this Court, CPSC tries to save its deficient decisionmaking process and fill-in missing explanations through a series of *post hoc* rationalizations, purporting to definitively say what the Commission did, even though the Commission itself did not reveal its reasons for its actions when they were made. Such *post hoc* explanations are not a legally permissible substitute for CPSC adequately articulating the basis

for its decisions at the time they were made. As such, this Court should find that clearing, publishing, and not retracting the Weighted Product Warning was arbitrary and capricious.

Ignoring its own failings, or perhaps recognizing them, CPSC tries to shield its Weighted Product Warning from this Court's review. It argues that its initial decision to clear and publish the statement is not final agency action. CPSC then argues, despite this Court's earlier decision to the contrary, that the statement is not reviewable as part of this Court's review of Dreamland's Retraction Request because the initial decision is itself final. In effect, CPSC has invented Schrödinger's agency action, which is apparently both final and not final for purposes of review. This Court should not permit such gamesmanship, especially considering the APA's presumption of reviewability and CPSC's reliance on its initial decision in denying the Retraction Request.

This Court should find that CPSC's initial actions to clear and publish its Weighted Product Warning and its denial of Dreamland's Retraction Request are reviewable. It should further find that those decisions are arbitrary and capricious. Dreamland's Motion for Summary Judgment should be granted, and CPSC's cross-motion should be denied. This Court should vacate CPSC's decisions and order the Weighted Product Warning removed from CPSC's website.

## ARGUMENT

### I. CPSC'S WEIGHTED PRODUCT WARNING IS REVIEWABLE FINAL AGENCY ACTION

#### A. CPSC's Decision to Make a Public Disclosure Constitutes Agency Action

CPSC ignores Dreamland's primary argument that clearing and publishing the Weighted Product Warning is agency action because it was an exercise of its power under its own procedures, as required by the CPSA. *See* Pl. Mem. at 15–16. Having failed to counter Dreamland's argument, "it is proper to treat that argument as conceded." *Wilkins v. Jackson*, 750 F. Supp. 2d 160, 162 (D.D.C. 2010). CPSC's other arguments that clearing and publishing the warning was not agency action are unavailing. The Supreme Court has observed that the term "agency action" was meant

"to assure the complete coverage of every form of agency power, proceeding, action, or inaction." *FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 238 n.7 (1980) (quoting S. Doc. No. 79-248, at 255 (1946)). Yet CPSC argues that the Weighted Product Warning does not constitute agency action as a threshold matter. *See* CPSC Mem. at 11-13. Because CPSC's decision to clear and publish its Weighted Product Warning adhered to a statutorily required process, implemented through its binding internal procedures, the statement qualifies as either an "order" or a "sanction" under the APA and is thus agency action. *See* 5 U.S.C. § 551(13).

The APA defines "order" broadly as "the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing." 5 U.S.C. § 551(6). In other words, "an order is virtually any authoritative agency action other than a rule." *N.Y. Stock Exch. LLC v. SEC*, 2 F.4th 989, 992 (D.C. Cir. 2021). CPSC's disclosure is an order under this capacious standard because it represents the "final disposition" of the Commission's review pursuant to its Clearance Procedures, AR519–28, required under 15 U.S.C. § 2055(b). *See, e.g.*, AR513 (CPSC staff "cleared it for public disclosure pursuant to its internal agency clearance process"). Like the issuance of a complaint after the completion of an agency's investigation, CPSC's public disclosure after completing its clearance process "is 'a part of a final disposition' and therefore is 'agency action.'" *Standard Oil Co.*, 449 U.S. at 238 n.7.

CPSC's argument to the contrary—that the Weighted Product Warning was not "formulated through [the] agency's process of 'adjudication,'" and is thus not an "order," *see* CPSC Mem. at 12 (citing 5 U.S.C. § 551(7))—is unavailing. CPSC attempts to narrowly constrain the definition of "adjudication" in the APA context as involving only "case-specific determinations" that "immediately bind parties." *See* CPSC Mem. at 12 (quoting *Elec. Energy, Inc. v. EPA*, 106 F.4th

31, 45 (D.C. Cir. 2024)). But courts have construed the term "adjudication" broadly to include "informal adjudications" encompassing a variety of agency processes, decisions, and actions that do not necessarily resemble traditional adversarial proceedings. *See Watts v. SEC*, 482 F.3d 501, 506 (D.C. Cir. 2007) (noting "the broad scope of formal and informal adjudications under the APA"). For example, in *Izaak Walton League of America v. Marsh*, the D.C. Circuit held that the Army Corps of Engineers' decision to implement a reconstruction project on the Mississippi River qualified as an informal adjudication, despite the fact that there were no adjudicative hearings leading up to its decision, and it involved no parties that would have been bound by the agency's decision. *See* 655 F.2d 346, 362 (D.C. Cir. 1981). Similarly, in *Safe Extensions, Inc. v. FAA*, the D.C. Circuit found that the issuance of advisory circulars by the FAA fell "into the vast category of 'informal adjudications' in which agencies routinely engage," even without involving any adversarial proceeding or express application to any one party. *See* 509 F.3d 593, 604 (D.C. Cir. 2007). CPSC's reliance on *Watts* is inapplicable here, as that case dealt with an agency's response to a third-party subpoena in private litigation, not, as here, an "exercise [of] its power." *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001).

The Weighted Product Warning is also a "sanction" under 5 U.S.C. § 551(10); *see Indus. Safety Equip. Ass'n v. EPA*, 837 F.2d 1115, 1119 (D.C. Cir. 1988) (recognizing that "adverse publicity" could "operate as a sanction" under the APA). CPSC's reliance on *Hearst Radio* misses the mark. *See* CPSC Mem. at 11. In *Hearst Radio*, the D.C. Circuit recognized that an agency's defamatory publication resembled a "sanction" but ultimately declined to hold that it constituted agency action. *See* 167 F.2d 225, 227 (D.C. Cir. 1948). That case is not applicable here because the CPSA imposes unique requirements on the Commission as to its public disclosures that "do not limit other Federal safety agencies." *See* 88 Fed. Reg. 10,432, 10,446 (Feb. 17, 2023). Unlike

4

the FCC's publication in *Hearst Radio*, CPSC's disclosures are constrained by CPSA's statutory guardrails and its implementing regulations, which are specifically designed to avoid and remedy unjust adverse publicity. *See, e.g.*, 15 U.S.C. § 2055(b)(6), (7); 16 C.F.R. §§ 1101.51, 1101.52; AR519–28; AR529–30. *Hearst Radio*'s holding that FCC's defamatory publication was not "agency action" thus cannot control here, where CPSC was required to adhere to the CPSA's prohibition on inaccurate and misleading information and its own internal regulatory Clearance Procedures before publishing the Weighted Product Warning.

Moreover, the D.C. Circuit has on multiple occasions questioned "the continued validity of the *Hearst Radio* decision." *Trudeau v. FTC*, 456 F.3d 178, 189 (D.C. Cir. 2006) (citing *Indus. Safety Equip. Ass'n*, 837 F.2d at 1118). In *Trudeau v. FTC*, the D.C. Circuit did not have the need either to "distinguish" or to "reconsider" *Hearst Radio* because, similarly as in *Hearst Radio*, the court merely assessed whether the FTC's issuance of a press release constituted reviewable agency action. *See id*. But unlike both *Trudeau* and *Hearst Radio*, CPSA's differing statutory regime supports the conclusion that, when an agency adheres (or fails to adhere) to a specific mandatory process to disseminate information to the public—and that information is in turn harmful— reviewable agency action may be found. *See Impro Prods., Inc. v. Block*, 722 F.2d 845, 849 (D.C. Cir. 1983) (explaining that court was "disinclined to find that no 'agency action' ha[d] taken place" when agency released information subject to "specific statutory authorization" and disclosed information was "concededly false").

There is no question that the Weighted Product Warning was harmful to Dreamland, causing it to suffer serious economic and reputational losses. *See, e.g.*, AR319, AR321. CPSC's decision to disclose it, after having arguably adhered to a required process specifically meant to mitigate unjust harmful publicity, qualifies as either an "order" or a "sanction" under the APA.

**B. The Weighted Product Warning Is Final Agency Action**

CPSC further argues that "even if the CPSC's safe sleep statement were 'agency action' under 5 U.S.C. § 551(13), it is not *final* agency action." CPSC Mem. at 13; *id.* at 13–17. Again, this argument fails because the Weighted Product Warning both marks the "consummation of the agency's decisionmaking process" and is action "from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (cleaned up).

The Weighted Product Warning represents CPSC's "definitive decision," not a "tentative or interlocutory" one. *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597-98 (2016). A "tentative" or "interlocutory" decision is one as to which an agency has "more work to do." *Jefferson v. Harris*, 170 F. Supp. 3d 194, 219 (D.D.C. 2016) (holding that mere investigation of plaintiff was not final agency action because agency had no authority to take any follow-up action against him). As CPSC admits, "[o]nce CPSC completed its internal procedure set forth in Directive 1450.2 and posted the statement to its website, no 'more work needed to be done.'" CPSC Mem. at 18 (citing *U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 592 U.S. 261, 272 (2021)); *see also N. Am.'s Bldg. Trades Unions v. Dep't of Def.*, 783 F. Supp. 3d 290, 307 (D.D.C. 2025) ("The decisionmaking processes set out in an agency's governing statutes and regulations are key to determining whether an action is properly attributable to the agency itself and represents the culmination of that agency's consideration of an issue."). Thus, the first *Bennett* prong is satisfied.

CPSC instead focuses its final agency action argument on the second prong of the *Bennett* test, arguing as a threshold matter that "CPSC's safe sleep statement does not determine any 'legal rights' or have any 'direct and appreciable legal consequences.'" CPSC Mem. at 14 (citing *Bennett*, 520 U.S. at 178). More specifically, CPSC asserts that its Weighted Product Warning did not itself trigger Dreamland's right to seek review of the statement's accuracy, cautioning that "under Dreamland's theory, every notice of proposed rulemaking would have legal consequences because

it triggers the right of 'interested persons' to 'submi[t] … written data, views, or arguments'" that the agency must consider." *Id*. at 14 (citing 5 U.S.C. § 553(c)). This argument is unavailing. Proposed rules are, by their very nature, tentative—they neither represent an agency's final decision on a matter nor impose any legal obligations or rights. They are thus clearly not final agency action under either prong of the *Bennett* test. *See In re Murray Energy Corp.*, 788 F.3d 330, 334-35 (D.C. Cir. 2015). In contrast, the Weighted Product Warning represents CPSC's final position, as explained above. Its disclosure signals that CPSC adhered to its Clearance Process and decided that the disclosure did not violate the CPSA, thus *binding the agency itself* and triggering Dreamland's right to seek a retraction and challenge the statement. *See* 15 U.S.C. § 2055(b)(7); 16 C.F.R. §§ 1101.51–1101.52; *see also Gen. Elec. Co. v. EPA*, 290 F.3d 377, 383 (D.C. Cir. 2002) ("[I]f the language of [a] document is such that private parties can rely on it as a norm or safe harbor by which to shape their actions, it can be binding as a practical matter.") (citation omitted).

CPSC also asserts that the harm to Dreamland's business and reputation was "attributable to independent responses and choices of third parties' and cannot be imputed to" the Commission itself. *See* CPSC Mem. at 16 (quoting *Invention Submission Corp. v. Rogan*, 357 F.3d 452, 460 (4th Cir. 2004)). But in *N. Am.'s Bldg. Trades Unions*, this Court gave considerable weight to the "direct and adverse impact" that certain memoranda issued by the Department of Defense had on the plaintiffs' ability to negotiate with third parties. 783 F. Supp. 3d at 309. Those memoranda exempted certain large-scale construction projects from Project Labor Agreement ("PLA") requirements set forth in Executive Order 14,063, which in turn deprived plaintiff-unions of the "bargaining chip" that the E.O. provided them by removing their ability to negotiate and administer the PLAs. *Id.* at 297-98. In other words, "[c]ontractors ceased PLA negotiations, and unions like [plaintiffs] lost opportunities to engage with bidders under the framework contemplated by the

EO." *Id.* at 309. Thus, the legal consequences and harm to plaintiffs that flowed from the memoranda were entirely dependent on the actions of third parties—the contractors—and not the DOD itself. Regardless, this Court still recognized that the memoranda "reshape[d] the legal landscape for affected stakeholders" and thus constituted final agency action. *Id.*

So too here, the fact that third-party companies and retailers were the ones who stopped selling Dreamland's products is irrelevant because it was the CPSC's Weighted Product Warning itself that signaled to the public that Dreamland's products are allegedly dangerous and thus "reshap[ed] the legal landscape." *Id.; see Am. Acad. of Pediatrics v. Kennedy*, No. 25-11916-BEM, 2026 WL 733828, at *6-7 (D. Mass. Mar. 16, 2026) (finding legal consequences flowed from CDC's immunization schedules as to potential legal entitlements and liabilities of third parties); *see also* Pl. Mem. at 17–18 (describing consequences of CPSC's warning). CPSC's disclosure is therefore a final agency action under both prongs of the *Bennett* test and is reviewable.

### C. CPSC's Initial Clearance Is Reviewable as a "Preliminary Action" Under the APA

Finally, if this Court finds that the Weighted Product Warning's initial clearance and publication is not final agency action, then it must constitute a "preliminary, procedural, or intermediate agency action" reviewable under 5 U.S.C. § 704. The APA has a "basic presumption of judicial review" of agency action. *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020) (citing *Abbott Labs. v. Gardner*, 387 U.S. 136, 140 (1967)). CPSC cannot avoid this presumption and shield its public disclosure from judicial review by arguing that it is neither final agency action nor "preliminary action" under § 704. *See* CPSC Mem. at 17–19, 26. This is not Schrödinger's agency action.

CPSC's decision not to retract its statement cannot be a separate agency action, evaluated entirely on its own record. Review of CPSC's denial decision necessarily encompasses review of the underlying determination that weighted infant sleep products are unsafe because it is precisely

8

this determination that informed CPSC's denial decision. *See* AR513 (Weighted Product Warning did not violate § 2055(b)(7) because "Commission staff cleared it for public disclosure pursuant to its internal agency clearance process."). Moreover, CPSC itself has suggested that it considers the Weighted Product Warning and the denial of the Retraction Request to be part of the same agency action: "[I]t is undisputed that CPSC has now reviewed the statement for accuracy and determined it does not need to be retracted." *See* Doc. 16, at 16. That review could not be completed without reviewing the initial clearance decision. *See* AR513. CPSC cannot now argue that its statement is not "preliminary" and therefore unreviewable under § 704. This Court's prior determination, Op. at 13–14, should guide its analysis at the Summary Judgment stage. *See LaShawn v. Barry*, 87 F.3d 1389, 1393 (D.C. Cir. 1996) ("[T]he *same* issue presented a second time in the *same case* in the *same court* should lead to the *same result*.").

II.   **CPSC's Clearance of the Weighted Product Warning and Its Denial of Dreamland's Retraction Request Were Arbitrary and Capricious**

   A. **CPSC's Decision Was Neither Reasonable nor Reasonably Explained**

The APA requires agencies to adequately explain their decisions and connect the facts relied on in a rational way. *See Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1407 (D.C. Cir. 1995). CPSC failed to do so here. Instead, it merely parrots procedural requirements and relies on its own conclusory statements to justify its actions. *Id.* at 1405; *Stewart v. Stackley*, 251 F. Supp. 3d 138, 156–57 (D.D.C. 2017); *see also Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 241 (D.C. Cir. 2008). Worse, CPSC provides a litany of *post hoc* rationalizations to this Court that it never articulated when making its decisions. *See Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962); *see also Gulf Restoration Network v. Haaland*, 47 F.4th 795, 804 (D.C. Cir. 2022) ("We cannot affirm based on a *post hoc* litigation rationalization pressed by agency counsel." (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87–88 (1943))). This Court should not permit CPSC

9

to "'fill in critical gaps in [its] reasoning' at this stage." *Powder River Basin Res. Council v. U.S. Dep't of the Interior*, No. 22-CV-2696 (TSC), 2026 WL 555013, at *6 (D.D.C. Feb. 27, 2026) (quoting *Point Park Univ. v. NLRB*, 457 F.3d 42, 50 (D.C. Cir. 2006)). CPSC's decisions to clear, publish, and retain its Weighted Product Warning were neither reasonable nor reasonably explained. As such the decisions were arbitrary and capricious.

### 1. CPSC's Conclusory Explanations Are Arbitrary and Capricious

CPSC continues to rely on its conclusory statements in the Denial Letter to justify its decisions. *See* CPSC Mem. 22–27. But conclusory statements are not "substitute[s] for a reasoned explanation" because they "provide[] neither assurance that the Commission considered the relevant factors nor a discernable path to which the court may defer." *Am. Radio Relay League*, 524 F.3d at 241. Thus, "stat[ing] conclusions … [without] connect[ing] them in any rational way" to the facts is "arbitrary and capricious." *Dickson*, 68 F.3d at 1407. Similarly, to avoid violating the APA, agencies cannot "adopt[] an *ipse dixit* approach" to decisionmaking, they must provide "reasoned analysis on the record." *D&F Afonso Realty Tr. v. Garvey*, 216 F.3d 1191, 1196–97 (D.C. Cir. 2000).

As Dreamland has argued, the Denial Letter's entire stated rationale boils down to two conclusory statements: 1) that CPSC can reference accurate, not misleading, and "complementary" information on other government websites, like the CDC's and NIH's statements; and, 2) that because its staff followed CPSC's internal clearance procedures in clearing the Weighted Product Warning, the warning is accurate and not misleading. AR513; Pl. Mem. at 23. The Agency Clearance Form is also conclusory. *See* AR290; Pl. Mem. 21.

Instead of responding to Dreamland's arguments, CPSC merely repeats the same conclusory statements it made in its Denial Letter and repeats the language of its various policies. *See* CPSC Mem. at 22–27. Conclusory statements and "boilerplate recitation" of legal

10

requirements or policies are not substitutes for a reasoned explanation of the agency's actions. *Getty v. Fed. Sav. & Loan Ins. Corp.*, 805 F.2d 1050, 1055, 1057 (D.C. Cir. 1986); *see also Dickson*, 68 F.3d at 1405 ("When an agency merely parrots the language of a statute without providing an account of how it reached its results, it has not adequately explained the basis for its decision."). Critically, CPSC did not respond to Dreamland's arguments that the Commission's justifications are conclusory and therefore insufficient under the APA. *See* Pl. Mem. at 21, 24, 26–30, 32 (arguing that the Commission's various statements were conclusory). Having failed to counter Dreamland's argument, "it is proper to treat that argument as conceded." *Wilkins*, 750 F. Supp. 2d at 162.

CPSC's arguments amount to little more than "we complied with our procedures that ensure that information is accurate and not misleading, so the statement is accurate and not misleading." *See, e.g.*, CPSC. Mem. at 22. Such logic is deficient under the APA. *See D&F Afonso Realty Tr.*, 216 F.3d at 1196–97; *Am. Radio Relay League, Inc.*, 524 F.3d at 241. For example, CPSC argues that "CPSC staff had thus performed 'a careful review'" because they said that they had completed the agency's clearance process. CPSC Mem. at 22 (quoting AR520 (CPSC's Clearance Procedures)); *see also id.* at 22–23 (relying on adherence with clearance process and Linking Out Policy). But repeating a regulatory requirement or an internal procedure does not "provid[e] an account of how [CPSC] reached its results" and is not an adequate explanation under the APA. *Dickson*, 68 F.3d at 1405. Outside of CPSC's conclusory statements in the Denial Letter, CPSC provides no explanation of how or on what basis CPSC staff determined that the Weighted Product Warning was accurate and not misleading. *See* Pl. Mem. at 22–24. The Denial Letter's conclusory statements alone do not provide a reasoned explanation. Moreover, this Court can only consider the CPSC's explanations provided at the time they were made; the Commission cannot

11

backfill previously unarticulated reasons now. *Grace v. Barr*, 965 F.3d 883, 903 (D.C. Cir. 2020); *Chenery Corp.*, 318 U.S. at 87; *see also infra* Section II.A.2.

Again, CPSC provides no response to the argument that its explanations are conclusory, so it should be deemed conceded. *See Wilkins*, 750 F. Supp. 2d at 162. Regardless of its concession, CPSC's arguments are insufficient under the APA. *See Getty*, 805 F.2d at 1055, 1057; *Dickson*, 68 F.3d at 1405; *see also D&F Afonso Realty Tr.*, 216 F.3d at 1196–97. Merely stating that it considered the Linking Out Policy or that it followed its Clearance Procedures, *see* CPSC Mem. at 22–24,[1] does not establish that the Commission acted reasonably or provided adequate explanations for its decisions. *See Getty*, 805 F.2d at 1055, 1057; *Dickson*, 68 F.3d at 1405.

CPSC's failure to recognize that its explanations were insufficient conclusory statements undermines its other arguments. For example, CPSC tries to draw several distinctions between this case and *Reliance Electric Co. v. CPSC*, 924 F.2d 274 (D.C. Cir. 1991), but each is mistaken. *See* CPSC Mem. at 24–26. Dreamland's position is that CPSC has never adequately explained the basis for clearing, publishing, and retaining the Weighted Product Warning. *See* Pl. Mem. at 21–32; *supra* p. 11. And, further, CPSC's conclusory statements that it complied with its procedures to determine that the warning was accurate and not misleading are insufficient under the APA. *See* Pl. Mem. at 24–29; *supra* pp. 10–12. CPSC argues that *Reliance Electric* is inapplicable here because the court determined that the Commission failed to address a company's "accuracy objections," whereas CPSC did address the accuracy of the Weighted Product Warning. *See* CPSC Mem. at 24–25 (citation omitted).

---

[1] CPSC relies on a June 2023 letter from the American Academy of Pediatrics ("AAP"), *see* CPSC Mem. at 22–23, but this is a *post hoc* rationalization that should be ignored. *See infra* pp. 16–17. (discussing same letter).

There is little daylight between this case and the *Reliance Electric* case. Both statutes at issue require the Commission to verify that its public statements are accurate, which the CPSA does not define and thus bears its ordinary meaning. *See* 15 U.S.C. § 2055(b)(1), (2), (6), (7); *see also* Pl. Mem. at 21–22; *but see* CPSC Mem. at 24–25 (arguing that *Reliance Electric* is inapplicable because it involves a different subsection). As here, the "Commission's counsel claimed … the Commission must have reviewed [certain] documents for accuracy" because CPSC took other actions suggesting that the review was completed. *See Reliance Electric*, 924 F.2d at 278; *see* CPSC Mem. at 20–21, 24–26. Also as here, "the Commission's letter did not explain *why* [the company's] accuracy objections … were not well-taken." *Reliance Electric*, 924 F.2d at 278 (emphasis added); *see, e.g.*, Pl. Mem. at 18–19. But CPSC's conclusory statements that it followed its own procedures to ensure accuracy are not the same thing as explaining why the Weighted Product Warning is accurate and not misleading. *See Dickson*, 68 F.3d at 1405. Indeed, just as Dreamland has argued in this case, the *Reliance Electric* court was concerned that "[a]t no point did the Commission explain why it considered [certain information] 'accurate'" under the CPSA. 924 F.2d at 279; *see, e.g.*, Pl. Mem. at 18–19.

At best, CPSC now asserts, through various record cites that its determinations were sufficient. *See* CPSC Mem. at 22–23, 25–28. But those reasons were not provided when CPSC made its decisions, and CPSC cannot fill them in belatedly. *See Grace*, 965 F.3d at 903; *Chenery Corp.*, 318 U.S. at 87. As discussed in more detail below, these reasons are impermissible *post hoc* rationalizations, as the Commission did not rely on or cite these facts in its Denial Letter, or when it cleared and published the Weighted Product Warning. *See infra* Section II.A.2. Just as the *Reliance Electric* court concluded that "[w]hat steps the Commission took to verify the factual assertions … and the reasons why the Commission was assured of their accuracy, if it was, cannot

13

be determined on this record," so too this Court should rule that CPSC's reasons for finding the Weighted Product Warning is accurate and not misleading cannot be determined from the Administrative Record. 924 F.2d at 279.

*Reliance Electric* stands for the proposition that CPSC "must reveal what it has done" in determining whether its statements are accurate. *Reliance Electric*, 924 F.2d at 280. But CPSC bristles at the fact that it must establish why it did what it did, claiming that Dreamland is merely disagreeing with its decision or that it is "seek[ing] to intrude on 'agency deliberations.'" *See* CPSC Mem. at 26 (citation omitted); *see also id.* at 25, 28–29. Not so. Dreamland's position is that CPSC's conclusory statements are not a "substitute for a reasoned explanation," and it has provided no reasoned explanation for its decisions beyond those conclusory statements. *See Am. Radio Relay League*, 524 F.3d at 241; *see also* Pl. Mem. at 20, 21, 26–27, 29, 30, 32 (citing same). The Administrative Record amplifies CPSC's deficient and conclusory explanations, which provide no way to "reasonably … discern[]" the path CPSC took at the time it took it. *See Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974); *see also* Pl. Mem. at 19–20; 24–29. Those conclusory statements do not show that CPSC followed its Clearance Procedures in a non-arbitrary manner. *Dickson*, 68 F.3d at 1405; *compare* ECF No. 6-1 at 23 (conceding that "whether CPSC followed its internal clearance procedures may be relevant" to Count IV) *with* CPSC Mem. at 26 (arguing that such a consideration was foreclosed by dismissal of Count I).

Dreamland is not seeking CPSC's internal deliberations, *see* CPSC Mem. at 26; it is merely asking this Court to hold CPSC to the same standards that every other agency abides by—that it must articulate and disclose its reasons for its actions. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983) ("It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself."). CPSC has now openly admitted

14

that it provided no reasons for its initial decision. *See* CPSC Mem. at 27 ("CPSC also need not memorialize a formal finding[.]"); *see also id.* at 26 (suggesting it does not have to provide its reasons for its decisions). Because CPSC's Agency Clearance Form, and Denial Letter merely parrot procedural requirements and rely on conclusory statements to justify its actions, CPSC's decisions to clear, publish, and retain the Weighted Product Warning are arbitrary and capricious.

### 2. *CPSC's* Post Hoc *Rationalizations Are Arbitrary and Capricious*

Given its prior reliance on conclusory statements to justify its decisions, it comes as little surprise that CPSC tries to save those inadequate explanations by filling in the gaps in its reasoning now. CPSC Mem. at 22–23 (relying on a June 2023 letter to establish that its reliance on CDC and NIH "was not inconsistent with [CPSC's] procedures); 25–26 (relying on incident data to justify Weighted Product Warning), 26–27 (relying on CPSC staff activities to establish "how" CPSC conducted its clearance process), 27–28 (relying on CPSC staff actions to argue that Weighted Product Warning was consistent with AAP's recommendation). This Court should not accept CPSC's *post hoc* rationalizations, nor should it accept a basis that the agency *itself* did not articulate when its decisions were made. *See Stewart*, 251 F. Supp. 138 at 157. The reasonableness of an agency's action is considered based on "what the agency said at the time of the [action]— not its [] lawyers' post-hoc rationalizations." *Grace*, 965 F.3d at 903 (citation omitted). The Agency Clearance Form says nothing about CPSC's reasons for clearing and publishing the Weighted Product Warning. *See* AR290. CPSC also said nothing beyond its conclusory statements and boilerplate recitations of regulatory and procedural requirements when it denied Dreamland's Retraction Request. *See supra* Section II.A.1. "[N]either the court nor [CPSC] may 'fill in critical gaps in the [agency]'s reasoning' at this stage." *Powder River Basin Res. Council*, 2026 WL 555013, at *6 (quoting *Point Park Univ.*, 457 F.3d at 50); *see also Gulf Restoration Network*, 47 F.4th at 804.

15

CPSC attempts to save its decisions, and the misleading and inaccurate nature of the Weighted Product Warning, by citing a June 2023 letter from AAP's President and now claiming that it relied on those AAP statements. CPSC Mem. at 22–23 (quoting AR106–07). Yet CPSC's website, even as of this filing, does not reflect the fact that it relied on AAP, only that it was relying on NIH and CDC. Nor did CPSC indicate it relied on AAP's June 2023 letter when it rejected Dreamland's Retraction Request. AR512–14. If CPSC was relying on AAP, why not admit that back then? Why instead justify its statement by saying that CPSC's recommendation came from government health agencies, rather than its true source? Why bury the lede? CPSC's reliance on the June 2023 AAP letter is a *post hoc* rationalization and should be ignored. As discussed here, and in its Motion for Summary Judgment, CPSC has not provided any basis for its initial decision to clear the Weighted Product Warning. [2] *See* Pl. Mem. at 20–23; *supra* p. 10.

CPSC did not provide a copy of the study AAP cites in the Administrative Record, even though the same study is cited elsewhere. *See* CPSC Mem. at 22 (quoting AR107); *see also* AR104–05. Not including the cited study in the Administrative Record indicates that CPSC did not rely on that study in making its decisions, yet it still relies on AAP's characterizations of the study's data here. *See Pac. Shores Subdivision, California Water Dist. v. U.S. Army Corps of Eng'rs*, 448 F. Supp. 2d 1, 4–5 (D.D.C. 2006).[3] Without having access to the underlying study, there is no way to evaluate if CPSC, through its reliance on AAP, only relied on information favorable to its position and ignored counter evidence. *Genuine Parts Co. v. EPA*, 890 F.3d 304,

---

[2] Here, CPSC actively seeks to avoid this Court's review of its initial decision altogether. CPSC Mem. at 10–19; 26.

[3] CPSC also attempts to suggest it relied on an NIH webpage that it did not include in the Administrative Record, is not referenced in its decisions, and is not linked to on its website. *See* CPSC Mem. at 6–7, n.2. CPSC requested that webpage be added to the record for completeness the same day that Dreamland filed its Summary Judgment Motion. Dreamland objected absent assurances that the website was considered by CPSC. Those assurances were never provided.

346 (D.C. Cir. 2018) ("[A]n agency cannot ignore evidence that undercuts its judgment[.]"). CPSC should not be permitted to fix its inadequate decision-making processes by relying on *post hoc* rationalizations that it did not consider or, worse, ones that may include undisclosed counter evidence that it ignored. *Cboe Futures Exch., LLC v. SEC*, 77 F.4th 971, 979 (D.C. Cir. 2023) (noting that "unquestioning reliance" is not a "substitute" for "reasoned analysis" (citation omitted)). This Court should ignore CPSC's alleged reliance on AAP's June 2023 letter and its claim that it "relied on evidence-based recommendations" in making its decisions when the study AAP cites is not in the Administrative Record.[4] CPSC Mem. at 22.

In addition, CPSC now relies on wearable infant sleep product incident data to conclude that certain incidents associated with weighted products "do not show it is *safe* to use weighted products." CPSC Mem. at 25–26 (emphasis in original). But CPSC did not say it relied on incident data at the time it cleared and published the Weighted Product Warning nor when it denied Dreamland's Retraction Request. AR290; AR512–14. CPSC's decisions cannot be deemed reasonable now based on its litigation positions, given it did not make those arguments when rendering its decisions.

Moreover, the fact that incidents were "associated with" weighted infant sleep products does not mean that the incidents were "caused by" the product's weighted component nor that the products are unsafe, despite what the Weighted Product Warning indicates. That is why voluntary and mandatory product safety regulations look to hazard patterns when evaluating whether and how to make products safer. *See, e.g.*, AR1, AR103; 86 Fed. Reg. 33,022, 33,028–32 (June 23,

---

[4] CPSC's decision is not "evidence-based" as it has consistently recognized that there is a lack of research about these products. *See* CPSC Mem. at 5, 22; *see also Evidence-based*, CAMBRIDGE DICTIONARY (accessed Mar. 31, 2026), https://dictionary.cambridge.org/us/dictionary/english/evidence-based ("supported by a large amount of scientific research").

2021) (discussing incident data and hazard patterns for infant sleep products).[5] You cannot make a product safer if you do not understand the actual, not merely hypothetical, dangers it poses.

Even if this Court were to consider the incidents, the CPSC's *post hoc* rationale does not support its decision. Most of the incidents involve hazards that are common to all swaddles, not just those with weighted components—including submarining,[6] unsafe sleep environments, and choking hazards. *Compare* AR405, AR408, AR410–11, AR456 (descriptions of Incident Nos. 80, 105, 137, 145, 156, indicating submarining incidents); AR408, AR410–11 (descriptions of Incident Nos. 112, 141, 160 indicating incident occurred in an unsafe sleeping environment); AR408 (describing Incident No. 114 as a choking hazard) *with* AR60 (ASTM discussing "submarining hazard associated with oversized neck openings"), AR399 (Incident No. 1 describing submarining in "NonWeighted" swaddle); AR184 (ASTM discussing unsafe sleep environment concerns with swaddle use), AR407 (Incident No. 99 describing infant death from unsafe sleep environment in "NonWeighted" swaddle); AR278 (noting choking incidents), AR409 (Incident No. 119 describing loose thread that presented choking hazard from "NonWeighted" wearable blanket). Three incidents specifically indicate that there were no injuries. *See* AR408, AR410, AR411 (Incident Nos. 105, 137, and 155). The causes of the other incidents are either unclear or speculative. *See* AR404, AR409, AR411 (Incident Nos. 64 (bruising), 130 (death attributed to Covid-19 complications or SIDS), and 148 (cause of death unclear but speculative)). None of the incidents related to weighted sleep products attribute the injury or death to the weighted component of the product.

---

[5] Two of CPSC's other "don'ts" stem from this rule and are in response to the identified hazard patterns supporting the rule. *See* AR532 (warning parents to not let infants sleep in inclined products).
[6] "Submarining" occurs "when an infant's head slips inside the neck hole of a wearable blanket." AR65; *see also* AR41.

CPSC never explains why it relies on incidents that are not unique to weighted infant sleep products to justify its Weighted Product Warning. To the extent that CPSC justifies its warning under CPSC's ability to "assist consumers in evaluating the comparative safety of consumer products[,]" 15 U.S.C. § 2051(b)(2), the question is: comparable safety of weighted infant products compared to what? Most of the incident data CPSC now relies on shows that weighted products involve the same hazards as nonweighted products. But CPSC does not tell the public to not use swaddles, it only tells the public not to use weighted swaddles. If there was a reasonable explanation for this decision, CPSC did not supply it.

Moreover, since 2011, over 3.5 million[7] weighted infant sleep products have been sold and CPSC has only identified 13 incidents.[8] If these products were as unsafe as CPSC and AAP claim, given the vast quantity of weighted infant sleep products sold, one would expect much higher incident rates. Instead, the experiential data suggest CPSC has besmirched a reasonably safe and useful product. *See* AR427; *see also In the Matter of Leachco*, CPSC Docket No. 22-1, Slip op. at 59 (July 3, 2024). In any event, CPSC's decisions below do not cite to or rely on *any* incident data to justify the Weighted Product Warning and thus should not be considered after the fact. *See Powder River Basin Res. Council*, 2026 WL 555013, at *6.

CPSC claims its warning was reasonable because it "confirm[ed] that the agency in fact followed its procedures." CPSC Mem. at 26. CPSC then cites various parts of the Administrative Record to show that its staff were engaging in certain activities. CPSC Mem. at 26–27. But the fact that agency staff engaged in certain activities does not explain how CPSC adhered to its procedural requirements, nor that it did so reasonably. Again, the only explanations of its decisions

---

[7] This number only accounts for sales of the top two market participants. AR427.
[8] The entire dataset includes 167 incidents in total. AR399–412.

provided are conclusory, *i.e.* "we followed our process," which cannot substitute for reasoned explanations. *See supra* Section II.A.1. CPSC's after-the-fact claims about its staff's participation in the ASTM F15.19 Subcommittee have no bearing on whether it acted counter to the evidence before it when it cleared, published, and retained the Weighted Product Warning. There is no contemporaneous evidence from the time CPSC's decisions were made explaining what it did to comply with Directive 1450.2, only its conclusory statement that it complied. *See* AR513; *see also supra* pp. 10–12. CPSC should not now be permitted to fill in the gaps of its process with record citations that lack indicia of CPSC's reliance and do not provide CPSC's reasoning.

Even if this Court were to consider CPSC staff's participation in the ASTM F15.19 process, the CPSC's *post hoc* rationales do not make any sense. CPSC argues that Dreamland is trying to "gin up" discrepancies between what CPSC staff was saying to the ASTM F15 Committee and its staff-clearance of the Weighted Product Warning. *See* CPSC Mem. at 27–28; *id.* at n.8. Not so. First, Dreamland did not waive this argument, *see* CPSC Mem. at 27, because it was unavailable to it when it submitted its Retraction Request. The fact that CPSC cleared a definitive statement about the safety of weighted infant sleep products *the same day* that agency staff participating in the ASTM F15.19 Subcommittee were saying more research was still necessary only became known to Dreamland when CPSC disclosed the Agency Clearance Form earlier this year. *See* Pl. Mem. at 27, 28; AR290.

CPSC tries to resolve the clear conflict between what its staff were saying in the ASTM F15.19 Subcommittee meetings and its staff clearing the Weighted Product Warning by suggesting that the staff participating in ASTM were only expressing their views, not those of the Commission. *See* CPSC Mem. 27–28. But if so, then that undermines CPSC's reliance on its staff's statements and actions in the ASTM F15.19 Subcommittee. *See id.* Indeed, had CPSC bothered to

20

explain why it did what it did, when it did it, then neither Dreamland nor CPSC nor this Court would need to comb the Administrative Record to divine what happened. *See* Pl. Mem. at 20; *see also* CPSC Mem. at 28 n.8 (speculating without any evidence about CPSC staff's actions). But CPSC chose not to explain its actions and instead claims that it "need not memorialize [its] formal finding[.]" CPSC Mem. at 27. It has done so at its own peril, as the APA commands agencies to adequately explain their decisions and connect the facts relied on in a rational way at the time the decisions are made. *See Dickson*, 68 F.3d at 1407; *see also Grace*, 965 F.3d at 903.

### 3.   *The Weighted Product Warning Is Inaccurate and Misleading*

CPSC's own argument shows that the Weighted Product Warning is misleading. *See* CPSC Mem. at 28. The warning unequivocally states that *all* weighted infant sleep products are unsafe, but its staff recognized that "evidence-based safety standards" that provide "weight concentration limits" could address "risks posed by weighted infant sleep products[.]" *Id.* (quoting AR289); *see also* AR280. This suggests that the issue is not that *all* weighted infant sleep products are problematic but that only those that exceed certain weight limits are. But the Weighted Product Warning did not say that, and its lack of any nuance makes it inaccurate and misleading.

CPSC also makes a *post hoc* claim that the Weighted Product Warning is consistent with AAP's recommendations because its staff indicated that more research was needed and AAP admitted that "no studies have documented the safety of weights for infants in an unobserved, nonclinical sleep environment." CPSC Mem. at 27–28. But a lack of evidence or hypothetical safety concerns cannot support the definitive nature of the Weighted Product Warning—that weighted infant sleep products are *un*safe—without making the claim inaccurate and misleading. *See, e.g.*, AR107; AR575; *see also* AR542–49. A statement that CPSC does not recommend the use of certain products because it cannot verify *if* they are safe absent additional research sends a

21

different message than an unequivocal warning not to use a product deemed unsafe, as CPSC issued here.

## B. CPSC's Remaining Arguments Lack Merit

CPSC makes a series of specious or cursory arguments, each of which lacks merit. *First*, CPSC argues that its Weighted Product Warning was not misleading because it clearly establishes that CDC and NIH relied on AAP's recommendations. *See* CPSC Mem. at 20–21; *see also* AR514.[9] But this argument—that the public will not only click on the links provided but also comb through NIH's website to discover that its recommendations "reflect[]" the AAP's recommendations—is without any basis. CPSC Mem. at 20. Starting with the NIH website CPSC links to, the public must navigate a series of tabs and dropdown menus, among numerous options, to navigate to the information CPSC relies on. *See*, *e.g.,* https://safetosleep.nichd.nih.gov/reduce-risk/safe-sleep-environment (follow "About the Campaign;" then follow "Campaign History;" then follow "2009 – 2000"). CPSC offers no justification for why it thinks that parents, caregivers, and the public would go through these hoops, rather than simply believe that a statement about the safety of a consumer product made by the agency charged with making such decisions reflects its own views. There is little reason to doubt that when the agency Congress charged with protecting consumers from unreasonable risks of harm says a product is "unsafe" that it has done so based on its own authority and evidence—not the parroting of a third-party nongovernmental entity's recommendation. *See, e.g.*, 15 U.S.C. § 2051(b) (describing CPSA's purposes).

*Second*, CPSC's claim that its "slight modification" to the Weighted Sleep Warning somehow moots Dreamland's claims makes no sense. *See* CPSC Mem. at 21. The modified statement is functionally the same as the initial statement. *See* AR422–23. All its modification did

---

[9] CPSC cites to AR509, though the documents are identical in terms of content, AR514 is the final signed version.

was say the same thing CPSC already had but with more words. *Compare* AR513 *with* AR532. Thus, it suffers the same insufficiencies as the initial Weighted Product Warning. CPSC's "slight modification" does not clarify that the warning was merely a repetition of AAP's recommendation, as laundered through NIH and CDC, or that the AAP's recommendation was based on a lack of evidence. *See* AR422–23. Nor does it fix that there is nothing in the record, beyond CPSC's own conclusory statements, suggesting that the NIH, CDC, or CPSC verified the accuracy of AAP's recommendations before repeating them. *See, e.g.*, Pl. Mem. at 20–21. Indeed, CPSC's Weighted Product Warning was and remains misleading because it did not base it on CPSC's own findings, data, and analysis, but rather hinges on NIH's and CDC's undisclosed repetition of AAP's recommendations. *See* CPSC Mem. at 20–21; AR514; *see also supra* Section II.A.2. (discussing *post hoc* rationalizations). This failing is entirely CPSC's as, even now, it has provided no contemporaneous explanation for why it did what it did.

*Third*, CPSC attempts to graft an obligation onto § 2055(b)(7) that is not there—that Dreamland was required to show a misled consumer. Neither the CPSA, nor its implementing regulations require that showing, as they only require showing that the Commission "made" a "public disclosure of inaccurate or misleading information[.]" 15 U.S.C. § 2055(b)(7); *see also* 16 C.F.R. § 1101.52(c); AR421–23. The Court should reject CPSC's atextual argument. *See Garcia Ramirez v. U.S. Immigr. & Customs Enf't*, No. 18-508 (RC), 2025 WL 3563183, at \*10 (D.D.C. Dec. 12, 2025). CPSC's argument is incorrect, as the public was misled about the source and basis of CPSC's Weighted Product Warning. *See, e.g.*, Lauren Kirchner, *Weighted blankets are dangerous for babies, doctors warn*, WASH. POST (Jan. 22, 2024 at 2:00 p.m. EST) (describing CPSC's Weighted Product Warning) (cited in AR424).[10]

---

[10] https://www.washingtonpost.com/wellness/2024/01/22/weighted-baby-blankets-unsafe/.

Similarly, CPSC faults Dreamland for not providing "additional data or information" but Dreamland did provide such information, the CPSC just ignored it. *See* AR321–22 (noting that Dreamland swaddles were donated "to over 250 neonatal intensive care units ("NICUs")" and that the company received positive feedback from professionals); AR322 (board-certified pediatrician stating that "[t]here is no clear clinical evidence against the use of weighted sleepwear products"); AR427 (noting that over 3.5 million weighted infant sleep products were sold and that "experiential data" provides "crucial evidence" about the risk of injury). Moreover, Dreamland also provided CPSC staff with specific safety information about weighted products, but that information was not included in the Administrative Record, suggesting that it was either ignored or not considered by the Commission. *See* Tara Williams Decl. ¶¶ 4–11, 14, and accompanying attachments; *see also* Attachment A (comparing mass of weighted products on the market to weight of a slice of American cheese). This Court may consider this extra-record evidence, as it is adverse to the CPSC's decision, and its arguments here, and it provides critical background information about what evidence CPSC had access to but ignored. *See City of Dania Beach v. FAA*, 628 F.3d 581, 590 (D.C. Cir. 2010).

*Fourth*, CPSC's invocation of the "presumption of regularity" as a shield for review and a justification for the reasonableness of its decisionmaking is wrong. CPSC Mem. at 26–27. That presumption "only permits a court to conclude that the statements in a government record were actually made; it says nothing about whether those statements are true." *Latif v. Obama*, 677 F.3d 1175, 1185 (D.C. Cir. 2011). CPSC offers its statements that it complied with Directive 1450.2 as conclusive proof that the Weighted Product Warning is accurate and not misleading, and that its decisions were reasonable. This Court should not allow CPSC's statements to cut off its review.

*Fifth*, having failed to provide anything more than conclusory statements and *post hoc* rationalizations to justify its decisions to clear, publish, and retain the Weighted Product Warning, CPSC now claims its decisions are entitled to "deference." CPSC Mem. at 29. CPSC's "perfunctory and undeveloped argument[]" is waived. *Sherrod v. McHugh*, 334 F. Supp. 3d 219, 265 (D.D.C. 2018) (internal quotation and citation omitted). Regardless, CPSC's reliance on its alleged "scientific judgment[s]" does not warrant deference. The only publicly disclosed evaluation of the data are those provided by its counsel, which are inadequate under the APA.

*Finally*, vacatur is the appropriate remedy for CPSC's unsupported decisions. *See Drs. for Am. v. Off. of Pers. Mgmt.*, 793 F. Supp. 3d 112, 148 (D.D.C. 2025). CPSC bears the burden of "convinc[ing] the Court" that vacatur is not warranted. *Nat'l Parks Conservation Ass'n v. Semonite*, 422 F. Supp. 3d 92, 102 (D.D.C. 2019). But CPSC has already waived its argument as it only suggested in a footnote that remand was warranted. *See* CPSC Mem. at 24 n.5; *see also Gold Rsrv. Inc. v. Bolivarian Republic of Venezuela*, 146 F. Supp. 3d 112, 126 (D.D.C. 2015). Vacatur is appropriate here as the CPSC's decisions are completely deficient of any reasonable explanation for its actions and vacatur will not have disruptive consequences. *Semonite*, 422 F. Supp. 3d at 99. Indeed, vacatur may allow these products to be studied as CPSC has requested. *See* Tara Williams Decl. ¶¶ 12–13 and accompany attachment (Dreamland sleep study terminated because of CPSC warning). This Court may consider this extra-record evidence as it relates to the relief at issue. *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989).

**CONCLUSION**

For the foregoing reasons, this Court should grant Dreamland's Motion for Summary Judgment and deny CPSC's Cross-Motion for Summary Judgment. This Court should vacate CPSC's decision to clear, publish, and retain the Weighted Product Warning and order it removed from CPSC's website.

Dated: April 2, 2026

Respectfully submitted,

*/s/ Kara M. Rollins*
Kara M. Rollins (DC Bar #1046799)
Andreia Trifoi (DC Bar # 90017660)
NEW CIVIL LIBERTIES ALLIANCE
4250 N. Fairfax Drive
Suite 300
Arlington, VA 22203
Tel: (202) 869-5210
Fax: (202) 869-5238
kara.rollins@ncla.legal
andreia.trifoi@ncla.legal

*Counsel for Dreamland Baby Co.*

26