**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| DREAMLAND BABY CO., | : | |
| Plaintiff, | : | Civil Action No.: 24-3277 (RC) |
| v. | : | Re Document Nos.: 23, 25 |
| CONSUMER PRODUCT SAFETY COMMISSION, *et al.*, | : | |
| Defendants. | : | |

# MEMORANDUM OPINION

**DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; DENYING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

Dreamland Baby Co. ("Dreamland") makes and sells weighted sleep blankets, bags, and swaddles for infants and children. In November of 2024, the company filed suit against the Consumer Product Safety Commission ("CPSC" or "Commission"); former CPSC Commissioner Richard Trumka, Jr., in his official capacity; the Department of Health and Human Services ("HHS"); and two HHS sub agencies, the Centers for Disease Control and Prevention and the National Institutes of Health (collectively, "Defendants"). Dreamland seeks declaratory and injunctive relief to stop Defendants from unfairly maligning weighted infant sleep products, including those produced and sold by Dreamland. Compl. ¶¶ 1–11, ECF No. 1. On September 26, 2025, this Court granted Defendants' motion to dismiss Dreamland's complaint as to all counts except Count Four, which asserts an arbitrary and capricious claim under the Administrative Procedure Act against the CPSC. *See Dreamland Baby Co. v. CPSC*, No. 24-cv-3277, 2025 WL 2758476, at *6 (D.D.C. Sept. 26, 2025). Now before the Court are Dreamland's motion for summary judgment and CPSC's cross-motion for summary judgment as

to Count Four. Upon review of the administrative record, for the reasons set forth below, the Court denies the parties' cross-motions for summary judgment and remands the case to the agency for further investigation or explanation.

## II. BACKGROUND

### A. Statutory and Regulatory Background

In 1972, Congress enacted the Consumer Product Safety Act ("CPSA"), 15 U.S.C. § 2051 *et seq.*, in order "to protect the public against unreasonable risks of injury associated with consumer products." 15 U.S.C. § 2051(b)(1). Through the CPSA, Congress established the Consumer Product Safety Commission, conferring "broad powers" on the agency to "conduct research and investigations of consumer products," "collect, analyze, and disseminate product safety information," and "establish comprehensive and effective regulation over the safety of unreasonably hazardous consumer products." *Honeywell, Inc. v. CPSC*, 582 F. Supp. 1072, 1074 (D.D.C. 1984) (citation omitted); *see also* 15 U.S.C. §§ 2051(b), 2053.

The CPSA requires the Commission to follow certain procedures, codified at 15 U.S.C. § 2055, whenever it makes public disclosures relating to consumer product safety. Under Section 2055(b)(1), before the CPSC may publicly disclose information about a consumer product that "will permit the public to ascertain readily the identity of [a] manufacturer," it must "take reasonable steps to assure" that the information is "accurate" and the disclosure "fair." *Id.* § 2055(b)(1). The CPSC must also allow the manufacturer "a reasonable opportunity to submit comments to the Commission in regard to such information." *Id.* Additionally, Section 2055(b)(6) requires the CPSC to "establish procedures designed to ensure" that publicly disclosed "information that reflects on the safety of a consumer product or class of consumer

products . . . is accurate and not misleading," regardless of whether the manufacturer's identity is readily ascertainable. *Id.* § 2055(b)(6).

The CPSC has implemented the latter requirement through its internal clearance process, titled "Clearance Procedures for Providing Information to the Public" and otherwise known as Directive 1450.2. *See* U.S. Consumer Prod. Safety Comm'n, Directive Sys. Order No. 1450.2, Clearance Procedures for Providing Information to the Public (Jan. 16, 2003), https://www.cpsc.gov/s3fs-public/pdfs/blk_media_1450.2.pdf [https://perma.cc/62LA-7JSH]; *see also* J.A., Admin. R. ("A.R.") at 519–28 ("Directive 1450.2"), ECF No. 31. Under Directive 1450.2:

> Clearance means a careful review and written approval of the information to be disclosed by each Assistant or Associate Executive Director (AED) (or delegate) whose area of responsibility is involved in the disclosure in order to eliminate inaccurate or misleading statements. No information shall be disclosed until approved as set out in this directive.

Directive 1450.2 § 7(a). Directive 1450.2's "procedures apply to any release of information initiated by the Commission, including information disseminated on the agency's web site." *Id.* § 1(a). The CPSC also maintains a policy on linking to nongovernment and other government websites, known as the "Linking Out Policy" and set forth in Appendix B to Directive 1450.2, which permits the Commission to "crosslink to content on federal and state government websites and Social Media Sites, provided that the content complements safety information issued by the agency and is related to the agency's mission." A.R. at 529–30.

Finally, the CPSA provides a mechanism for the CPSC to retract inaccurate or misleading disclosures. Under Section 2055(b)(7), "[i]f the Commission finds that . . . it has made public disclosure of inaccurate or misleading information which reflects adversely upon the safety of any consumer product or class of consumer products," it "shall, in a manner equivalent to that in which such disclosure was made, take reasonable steps to publish a retraction of such inaccurate

or misleading information." 15 U.S.C. § 2055(b)(7). As CPSC regulations establish, the Commission may retract information on its own initiative or upon the written request of a third party, such as a manufacturer. 16 C.F.R. §§ 1101.52(a)–(b). A written request must include, among other things, "[a] statement of the specific aspects of the information the firm believes are inaccurate or misleading," "[a] statement of the reasons the firm believes the information is inaccurate or misleading," and "[a]ny additional data or information the firm believes is relevant." *Id.* § 1101.52(c). The CPSC must act "expeditiously" on such requests and "promptly notify the requester in writing of its decision on request for retraction," along with "the reasons for the Commission's decision." *Id.* §§ 1101.52(d)–(e).

**B. Factual Background**

Plaintiff Dreamland Baby Co. "develops, designs, produces, and sells infant and toddler products, including weighted sleep sacks and swaddles." A.R. at 324. Its products feature a quilted fabric design that allows a "gentle weight" to be "evenly distributed" throughout the product. *Id.* at 295. Since its founding in 2019, Dreamland has sold over a million products and donated weighted sleep swaddles to over 250 neonatal intensive care units across the United States. *Id.* at 320–22. Dreamland's arbitrary and capricious claim against the CPSC is based on the agency's 2023 publication of a statement on an agency webpage warning the public not to use "weighted blankets or weighted swaddles." *Id.* at 433. As described below, in publishing this statement, the CPSC adopted similar guidance from other federal agencies and private organizations.

1. AAP's 2022 Infant Sleep Recommendations

The CPSC participates in the Safe to Sleep Campaign, a public effort to "educate caregivers, healthcare provides, and service providers . . . about ways to reduce the risk of

Sudden Infant Death Syndrome (SIDS) and other sleep-related causes of Sudden Unexplained Infant Death (SUID)." *Id.* at 9. Fellow Safe to Sleep Campaign collaborators include other federal agencies, such as the National Institutes of Health ("NIH") and the Centers for Disease Control ("CDC"), and private organizations like the American Academy of Pediatrics ("AAP"). *Id.* The Campaign's education efforts are "in accordance with the current safe infant sleep recommendations from the AAP Task Force on SIDS." *Id.* at 10. Campaign collaborators therefore agree to "[w]ork collaboratively to develop and revise messages, materials, and strategies for the campaign, with the goal of providing consistent information about safe infant sleep and, as permitted by law and organizational policy, promote campaign messages, materials, and resources." *Id.* at 12.

In June of 2022, the AAP released a report sharing updated recommendations for reducing infant deaths in the sleep environment ("AAP's 2022 Infant Sleep Recommendations"). *Id.* at 19, 23–24, 30–32. For the first time, the AAP advised that "[w]eighted swaddle clothing or weighted objects within swaddles are not safe and therefore not recommended," *id.* at 24, and recommended that "weighted blankets, weighted sleepers, weighted swaddles, or other weighted objects not be placed on or near the sleeping infant," *id.* at 23. In support of the latter recommendation, the AAP cautioned that "no studies have documented the safety of weights for infants in an unobserved, nonclinical sleep environment." *Id.* at 575.

Sometime after AAP's 2022 Infant Sleep Recommendations were issued, NIH and the CDC updated webpages providing "safe sleep" guidance from the agencies to the public to include warnings against using weighted infant sleep products. *See id.* at 487–96 (NIH); *id.* at 497–503 (CDC). The NIH webpage, for example, stated that "[t]hings in the sleep area can pose dangers for [a] baby, especially if they are . . . weighted (e.g., weighted blankets, weighted

swaddles)." *Id.* at 488–89. Meanwhile, the CDC webpage advised that "[p]roducts labeled as weighted—including weighted sleepers, swaddles, sleep sacks, and blankets—are not safe for infants." *Id.* at 500.

2. ASTM International Subcommittee on Wearable Infant Products

CPSC also participates, alongside various government entities, manufacturers, and private organizations, in efforts to develop voluntary standards for consumer products in connection with non-profit ASTM International. For context, although the CPSA empowers the Commission to promulgate mandatory consumer product safety standards, the agency must instead "rely upon voluntary . . . standards" whenever such voluntary standards would "eliminate or adequately reduce the risk of injury addressed" and "substantial compliance" with these standards is likely. 15 U.S.C. §§ 2056(a)–(b). Since July of 2021, CPSC staff have worked with public and private stakeholders in a new ASTM International subcommittee—Subcommittee F15.19 on Wearable Infant Blankets—to develop a voluntary standard for wearable infant products. A.R. at 1, 393–94.

In October of 2023, the Subcommittee's first draft voluntary standard was balloted. *Id.* at 394. In mid-November, however, the CPSC informed the Subcommittee that it was voting against the standard due to concerns that "weighted wearable infant blankets and swaddles [were] included in the scope of the standard without an accompanying specification of maximum weight limits by age." *Id.* at 278. The Commission encouraged the Subcommittee to "review all scientific research on weighted products" and "conduct and share research, testing, and evaluation on weighted products" in order to "set[ ] a standard as soon as possible to ensure unsafe products are precluded from the market." *Id.* at 279.

As the balloting process continued, the CPSC periodically provided the Subcommittee with incident reports and summaries of incidents involving weighted and non-weighted infant sleep products. *See, e.g.*, *id.* at 5–8, 72–99, 396–412, 550–55. On July 1, 2024, the agency provided the Subcommittee with "the most comprehensive data possible," detailing 167 incidents from 2011 to early 2024. *Id.* at 397. "To facilitate the [S]ubcommittee's work of identifying addressable hazard patterns," CPSC staff categorized each incident based on product type and whether the product was weighted. *Id.* at 398. The CPSC's data showed at least twelve incidents involving weighted products, including five deaths. *Id.* at 396–412 (rows 64, 80, 112, 114, 130, 137, 141, 145, 148, 155, 156, and 160).

3. June 2023 AAP Letter

On June 15, 2023, the President of the AAP wrote to the then Chair of the CPSC, Alexander Hoehn-Saric, along with the Chair of ASTM's F15 Committee on Consumer Products, to express the AAP's "concerns about the possible development of a voluntary safety standard for weighted infant sleep products." *Id.* at 106–07. The AAP observed that its most recent recommendations for safe sleep included a warning against using such products, as "[t]he evidence available at this time does not indicate that weighted swaddle products are safe." *Id.* at 106. Specifically, the AAP explained that there was "no evidence in the peer-reviewed scientific literature evaluating the safety of weighted sleep products on typical, healthy infants" and "nothing published regarding their use in an unmonitored setting." *Id.* at 107. Furthermore, "[e]ven preliminary, non-peer-reviewed data under discussion in ASTM proceedings suggest these products are associated with concerning reductions in oxygen saturation levels in infants." *Id.* Despite "[a] lack of substantial evidence about the possible harms of weighted sleep products," the AAP cautioned that this "should not serve as evidence that [weighted products] do

not cause harm." *Id.* "[G]iven the AAP's clear policy regarding the danger of weighted infant sleep products," the AAP President indicated that the AAP "oppose[d] the development of any voluntary standard for these products." *Id.* at 106.

4. CPSC Adopts NIH and CDC Guidance

On November 8, 2023, the CPSC met to discuss its Fiscal Year 2024 Opening Plan. *Id.* at 256. Among other things, the Commission considered an amendment to the Plan to "initiate rulemaking and issue a proposed rule to address risks associated with weighted infant blankets, sleepers, and swaddles and align the Commission's safe sleep guidance with [CDC] and [NIH] guidance for weighted products." *Id.* at 257. Although the Commission voted not to adopt the amendment—purportedly because CPSC staff had "not conduct[ed] the research necessary to draft a notice of proposed rulemaking in 2024"—then Commission Chair Hoehn-Saric stated that the CPSC was planning to update its safe sleep guidance to incorporate advice from the CDC and NIH. *Id.* at 255 (19:59–20:54).

That same month, CPSC staff initiated the clearance procedures contemplated in Directive 1450.2 to add language to its "Safe Sleep" webpage recommending against the use of weighted blankets and swaddles. *Id.* at 290. On November 27, 2023, a draft update was circulated to CPSC senior staff for review and comment. *Id.* Reviewers from Safety Operations and the Office of Hazard Identification & Reduction, as well as the General Counsel, Executive Director, and Director of Communications, confirmed their approvals of the draft by November 30, 2023. *Id.* An email notification from that date indicates that the "Agency Clearance" form for the "weighted blanket language addition" was "successfully completed and approved." *Id.* (citation modified). Shortly thereafter, CPSC updated its "Safe Sleep" webpage to state: "Don't

use weighted blankets or weighted swaddles*." *Id.* at 433. Further down, an asterisk footnote stated simply "NIH.gov and CDC.gov." *Id.*

5. CPSC Denies Dreamland's Retraction Request

On July 23, 2024, Dreamland invoked 16 C.F.R. § 1101.52(b) to send a formal request to the CPSC for retraction of the agency's statement advising the public not to use weighted blankets or swaddles ("CPSC Statement"), which Dreamland claimed was "inaccurate or misleading."[1] *See* A.R. at 416–30. Dreamland argued that the CPSC Statement was misleading because "consumers, particularly parents, expect that when the Commission makes statements about or recommendations regarding the safety of a product or a class of products that the Commission is doing so based on its own findings, analysis, and data." *Id.* at 422. Yet, according to Dreamland, the Statement was "not spoken from a place of either evidence or data" but "instead relie[d] on references to statements" by NIH and the CDC. *Id.* Dreamland thus argued that the CPSC's "statement misleads consumers into believing that its recommendation is backed by the Commission's findings, analysis, and data when it is not." *Id.* Moreover, Dreamland maintained that the Statement was inaccurate because "neither CDC nor NIH based their statements on any data or evidence specific to weighted swaddles or blankets but relied only on a perceived lack of safety data" and because the CPSC did not corroborate the other agencies' statements. *Id.* at 423.

[1] Dreamland also requested that the CPSC retract statements made by former Commissioner Richard Trumka "maligning weighted swaddles and blankets." A.R. at 417. The CPSC reached a deadlocked vote regarding whether to retract Commissioner Trumka's statements, lacking a majority needed to take action. Although Dreamland claims that the CPSC's refusal to retract Commissioner Trumka's statement violated the APA, this Court explained in its prior memorandum opinion that this claim lacks merit because, as Dreamland "appear[ed] to concede," the "deadlocked vote was not final agency action." *Dreamland Baby Co.*, 2025 WL 2758476, at *6.

On August 30, 2024, the CPSC sent Dreamland a letter informing it that the agency had voted to deny the retraction request. *Id.* at 512–14. The Commission noted that it had "determined that the CPSC Statement is not barred by [§ 2055(b)(7)]," which "allows the CPSC to reference complementary information on other federal websites as long as such information is accurate and not misleading." *Id.* at 513. The CPSC also asserted that "[i]n adding the CPSC Statement to the CPSC website, Commission staff cleared it for public disclosure pursuant to its internal agency clearance process, found in Directive 1450.2" *Id.* Furthermore, the CPSC "disagree[d] with Dreamland's assertion . . . that the references to the NIH and CDC guidance are *per se* inaccurate or misleading unless CPSC independently corroborates them." *Id.* Instead, the CPSC maintained, "consideration of and crosslinking to other agencies' guidance is consistent with the CPSC's Linking Out Policy." *Id.* Finally, the CPSC noted that this guidance in question came from the Safe to Sleep campaign, whose "safe sleep guidance has reflected the recommendations of the AAP . . . since 2000, and that "[t]his reliance on AAP is made clear on the NIH website." *Id.* at 514.

Although the Commission voted not to retract the CPSC Statement, it informed Dreamland that it had decided to "provide further context for the [Statement's] crosslinks to content from NIH and CDC" by making a "slight modification" to the asterisk footnote in the Statement. *Id.* at 514. Whereas previously the footnote had directed readers to "NIH.gov and CDC.gov," it thereafter read: "This guidance is based on information from the Centers of Disease Control and the National Institutes of Health. Please go to CDC.gov and NIH.gov for more information." *Id.* at 532.

## III. LEGAL STANDARD

The Administrative Procedure Act ("APA") requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "Although Federal Rule of Civil Procedure 56 provides the ordinary summary judgment standard, it is well established that, in cases involving review of final agency action [under the APA], the standard set forth in Rule 56 does not apply because of the limited role of a court in reviewing the administrative record." *Cognitive Pro. Servs. Inc. v. U.S. Small Bus. Admin.*, 254 F. Supp. 3d 22, 32 (D.D.C. 2017) (citation modified). On a motion for summary judgment in an APA case, "[t]he entire case on review is a question of law, and only a question of law." *Marshall Cty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993). "Under the APA, it is the role of the agency to resolve factual issues to arrive at a decision that is supported by the administrative record, whereas the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Cognitive Pro. Servs. Inc.*, 254 F. Supp. 3d at 32 (citation modified). In other words, summary judgment in APA cases "serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Landmark Hosp. of Salt Lake City v. Azar*, 442 F. Supp. 3d 327, 331 (D.D.C. 2020) (citation omitted).

The parameters of a district court's authority to decide whether an agency acted in violation of the APA are set forth in the APA itself. *Cognitive Pro. Servs. Inc.*, 254 F. Supp. 3d at 32. As described, "[t]hat statute requires reviewing courts to set aside agency action that is, *inter alia*, 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

law.'" *Id.* (quoting 5 U.S.C. § 706(2)(A)). "[W]hen evaluating agency actions under this standard, a court must be satisfied that the agency has 'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choices made.'" *Id.* (quoting *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). "Review by this Court under the APA is generally limited to the administrative record that was before the agency when it reached its decision." *Zemeka v. Holder*, 989 F. Supp. 2d 122, 128 (D.D.C. 2013).

Judicial review under the "arbitrary and capricious" standard is "'highly deferential' to the agency's decision and presumes that the agency action is valid." *Oceana, Inc. v. Ross*, 920 F.3d 855, 863 (D.C. Cir. 2019) (quoting *Ethyl Corp. v. EPA*, 541 F.2d 1, 34 (D.C. Cir. 1976) (en banc)). "A court simply ensures that the agency has acted within a one of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Even "a decision of less than ideal clarity" must be upheld "if the agency's path may be reasonably discerned." *Motor Vehicle Mfrs. Ass'n of U.S.*, 463 U.S. at 43 (citation omitted). Still, a court "may not supply a reasoned basis for the agency's action that the agency itself has not given," *id.*, or "affirm an agency decision on a ground other than that relied upon by the agency," *Manin v. NTSB*, 627 F.3d 1239, 1243 (D.C. Cir. 2011).

## IV. ANALYSIS

The parties now cross-move for summary judgment on Count Four of the complaint. *See* Pl.'s Mot. Summ. J. ("Pl.'s MSJ"), ECF No. 23-1; Defs.' Cross-Mot. Summ. J. ("Def.'s X-MSJ"), ECF No. 25-1. In that count, Dreamland alleges that the CPSC acted arbitrarily and capriciously, in violation of the APA, when it published the CPSC Statement on weighted infant

sleep products on its "Safe Sleep" webpage and when it later denied Dreamland's request for retraction of the Statement. Compl. ¶ 185. Below, the Court first addresses a preliminary issue: whether the CPSC's decision to publish the CPSC Statement is reviewable. In reviewing the CPSC's denial of Dreamland's retraction request as the final agency action, the Court finds that this decision is "[a] preliminary, procedural, or intermediate agency action" that is "subject to review on the review of [a] final agency action." 5 U.S.C. § 704. Next, the Court considers whether the administrative record supports the CPSC's publication of the Statement and denial of Dreamland's retraction request. Finding that it does not, the Court denies the parties' cross-motions and remands the case to the CPSC for further investigation or explanation.

**A. The CPSC Statement is Reviewable**

The APA provides a right to judicial review of "*final* agency action for which there is no other adequate remedy in a court." *Id.* (emphasis added). Consistent with this rule, "[a] preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action." *Id.* "While the requirement of finality is not jurisdictional, without final agency action, there is no doubt that [a plaintiff] would lack a cause of action under the APA." *Soundboard Ass'n v. FTC*, 888 F.3d 1261, 1267 (D.C. Cir. 2018) (citation omitted). Two conditions must be met for an agency action to be "final." *Bennett v. Spear*, 520 U.S. 154, 177 (1997). "First, the action must mark the 'consummation' of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow." *Id.* at 178 (first quoting *Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 113 (1948); and then quoting *Port of Bos. Marine Terminal Ass'n. v. Rederiaktiebolaget Transatl.*, 400 U.S. 62, 71 (1970)).

In this case, although the CPSC does not dispute that its denial of Dreamland's retraction request was a final agency action, it argues that its earlier decision to publish the Statement on weighted infant sleep products is not reviewable either as a final agency action or as a "preliminary, procedural, or intermediate agency action" within the Commission's retraction proceeding. Def.'s X-MSJ at 10–19. The Court previously found, however, that "[e]ven if CPSC's statement is not final agency action, Dreamland is entitled to [review] because CPSC's decision not to retract its disclosure is final agency action subject to this Court's review." *Dreamland Baby Co.*, 2025 WL 2758476, at *6 (citation omitted). The Court declines CPSC's invitation to revisit this prior finding.

A recent decision from the District of Maryland—*Keezio Grp., LLC v. CPSC*, No. 25-cv-1389, 2026 WL 1090957 (D. Md. Apr. 22, 2026)—supports the notion that, even if the CPSC Statement is not a final agency action, it is reviewable as a "preliminary, procedural, or intermediate agency action or ruling" under 5 U.S.C. § 704. In *Keezio*, a manufacturer of infant and toddler sleep products challenged a CPSC press release that "advised consumers to stop using Keez[i]o's [infant mattresses] immediately due to a risk of 'Serious Injury or Death from Entrapment or Suffocation.'" 2026 WL 1090957, at *3. The district court found that the press release was not a final agency action subject to APA review, including because it "did not determine Keezio's, nor any other party's, 'rights or obligations'" or "impose any 'legal consequences' upon Keezio." *Id.* at *5 (quoting *Bennett*, 520 U.S. at 178). As the district court explained, despite Keezio's allegations that the press release caused "significant downstream effects," including financial and reputational harm to the manufacturer, "such market-based consequences" did not transform the press release into a reviewable agency action. *Id.* Still, in declining to deem the press release a final agency action, the district court emphasized that

Keezio had failed to "invoke[ ] the available regulatory mechanism for seeking retraction" of the press release pursuant to 16 C.F.R. § 1101.52(b). *Id.* at *6. "Had [Keezio] done so," the district court reasoned, "the process would have culminated in a formal Commission decision regarding whether the disclosure was inaccurate or misleading." *Id.*

Here, unlike in *Keezio*, Dreamland *did* file a formal request under § 1101.52(b) for CPSC to retract the Statement on the "Safe Sleep" webpage. *See* A.R. at 416–503. In its request, Dreamland provided specific reasons for which it believed that the Statement was inaccurate or misleading. *See id.* That request triggered CPSC's regulatory obligation "to determine whether it had [in fact] disseminated inaccurate or misleading information." *Keezio*, 2026 WL 1090957, at *5; *see also* 16 C.F.R. § 1101.52(d)–(e) (obligating CPSC to act "expeditiously" on retraction requests and "promptly notify the requester in writing of its decision on request for retraction" along with "the reasons for the Commission's decision"). To be sure, CPSC was also obligated to "check for accuracy and fairness" before publishing the Statement. *Keezio*, 2026 WL 1090957, at *6; *see also* 15 U.S.C. § 2055(b)(6) (requiring CPSC to "establish procedures designed to ensure" that publicly disclosed "information that reflects on the safety of a consumer product or class of consumer products" is "accurate and not misleading"); 16 C.F.R. § 1101.1(c) (noting that Directive 1450.2 establishes CPSC's internal clearance procedures, as required under § 2055(b)(6)). But now that CPSC has responded to Dreamland's retraction request, a "formal Commission decision" has been reached "regarding whether the [Statement] was inaccurate or misleading." *Keezio*, 2026 WL 1090957, at *6. Accordingly, even if the CPSC's initial clearance of the Statement "d[id] not mark the consummation of the agency's decisionmaking process," that process has now produced a final decision, and the CPSC

Statement is therefore reviewable as a preliminary agency action upon review of the CPSC's denial of Dreamland's retraction request.[2]

**B. The Administrative Record Does Not Support the CPSC's Actions**

"A 'fundamental' requirement of administrative law is that an agency 'set forth its reasons' for decision; an agency's failure to do so constitutes arbitrary and capricious government action." *Tourus Recs., Inc. v. Drug Enf't Admin.*, 259 F.3d 731, 737 (D.C. Cir. 2001) (quoting *Roelofs v. Sec'y of the Air Force*, 628 F.2d 594, 599 (D.C. Cir. 1980)). Dreamland contends that CPSC acted arbitrarily and capriciously when it cleared the CPSC Statement and when it later denied Dreamland's retraction request because the agency did not disclose adequate reasons for either decision. Pl.'s MSJ at 18–21. Dreamland also argues that the administrative record fails to establish that CPSC adequately followed its clearance procedures, set forth in Directive 1450.2, in approving the CPSC Statement. *Id.* at 24–29. The Court agrees only as to Dreamland's first contention. Although there is no shortage of data in the administrative record showing potential safety risks associated with weighted infant sleep products, the overall record does not persuade the Court that the CPSC "articulate[d] a

[2] The parties' supplemental filings do not alter this conclusion. Dreamland relies on *Center for Taxpayer Rights v. Internal Revenue Service*, No. 26-5006, 2026 WL 2635380 (D.C. Cir. Sept. 8, 2026), to support its contention that the CPSC Statement itself is final agency action. *See* Pl.'s Notice Supp. Auth., ECF No. 32. There, the court considered an IRS procedure governing how the agency processed ICE requests for confidential taxpayer information. The court held, in relevant part, that the procedure was final because it was the IRS's operative policy and itself bound agency officials by prescribing how they had to process those requests and limiting their discretion to reject them. *Ctr. For Taxpayer Rts*., 2026 WL 2635380, at *7–10. Here, the CPSC Statement is different: Unlike the procedure in Center for Taxpayer Rights, the Statement does not itself prescribe how CPSC officials must act or purport to constrain their discretion. And any requirements governing retraction arise from the CPSA and CPSC regulations rather than from the Statement itself. *See* Defs.' Resp. Pl.'s Notice Supp. Auth. at 2–3, ECF No. 33.

satisfactory explanation for [each] action including a rational connection between the facts found and the choices made." *Motor Vehicle Mfrs. Ass'n of U.S.*, 463 U.S. at 43.

The Court first reviews the publication of the CPSC Statement. The administrative record reflects that in early November of 2023, CPSC discussed, among other things, an amendment to its Fiscal Year 2024 Opening Plan to initiate rulemaking and issue a proposed rule to address risks associated with weighted infant sleep products. A.R. at 257. Although CPSC rejected the amendment, then Chair Hoeh-Saric commented that CPSC was planning to update the agency's safe sleep guidance to incorporate advice on weighted infant sleep products from NIH and the CDC. *Id.* at 255 (19:59–20:26). Later that month, an "Agency Clearance" form for the "weighted blanket language addition" circulated among CPSC senior staff for review and comment. *Id.* at 290. CPSC staff "successfully completed and approved" the form. *Id.* The CPSC Statement was published shortly thereafter, warning the public not to use "weighted blankets or weighted swaddles." *Id.* at 433.

This record satisfies the Court that, in approving the CPSC Statement, the Commission complied with the clearance procedures set forth in Directive 1450.2. As the CPSC observes, the administrative record includes contemporaneous documentation of the agency's adherence to Directive 1450.2. *See id.* at 290 (noting that the "Agency Clearance" form was "successfully completed and approved"). In any event, the Court had previously dismissed Dreamland's claim that the Statement "was not cleared under CPSC's clearance procedures," as Dreamland "provide[d] no basis for this allegation and, regardless, it is unclear what procedure in Directive 1450.2 Dreamland believes the Commission was required, but failed, to take." *Dreamland Baby Co.*, 2025 WL 2758476, at *7. Dreamland's renewed attempt to reassert this argument fails. In view of the "presumption of regularity [that] attaches to the actions of Government agencies,"

*U.S. Postal Serv. v. Gregory*, 534 U.S. 1, 10 (2001), as well as the absence of evidence here undermining that presumption, the Court finds no basis to conclude that CPSC failed to follow its clearance procedures.

But it is not enough that the CPSC complied with procedural requirements; the agency further had to "offer a satisfactory explanation for its action." *Nat'l Ass'n for Home Care v. Shalala*, 135 F. Supp. 2d 161, 168 (D.D.C. 2001). The CPSC is correct that, in clearing the Statement for publication, neither 15 U.S.C. § 2055(b)(6) nor Directive 1450.2 required it to "memorialize a formal finding" that the Statement was accurate and not misleading. Def.'s X-MSJ at 27; *see also Danara Int'l, Ltd. v. CPSC*, 549 F. Supp. 367, 375 (D.N.J. 1982) ("Section [2055(b)(6)] is . . . solely a direction to the Commission to establish internal clearance procedures." (citation modified)); Directive 1450.2 § 7(a) (defining "clearance" to mean "a careful review and written approval of the information to be disclosed"). But once Dreamland filed a request under 16 C.F.R. § 1101.52(b) for retraction of the Statement, CPSC was required to assess the merits of the request, render a formal decision on the request, and "promptly notify [Dreamland] in writing" of "the reasons for the Commission's decision." 16 C.F.R. § 1101.52(e). The CPSC complied with these requirements, notifying Dreamland of its denial of the retraction request on August 30, 2024. A.R. at 512–14. As set forth below, however, the CPSC's reasoning in the denial falls short under the applicable standard.

In its retraction request, Dreamland argued that the CPSC Statement is inaccurate and misleading because, rather than basing its decision to publish the Statement on the CPSC's "own findings, analysis, and data," the agency "relie[d] on references to [unsubstantiated] statements" by NIH and the CDC. *Id.* at 422. In its prior memorandum opinion, the Court rejected Dreamland's contention that "Congress intended for CPSC to make product safety

determinations independently of the CDC, NIH, or AAP." *Dreamland Baby Co.*, 2025 WL 2758476, at *8. The Court also noted that the AAP's 2022 Infant Sleep Recommendations, on which the CDC and NIH guidance was in turn based, did not appear to be unsubstantiated, given that the CPSC possessed "data involving multiple infant fatalities associated with weighted sleep products." *Id.* Nevertheless, the Court observed that "in the absence of an Administrative Record, it [was] unclear whether the CPSC based its decision to publish and not retract the Statement on this data, or on blind reliance on the CDC and NIH." *Id.* (citation modified). The administrative record is now before the Court. However, neither the CPSC's retraction denial nor other parts of the record give the Court greater insight into the basis for the CPSC's decisions to publish and not retract the Statement.

The administrative record shows that, after review by various senior CPSC staff, an "Agency Clearance" form for the "weighted blanket language addition" to the "Safe Sleep" webpage was "successfully completed and approved" in November of 2023. A.R. at 290. That form is not in the record. Months later, in August of 2024, the CPSC denied Dreamland's request to retract the Statement. In its denial, the CPSC confirmed that "[i]n adding the CPSC Statement to the CPSC website, Commission staff cleared it for public disclosure pursuant to . . . Directive 1450.2," whose procedures are "designed to comply with [the CPSA's] mandate" that disclosed information be "accurate and not misleading." *Id.* at 513. But the administrative record does not reveal *why* the CPSC believed the Statement is "accurate and not misleading"—whether it was simply because the CDC, NIH, and AAP believed that weighted infant sleep products were not safe, or because the CPSC itself also considered the relevant data and concluded that such products were not safe.

To be sure, the administrative record leaves little doubt that the CPSC was aware of potential safety risks associated with weighted infant sleep products when it published the Statement. For example, in June of 2023, the President of the AAP advised then Commission Chair Hoehn-Saric and the President of the ASTM International Subcommittee on Wearable Infant Products that "[e]ven preliminary, non-peer-reviewed data . . . suggest [weighted] products are associated with concerning reductions in oxygen saturation levels in infants." *Id.* at 107. Furthermore, in November of 2023, the CPSC voted against the Subcommittee's draft voluntary standard for wearable infant products due to concerns that this standard failed to specify "maximum weight limits by age," which raised safety concerns for weighted products. *Id.* at 278-79. And in July of 2024—before the CPSC denied Dreamland's retraction request—the CPSC provided the Subcommittee with data showing at least twelve incidents involving weighted infant sleep products, including five deaths. *Id.* at 396–412 (rows 64, 80, 112, 114, 130, 137, 141, 145, 148, 155, 156, and 160).

However, even if the administrative record shows that the CPSC possessed concerning data regarding weighted infant sleep products, it does not reveal whether the CPSC ever made an affirmative finding, based on such data or other data-driven considerations, that weighted infant sleep products are, in fact, not safe. Such a finding is not self-evident to the Court. Dreamland observes, for example, that over 3.5 million weighted infant sleep products have been sold since 2011. Pl.'s Opp'n to Def.'s X-MSJ at 19, ECF No. 27. If CPSC has identified only twelve incidents involving such products,[3] it does not necessarily follow that weighted infant sleep

[3] Of course, the CPSC might well have more data showing further incidents involving weighted infant sleep products. But if that is the case, such data is not in the administrative record. And the record provides no indication that the CPSC based its decision to publish the CPSC Statement on similar data.

products are dangerous. Even the President of the AAP acknowledged that there was "[a] lack of substantial evidence about the possible harms of weighted sleep products." A.R. at 107. Furthermore, although the CPSC voted against the Subcommittee's first draft voluntary standard for wearable infant products, the agency encouraged the Subcommittee to "set[ ] a standard [for weighted products] as soon as possible to ensure unsafe products are excluded from the market." *Id.* at 279. This suggests that the CPSC believed that, with an adequate standard, certain weighted infant sleep products could be safe. Of course, it is possible that the CPSC nevertheless considered that, without such a standard in place, the potential risks associated with weighted infant sleep products justified its categorical admonition to the public against using any "weighted blankets or weighted swaddles." *Id.* at 433. But if that was the CPSC's view, the administrative record does not reflect it. *Cf. Motor Vehicle Mfrs. Ass'n of U.S.*, 463 U.S. at 43 (noting that the reviewing court "may not supply a reasoned basis for the agency's action that the agency itself has not given").

Instead, the reasons the CPSC provided for its decisions to publish and not retract the Statement focused on the agency's adherence to internal clearance procedures and the fact that, under the CPSA, Directive 1450.2, and the Linking Out Policy, the Commission was "allow[ed] . . . to reference complementary information on other federal websites as long as such information is accurate and not misleading." *Id.* at 508–09. However, although the CPSC emphasized that the Statement mirrored NIH and CDC guidance and ultimately "reflected the recommendations of the AAP Task Force on SIDS," *id.* at 509, the agency did not explain why it believed that the Statement was accurate and not misleading.[4] Needless to say, the basis for the

[4] The administrative record does, however, show that the CPSC adequately explained that the source for the Statement was NIH and CDC guidance. Although the CPSC initially attributed the Statement in an asterisk footnote to "NIH.gov and CDC.gov," it modified the

CPSC's belief cannot simply have been that the Statement reflected the guidance of other federal agencies. At minimum, the CPSC had to "review" the NIH and CDC guidance "to eliminate inaccurate or misleading statements." Directive 1450.2 § 7(a).[5] And although the Linking Out Policy allows the CPSC to crosslink to content on federal government websites "provided that the content complements safety information issued by the agency and is related to the agency's mission," A.R. at 530, the Court does not read this policy as eliminating the Commission's incessant obligation under Directive 1450.2 to "assure that information disclosed to the public is accurate." Directive 1450.2 § 1(b). The Court thus believes that, in the present context, the CPSC was required to examine the data available to it in determining whether the Statement is inaccurate or misleading. *Cf.* Def.'s X-MSJ at 22–23 (observing that Directive 1450.2 § 7(a)(1) "allow[s] for statements to be supported by" either "data in the Commission's files" or "data . . . in currently applicable literature" (citation omitted)).

Because the administrative record offers no indication as to whether CPSC did so, the Court remains unable to "assess whether the CPSC examined the relevant data and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Dreamland Baby Co.*, 2025 WL 2758476, at *8 (citation modified). "If the record before the agency does not support the agency action . . . the proper course, except in rare

---

footnote in response to Dreamland's retraction request to read: "This guidance is based on information from the Centers of Disease Control and the National Institutes of Health. Please go to CDC.gov and NIH.gov for more information." A.R. at 532. To the extent Dreamland is arguing that the Statement is misleading because it insufficiently identifies the CDC and NIH guidance as the source for the Statement, the Court rejects that argument.

[5] The CPSC appeared to suggest to Dreamland that the agency was not required to "independently corroborate" the "references to the NIH and CDC guidance." A.R. at 513. To the extent the CPSC is arguing that it can publicly disclose information reflecting on the safety of consumer products without following Directive 1450.2's procedures if such information is referenced on other federal government websites, the Court disagrees.

circumstances, is to remand to the agency for additional investigation or explanation." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985). "In such circumstances, the agency must first be afforded an opportunity to articulate, if possible, a better explanation." *Banner Health v. Price*, 867 F.3d 1323, 1356 (D.C. Cir. 2017) (citation modified). The Court sees no reason to depart from this course here. Therefore, this case is remanded to the CPSC for further investigation or explanation regarding its decisions to publish the CPSC Statement and to deny Dreamland's request to retract the Statement.

## V. CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Summary Judgment (ECF No. 23) is **DENIED** and Defendant's Cross-Motion for Summary Judgment (ECF No. 25) is **DENIED**. This case is remanded to the Consumer Product Safety Commission for further investigation or explanation regarding its decisions to publish the CPSC Statement and to deny Dreamland's request to retract the Statement. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated: September 25, 2026

RUDOLPH CONTRERAS
United States District Judge